No. 16-1526, 16-1527

---

# United States Court of Appeals
# for the Federal Circuit

CRESTA TECHNOLOGY CORPORATION,

Appellant,

v.

SILICON LABORATORIES INC.,

Appellee.

---

Appeal from the Patent Trial and Appeal Board
in *Inter Partes* Review Nos. IPR2014-00728, -00809

---

## BRIEF OF APPELLANT
## CRESTA TECHNOLOGY CORPORATION

Craig R. Smith
*Counsel of Record*
LANDO & ANASTASI, LLP
1 Main Street
Cambridge, MA 02142
Tel:   617-395-7000
Fax:   617-395-7070

***Attorney for Appellant***
***Cresta Technology Corporation***

Date: March 28, 2016

# CERTIFICATE OF INTEREST

Counsel for the Appellant, Cresta Technology Corporation, certifies the following:

1.      The full name of every party represented by me is Cresta Technology Corporation;

2.      The name of the real party in interest represented by me is Cresta Technology Corporation;

3.      There are no parent companies, subsidiaries, or affiliates of the party represented by me that have issued shares to the public; and

4.      The names of all law firms and the partners and associates who appeared for Appellant in the proceedings below are: Michael R. Fleming, Robert W. Hahl and Robert Mihail for Neifeld IP Law, PC and Irell & Manella LLP, Benjamin Haber for Irell & Manella LLP, Mihai Murgulescu and Andrei Popovici. The names of all law firms and the partners and associates who are expected to appear for Appellant in this Court are: Craig R. Smith, William J. Seymour and Eric P. Carnevale for Lando & Anastasi, LLP.

# TABLE OF CONTENTS

Certificate of Interest ................................................................... i

Table of Contents ........................................................................ ii

Table of Authorities .................................................................... vi

Statement of Related Cases......................................................... viii

Jurisdictional Statement ...............................................................1

Statement of Issues.......................................................................2

Statement of the Case...................................................................5

I.      Cresta Technology Corporation......................................5

II.     Technology of the Patents ...............................................5

        A.      The '585 Patent ......................................................7

        B.      The '792 Patent ......................................................9

III.    The Asserted Prior Art....................................................12

        A.      EP 0 696 854 ("Thomson")..................................12

        B.      Clay Olmstead and Mike Petrowski, *A Digital Tuner for Wideband Receivers*, DSP Applications Magazine (Sept. 1992) ("Harris") ..................................................13

        C.      U.S. Patent No. 6,804,497 ("Kerth") ...................14

IV.     The Final Written Decisions...........................................14

        A.      The '585 Decision ...............................................14

        B.      The '792 Decision ...............................................15

Summary of the Argument............................................................17

I.      Claim Construction .........................................................17

A.    The Board Erred in its Construction of "Input RF Signals" .......................................................................17

B.    The Board Erred in its Construction of "Frequency Conversion Circuit" ..........................................17

II.    The '585 Patent ..........................................................................18

A.    The Board Improperly Held that Thomson's Pre-Processed IF Signal Was an Input RF Signal .....................18

B.    The Board Improperly Held that Thomson and Figure 1 of the '585 Patent Disclose "a Plurality of Demodulators" ...............19

C.    The Board Improperly Held that Claim 3 Was Obvious in Light of Thomson, Harris, and Kerth Without Considering the Additional Limitations of Independent Claim 1 ...............................................................19

III.   The '792 Patent ..........................................................................20

A.    The Board Improperly Held that Thomson's Pre-Processed Intermediate Frequency Signal Was an Input RF Signal .......................................................................20

B.    The Board Improperly Held that the Outdoor Unit of Thomson was a Frequency Conversion Circuit ..................20

C.    The Board Improperly Placed the Burden on Cresta to Disprove the Disclosures of Thomson ..............................21

D.    The Board Improperly Combined Thomson and Harris .....................21

E.    The Board Erred by Relying on Arguments Raised For the First Time in Petitioner's Reply ....................................21

Argument ..........................................................................23

I.    Legal Standards and Standard of Review ......................................23

II.   The Board Erred in Construing the Claims of the '585 and '792 Patents .........................................................................23

A.     The Proper Construction of "*Input RF Signal*" and "Tuner for Receiving *Input RF Signals*" in the '585 and '792 Patents Requires an External Signal With No Pre-Processing ........................................................................................23

B.     The Proper Construction of "Frequency Conversion Circuit" in the '792 Patent Requires Receiving a Transmitted RF Signal That Has Not Been Pre-Processed .................29

III.   Claims 1-3, 5, 10 and 16-19 of the '585 Patent are Patenable Over Thomson Alone or in Combination .......................................................33

A.     The Board Erred in Finding Thomson Taught "Receiving Said Input RF Signals Encoding Information In One of a Plurality of Formats" and "Converting Input RF Signals to Intermediate Signals Having an Intermediate Frequency" .......................................................................................33

      1.     Thomson Merely Discloses Receiving an Intermediate Frequency Signal and Converting that Signal into a Second Intermediate Frequency Signal ......................................................................................33

      2.     The Board's Findings Are Not Supported by Substantial Evidence ...............................................................37

B.     The Board Erred in Finding the Prior Art Disclosed a "Plurality of Demodulators . . . Each of Said Demodulators Generating Video and Audio Baseband Signals . . ." ..................................................................................38

      1.     Thomson Does Not Disclose Multiple Demodulators Producing Baseband Signals Encoding Both Audio and Video Information ...........................39

      1.     Figure 1 of the '585 Patent Does Not Disclose Multiple Demodulators Producing Baseband Signals Encoding Both Audio and Video Information ...............................................................................41

C.     The Board Erred in Finding that Claim 3 is Obvious over Thomson and Kerth, or Thomson, Harris and Kerth ..........................42

iv

IV.    The Board Erred in Finding Claims 1-17, 26 and 27 of the '792
       Patent to be Invalid ..........................................................................43

       A.    The Board Erred in Finding Thomson Taught "a
             Frequency Conversion Circuit" Required by Claim 1 of
             the '792 Patent ......................................................................43

             1.    Thomson Merely Discloses Receiving an IF Signal
                   and Converting that Signal into a Second IF Signal.................44

             2.    The Board Improperly Placed the Burden on
                   Cresta to Show that Thomson Does Not Disclose a
                   Frequency Conversion Circuit ...................................................48

       B.    There is No Evidence that Thomson Teaches a Signal
             Processor for Processing in Accordance with One
             Television Signal Format ...................................................51

       C.    The PTAB Improperly Combined Harris with Thomson ...................54

       D.    The Board Erred in Cancelling Claim 3 of the '792
             Patent Based on Arguments Raised for the First Time in
             Petitioner's Reply ...............................................................60

Conclusion ...........................................................................................63

Addendum

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(B)

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*Align Tech. v. ITC*, 771 F.3d 1317(Fed. Cir. 2014) .................................................60

*Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532 (1970) ........................60

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ........................................................................................ 48, 49

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629 (Fed. Cir. 2011) ...............54

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ................................................................60

*Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010) .................24

*Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641 (1990).................60

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ........................................................23

*In re Baxter Int'l, Inc.*, 678 F.3d 1357 (Fed.Cir.2012)............................................23

*In re Cuozzo Speed Techs.*, 778 F.3d 1271 (Fed. Cir. 2015) ...................................23

*In re Gleave*, 530 F.3d 1331 (Fed. Cir. 2009) .........................................................34

*In re Gordon*, 733 F. 2d 900 (Fed. Cir. 1984) .........................................................57

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) .............................................................59

*In re Omeprazole Patent Litig.*, 483 F.3d 1364 (Fed. Cir. 2007) ...........................54

*In re Suitco Surface, Inc.*, 603 F.3d 1255 (Fed. Cir. 2010) ....................................24

*In re Urbanski*, 809 F.3d 1237 (Fed Cir. 2016).......................................................55

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).................................................59

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) ......................57

*Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) ...........................................................................................................32

*Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306 (Fed. Cir. 2003) ...................................................................................................28

*Motorola Mobility, LLC v. ITC*, 737 F.3d 1345 (Fed. Cir. 2013) ...........................48

*Nystrom v. TREX Co.*, 434 F.3d 1136 (Fed. Cir. 2005)..........................................24

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................... 26, 27, 31

*Rapoport v. Dement*, 254 F.3d 1053 (Fed. Cir. 2001) .............................................23

*Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347 (Fed. Cir. 2013)...........................50

*See PPC Broadband, Inc. v. Corning Optical Comms. RF, LLC*, --- F.3d ----, 2016 WL 692369 (Fed. Cir. Feb. 22, 2016).......................................27

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz*, Inc., 135 S. Ct. 831 (2015) ....................................................................................................23

## Regulations

37 C.F.R. 42.23 .......................................................................................................61

Office Patent Trial Practice Guide, Part II. I, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012)..........................................................................................61

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant states:

A.    There have been no other appeals from these *inter partes* reviews before this or any other court.

B.    Appellant believes the following cases may be directly affected by this Court's decision in this appeal:

      a.  *Cresta Technology Corporation v. Silicon Laboratories, Inc.*, No. 1:14-cv-00078 (D. Del. Filed Jan. 21, 2014);

      b.  *Cresta Technology Corporation v. MaxLinear, Inc.*, No. 1:14-cv-00079 (D. Del. Filed Jan. 21, 2014).

## JURISDICTIONAL STATEMENT

This is an appeal from the Final Written Decisions in two *inter partes* reviews: IPR2014-00728 and 2014-00809 (the "'585 IPR" and the "'792 IPR," respectively). The two appeals from these proceedings have been consolidated and the instant brief represents Appellant's consolidated brief for both appeals. The decisions appealed from are final and thus appealable pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 319.

On October 21, 2015 a panel of the Patent Trial and Appeal Board issued Final Written Decisions in the above-referenced *inter partes* reviews. The Final Decisions invalidated claims 1-3, 5, 10 and 16-19 of U.S. Patent No. 7,075,585, (the "'585 Decision"), A1-A33, and claims 1-3 and 4-17 of U.S. Patent No. 7,265,792 (the "'792 Decision"), A34-A74. On December 18, 2015, patent owner Cresta Technology Corporation ("Cresta") timely filed its notices of appeal of the '585 Decision (ECF No. 1 at 2-6) and the '792 Decision (16-1527, ECF No. 1 at 2-6) with the United States Patent and Trademark Office, and simultaneously served copies of its notices on the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit. (*See* ECF No. 1 at 4). Cresta appeals from the '585 Decision and the '792 Decision, and from all orders, decisions, rulings and opinions underlying those decision. (*See id.* at 3-4).

## STATEMENT OF ISSUES

1.     Whether the Board erred in construing the term "input RF signals" in the '585 and '792 Patents and "tuner for receiving input RF signals" in the '585 Patent, where the Board ignored the intrinsic record and relied instead on extrinsic evidence.

2.     Whether Board erred in construing the term "Frequency Conversion Circuit" in the '792 Patent, where the Board ignored the intrinsic evidence, including the claims themselves.

3.     Whether the Board erred in finding claims 1-3, 5, 10 and 16-19 of the '585 Patent to be invalid over EP 0 696 854 ("Thomson"), alone or in combination with other art, including:

a)  Whether substantial evidence supported the Board's finding that Thomson disclosed "receiving said input RF signals encoding information in one of a plurality of formats" and "converting input RF signals to intermediate signals having an intermediate frequency" under the correct construction of claim term "input RF signal," where Thomson only discloses an IF signal, not an incoming RF signal;

b)  Whether the Board's finding that Thomson, or Figure 1 of the '585 Patent, disclosed a "plurality of demodulators . . . each of said demodulators generating video and audio baseband signals . . ." is

2

supported by substantial evidence, where neither reference discloses multiple demodulators that each generate both audio and video baseband signals; and

c) Whether the Board erred in finding a motivation to combine Thomson and Kerth, or Thomson, Harris, and Kerth, where the proposed combinations would fail to make out a prima facie case of obviousness with respect to claim 1, from which claim 3 depends.

4.     Whether the Board erred in finding claims 1, 2, 4, 10, and 11 of the '792 Patent to be invalid over Thomson and Harris, including:

a) Whether substantial evidence supported the Board's finding that Thomson discloses a frequency conversion circuit for processing "input RF signals," where Thomson only discloses pre-processed IF signals;

b) Whether substantial evidence supported the Board's finding that Thomson discloses a "signal processor for processing signals in accordance with one television signal format," where Thomson merely discloses parallel pathways for the simultaneous processing of two different signal formats; and

c)  Whether the Board erred in combining the teachings of Thomson with Harris, where the proposed combination with Harris would render Thomson inoperable for its intended use.

5.     Whether the Board erred in relying on an argument raised for the first time in Petitioner's Reply in support of its finding cancelling Claim 3 of the '792 Patent.

## STATEMENT OF THE CASE

## I.    CRESTA TECHNOLOGY CORPORATION

Cresta is a technology start-up based in Santa Clara, California.  Cresta was founded in 2005 and has worked to become an innovator in programmable broadband television reception for personal computers.  A234-A235.

In 2011, Cresta expanded its technology portfolio, suite of products, and engineering staff by acquiring the assets of Xceive Corporation ("Xceive").  *Id.* Xceive was another Silicon Valley company that worked to develop fully integrated, multi-standard, RF-to-baseband receivers for television sets and set top boxes. *Id.*

## II.    TECHNOLOGY OF THE PATENTS

The patents-in-suit relate to multi-standard television signal receivers for receiving television signals encoded in accordance with a variety of analog and digital television standards.

Television signals in different countries frequently operate according to different standards.  A87, col. 1 ll. 27-30.  An analog signal may be transmitted according to, for example, the National Television Standards Committee (NTSC) standard, and digital signals may be transmitted according to the Digital Video Broadcast (DVB) standards.  *Id.*, col. 1 ll. 34-37.

Traditionally, television receivers were manufactured specifically for the analog or digital standards used in a particular geographic area. *Id.*, col. 1 ll. 37-39. The inability of most televisions to receive and decode signals from multiple standards restricted the use of those televisions to the countries or regions having the compatible standard. *Id.*, col. 1 ll. 39-42.

Televisions capable of receiving signals in multiple standards typically did so by duplicating the hardware necessary for decoding each standard. *Id.*, col. 1 ll. 43-47. One such system is reproduced in Figure 1 of the '585 Patent, shown below. A82, FIG. 1.



This system required a tuner (14), which received an input radio frequency (RF) signal and converted the input RF signal to an intermediate frequency (IF). A87, col. 1 ll. 48-57. Once converted, the IF is received by a bank of channel filters (18) each of which was typically a discrete filter designed specifically for one particular television standard. *Id.*, col. 2 ll. 1-8. Each channel filter would be matched with a demodulator (20a – 20c), which received the filtered signals and output video and audio signals in either a digital or analog format. *Id.*, col. 2 ll. 12-26. These

6

solutions have several drawbacks, as the required duplication of components increases both the size of the receiver, and its cost of manufacture. *Id.*, col. 2 ll. 27-35. The '585 and '792 Patents address these problems by providing multi-standard, dual-format television receivers that are both high-performance and cost-effective. *Id.*, col 2 ll. 36-39; A95, col 2 ll. 21-24.

## A.    The '585 Patent

The '585 Patent discloses a "broadband television signal receiver for receiving multi-standard analog television signals, digital television signals and data channels." A87, col. 1 ll. 16-19. One example of the patented receiver is represented in Figure 2 of the '585 Patent:



A83. FIG 2. The television receiver (50) receives input RF signals, such as those received on an antenna or on a cable line, on an input terminal (52). A88 col. 3 ll. 46-48. The input RF signals are received by a tuner (54) which converts the input

RF signal to an intermediate signal having an intermediate frequency (IF).  *Id.* at col. 3 ll. 48-56.  The IF signal from the tuner is then received by the multi-standard channel filter (58).  *Id.*, col. 4 ll. 3-5.  The channel filter includes an anti-aliasing filter (60), an analog-to-digital converter (ADC) (62) and a digital signal processor (DSP) (64).  *Id.*, col. 4 ll. 5-9.  The anti-aliasing filter performs pre-processing on the IF signal to prevent aliasing during sampling and digitization by the ADC.  *Id.*, col. 4 ll. 17-20.  The ADC in turn, samples the IF signal and creates a digital representation thereof.  *Id.*, col. 4 ll. 25-30.

After filtering and digitization, the digital signal is processed by the DSP according to the television standard in which the input RF signal is encoded.  *Id.*, col. 4 ll. 51-54.  In one embodiment, the receiver uses a channel selection circuit (68) for selecting between the several analog and digital television standards.  *Id.*, col. 4 ll. 55-61.  Based on the state of the channel selection circuit, the DSP may apply one of several filter functions, stored in a look-up table in memory (70) to the incoming digital signal.  *Id.*, col. 4 ll. 57-64.  The outputs from the channel filter are coupled with a bank of demodulators (66) for generating the appropriate audio and video baseband signals.  *Id.*, col. 5 ll. 43-47.  In one example, the bank of demodulators includes a demodulator for analog television signals, for digital television signals, and for digital data channels.  *Id.*, col. 5 ll. 49-51.

The '585 Patent has 21 claims, including independent claims 1 and 17.  The

Board found claim 17 of the '585 Patent to be representative.  It reads:

> A method for receiving input RF signal comprising:
>   receiving said input RF signals encoding information
>       in one of a plurality of formats;
>   converting said input RF signals to intermediate
>       signals having an intermediate frequency;
>   applying a first filter function to said intermediate
>       signals, said first filter function being an anti-
>       aliasing filter and having a center frequency;
>   digitizing said filtered intermediate signals at a
>       sampling frequency;
>   processing said digitized signals in accordance with
>       said format of said input RF signals and generating
>       digital output signals indicative of information
>       encoded in said input RF signals; and
>   demodulating using a plurality of demodulators said
>       processed digitized signals to generate baseband
>       signals corresponding to said format of said input
>       RF signals.

A99-A100, Claim 17.  Claims 1-3, 5, 10 and 16-19 are at issue in this appeal.  A2.

## B.    The '792 Patent

The '792 Patent is also directed to "a broadband television signal receiver

for receiving multi-standard analog television signals and digital television

signals."  A96, col. 1 ll. 6-10.  An embodiment of the '792 Patent is shown in

Figure 1 of that patent, reproduced below:



The dual-format television receiver includes a signal input terminal (102) for receiving input RF signal, as well as a frequency conversion circuit (110), digitizing IF circuit (120), a digital signal processor (DSP) circuit (130) and a signal output circuit (140). A97, col. 3 l. 57 to col. 4 l. 52.  The frequency conversion circuit converts the input RF signal to an intermediate frequency (IF) signal using one or more frequency conversion.  *Id.*, col. 4 ll. 55-57.  The IF signal generated by the frequency conversion circuit is provided to digitizing IF circuit, which includes a bandpass filter (121), a variable gain amplifier 122 and an analog-to-digital converter (ADC) (123).  A98, col 5 ll. 14-18.  The ADC digitizes the analog IF signal and provides a digital IF signal on terminal (124)." *Id.*, col. 5 ll. 21-23.  Subsequent processing occurs entirely in the digital domain.  *Id.*, col. 5 ll. 23-25.  The DSP circuit applies the appropriate signal processing functions to handle television signals in any format (analog or digital) and in any standard (*e.g.* NTSC, PAL, SECAM, DVB or ATSC).  *Id.*, col. 5 ll. 25-29.

10

By processing all signals in the digital domain, the receiver of the '792

Patent eliminates the need for bulky analog components such as SAW filters.  A97,

col. 3 ll. 32-35.  This design allows for the construction of a receiver "in one

integrated circuit to reduce the size and manufacturing cost of the receiver."  A97,

col. 3 ll. 36-37, col. 3 ll. 39-41; A99, col. 9 ll. 30-26.  It also provides for a digital

signal processor circuit that "uses a single signal processing path to process

television signals in either the analog or the digital format."  A97, col. 3 ll. 45-49.

The '792 patent concludes with 29 claims, including independent claim 1.

Claim 1 recites:

> A television receiver comprising:
>> a frequency conversion circuit for receiving an input RF signal and for converting the input RF signal to an intermediate frequency signal having an intermediate frequency (IF), the input RF signal encoding information in one of a plurality of television signal formats;
>> an analog-to-digital converter for sampling the intermediate frequency signal and generating a digital representation thereof;
>> a signal processor for processing the digital representation of the intermediate frequency signal in accordance with the television signal format of the input RF signal, the signal processor generating digital output signals indicative of information encoded in the input RF signal, Wherein the signal processor applies one of a plurality of finite impulse response filters to the digital representation of the intermediate frequency signal, each of the plurality of finite impulse response corresponding to a format of the input RF signal; and

a signal output circuit for receiving the digital output
signals from the signal processor and for providing
one or more output signals corresponding to the
digital output signals.

A99-A100, Claim 1.  Claims 1-17, 26 and 27 are at issue in this appeal.  A35.

## III.    THE ASSERTED PRIOR ART

### A.    EP 0 696 854 ("Thomson")

The Board relied on Thomson on all challenged grounds, in both the '585

and '792 Patents.  A5; A38-A39.  Thomson discloses a satellite television receiver

for processing satellite television signals.  *See* A365, col. 1 ll. 29-33.  Figure 1 of

Thomson shows a schematic of the disclosure:



A satellite RF signal is received by an "outdoor unit" or "outdoor station," which is

not shown in the figures and uses undisclosed components to convert the signal

into an IF$_{SAT}$ signal, which is capable of being handled by a television tuner.

12

A267, FIG. 1; A265 col. 1 l. 56 – col. 2 l. 1, col 2 ll. 30-33.  The $IF_{SAT}$ signal is fed

through a surface acoustic wave (SAW) filter (1), and then through a mixer (2) to

further down convert the signal to around 75 Mhz.  A265, col. 2 ll. 30-33, 47-57.

This down converted signal becomes the input (3) to the circuit (4) which includes

an amplifier (5) controlled in amplitude by AGC control circuit (6), an

analog/digital (A/D) converter (7), a bandpass-filter (8), and FM demodulator (9).

*Id.*, col. 2 ll. 33-39.  The FM demodulator converts the IF signal into the CVBS

(analog baseband video) signal and the subcarrier modulated sound signals, which

are separated by low-pass filter (1) and bandpass filters.  A266, col. 3 ll. 19-25.

For digitally transmitted signals, after the bandpass-filter (8), the signal is fed

through a special carrier regenerator (11) and synchronous demodulators 12 and 13

which use quadrature phase shift key (QPSK) demodulation to provide quadrature

("Q") and in-phase ("I") signals.  *See* A265, col 2 ll. 37-44.

### B.     Clay Olmstead and Mike Petrowski, *A Digital Tuner for Wideband Receivers*, DSP Applications Magazine (Sept. 1992) ("Harris")

Harris is relied on by the Board as prior art to the '585 and '792 Patents with

respect to grounds 2, 4 and 6 in the '585 Decision, and all grounds in the '792

Decision.  A5 at 5; A38-A39.  Harris discloses a digital tuner for receivers in

devices such as cellular telephones, mobile radios and wireless LANs.  A271-

A277.  The Board relied on Harris' disclosure related to a "digital decimating

filter" (DDF).  A274; A27-A28; A57.  The DDF:

consists of a cascade of two lowpass filter stages. The first stage performs coarse low pass filtering while providing programmable decimation to 1024. The second stage consists of a 512 tap Finite Impulse Response (FIR) filter which narrows and shapes the passband while providing additional decimation up to 16.

A275. Harris states the DDF "can be rapidly configured via a standard microprocessor interface." *Id.*

### C.    U.S. Patent No. 6,804,497 ("Kerth")

Kerth is relied on by the Board for three grounds of the '792 Decision. A38-A39. It is also relied on in two grounds of the '585 Decision. A5. Kerth discloses RF receivers for cellular telephones. A500-A538, at col. 2 ll. 2-9. Regarding the '585 Patent, the Board relied on Kerth only for the proposition that the digital-to-analog converter of Kerth could be inserted between the bandpass filter of Thomson and the demodulators of Thomson. A31. For the '792 Patent, the Board concluded that Kerth teaches differential I and Q outputs. A64-A65.

## IV.   THE FINAL WRITTEN DECISIONS

### A.    The '585 Decision

The Board instituted review of the '585 Patent on 6 grounds, as shown in the table below:

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Thomson | § 102(b) | 1, 2, 5 and 16-19 |
| Thomson and Harris | § 103(a) | 1, 2, 5, 10 and 16-19 |
| Thomson and Figure 1 of the '585 Patent | § 103(a) | 1, 2, 5 and 16 |

14

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Thomson, Harris and Figure 1 of the '585 Patent | § 103(a) | 1, 2, 5, 10 and 16 |
| Thomson and Kerth | § 103(a) | 3 |
| Thomson, Harris and Kerth | § 103(a) | 3 |

A5.  The Board proceeded to construe six sets of terms in the challenged claims. A6-A12.  Of relevance to the appeal, the Board construed "input RF signals" and "tuner for receiving input RF signals" to mean "signals that are input having a frequency between 10 kHz and 100 GHz" and "a tuner that receives signals that are input having a frequency between 10 kHz and 100 GHz," respectively.  A6-A8. The Board also construed the term "baseband signals" as "a signal without transmission modulation," and clarified that "video and audio baseband signals" refer to "a single signal that encodes both video and audio information without transmission modulation."  A11-A12.

The Board found claims 1-3, 5, 10 and 16-19 of the '585 Patent to be unpatentable under each of the grounds asserted by Petitioner.

### B.    The '792 Decision

The Board instituted review of the '792 Patent on five grounds, as shown in the table below:

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Thomson and Harris | § 103(a) | 1, 2, 4, 10, and 11 |
| Thomson, Harris and Cirrus Logic | § 103(a) | 5 and 6 |

15

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Thomson, Harris and Kerth | § 103(a) | 7 and 12 |
| Thomson, Harris, Kerth and U.S. Pat. Pub'n No. 2002/0057366 | § 103(a) | 13–17 |
| Thomson, Harris, Kerth, and Cirrus Logic | § 103(a) | 8 and 9 |

A63.  The Board proceeded to construe six sets of terms in the challenged claims.

A39-A45.  Of relevance to the appeal, the Board construed "input RF signals" to

mean "signals that are input having a frequency between 10 kHz and 100 GHz."

A40-A42.  The Board also construed "frequency conversion circuit" to mean "a

circuit for converting the frequency of the input RF signal to an intermediate

frequency signal having an intermediate frequency."  A42-A43.  The Board also

construed "signal processor for processing . . . in accordance with the television

signal format" to mean "a digital module that processes signals in the digital

domain in the exactly one format in which each received input RF signal is

encoded."  A44-A46.

The Board found the challenged claims of the '792 Patent to be unpatentable

under each of the grounds asserted by Petitioner.

# SUMMARY OF THE ARGUMENT

## I.    CLAIM CONSTRUCTION

### A.    The Board Erred in its Construction of "Input RF Signals"

The Board erred by providing an unreasonable construction of the terms "input RF signals" in the '585 and '792 Patents, and "tuner for receiving input RF signals" in the '585 Patent.  The claims and the specification of the  Patents clearly show that the phrase "input RF signal" should be interpreted as an undivided expression meaning *a signal that was external to receiver and that had not been processed or converted prior to being received from the medium of propogation.*[1] The Board should have focused on the term "input" in the "input RF signal," but instead relied on an extrinsic dictionary definition for "RF signal."  The claims and specification provide a consistent meaning of "input RF signal," that the Board ignored.

### B.    The Board Erred in its Construction of "Frequency Conversion Circuit"

The Board also erred in construing "frequency conversion circuit" with respect to the '792 Patent.  The broadest reasonable interpretation of this claim limitation requires a circuit receiving a transmitted RF signal that has not been pre-processed or converted.  Therefore, this claim term should be construed as "*a*

---

[1] All emphasis in the brief is our own, unless otherwise noted.

17

*frequency conversion circuit that receives an incoming signal that comes out of the medium of propagation and is external to the frequency conversion circuit without any processing*." The Board's construction of this term as "a circuit for converting the frequency of the input RF signal to an intermediate frequency signal having an intermediate frequency" encompasses systems wherein the relevant signals are pre-processed. The Board's construction renders claim language requiring converting the input RF signal to an intermediate frequency redundant.

## II.    THE '585 PATENT

### A.    The Board Improperly Held that Thomson's Pre-Processed IF Signal Was an Input RF Signal

The Board's invalidity findings with respect to the limitations "receiving said input RF signals encoding information in one of a plurality of formats" and "converting input RF signals to intermediate signals having an intermediate frequency" in the '585 Patent are not supported by substantial evidence. The Board found that the receiver disclosed in Thomson received an intermediate frequency ($IF_{SAT}$) that had been previously down converted using an undisclosed "outside unit" and converted that $IF_{SAT}$ into a second intermediate frequency within the receiver. The $IF_{SAT}$ signal is an *intermediate* frequency signal, not an *input RF signal*, as required by the claims. The Board erred in concluding that because the $IF_{SAT}$ signal fell within the 10 kHz and 100 GHz range, it was an "input RF signal" as it construed that term. The Board offered no other evidence to support its

findings with respect to these limitations.  Under a proper construction of "input

RF signal," the Board's findings should be reversed for lack of substantial

evidence.

**B.     The Board Improperly Held that Thomson and Figure 1 of the '585 Patent Disclose "a Plurality of Demodulators"**

The Board did not apply its own claim construction in finding that the

Thomson reference and Figure 1 of the '585 Patent disclosed the limitation

"demodulating using a plurality of demodulators said processed digitized signals to

generate baseband signals corresponding to said format of said input RF signals."

In its Final Written Decision the Board clarified that "video and audio baseband

signals" refer to "a single signal that encodes both video and audio information

without transmission modulation."  However, neither of the references the Board

relied on with respect to this limitation discloses a plurality of demodulator

generating baseband signals containing both video and audio information.  Because

the evidence the Board relied on fails to show a *plurality* of claimed demodulators,

its findings should be reversed with respect to claims 1-3, 5, 10 and 16.

**C.     The Board Improperly Held that Claim 3 Was Obvious in Light of Thomson, Harris, and Kerth Without Considering the Additional Limitations of Independent Claim 1**

The Board erred in invalidating claim 3 of the '585 Patent as obvious over

Thomson and Kerth, or Thomson, Harris and Kerth, because the evidence relied

upon by the Board did not support such a combination.  The Board found Kerth

taught the digital-to-analog converter of claim 3 of the '585 Patent, and that such a combination would have been obvious because Figure 1 of the '585 Patent showed the use of analog demodulators in the prior art.  However, the use of analog demodulators in the prior art is inapposite because the demodulators in claim 1 (from which claim 3 depends) accept digital signals, not analog.

## III.    THE '792 PATENT

### A.    The Board Improperly Held that Thomson's Pre-Processed Intermediate Frequency Signal Was an Input RF Signal

Based on its erroneous construction of "input RF signals," the Board held that an ***intermediate*** signal disclosed in Thomson satisfied that limitation. However, the intermediate frequency signal in Thomson is not an input signal at all.  Rather, as the word "intermediate" suggests, it is a signal that is generated by an "outdoor unit" that ***processes*** a signal received from a satellite.  Because the intermediate signal is pre-processed, it is not an ***input*** signal at all.

### B.    The Board Improperly Held that the Outdoor Unit of Thomson was a Frequency Conversion Circuit

The Board further erred by holding that the outdoor unit of Thomson satisfied the "frequency conversion circuit" element of the claim.  Thomson's outdoor unit is ***upstream*** from the intermediate signal, which makes it impossible for the outdoor unit to "receive" it and convert it into an intermediate frequency signal, as the claimed frequency conversion circuit is intended to do.

20

### C.  The Board Improperly Placed the Burden on Cresta to Disprove the Disclosures of Thomson

The Board placed the burden on *Cresta* to show that Thomson ***does not***

disclose a frequency conversion circuit, when the burden at all times rests on the

Petitioner.

### D.  The Board Improperly Combined Thomson and Harris

The Board erred by combining the Thomson with Harris references.  One of

ordinary skill in the art would appreciate that Harris would have rendered

Thomson inoperable for its intended purpose.  The evidence produced by Cresta

showed that the components disclosed in Harris were incompatible with the system

described in Thomson.  Nevertheless, the Board found that Harris could be relied

upon for its "general" teachings despite the fact that it described hardware that

could not be incorporated into the architecture of Thomson.  As such, the Board

failed to articulate any adequate basis why one of ordinary skill in the art would

seek to combined Thomson with Harris and have any reasonable expectation of

success.

### E.  The Board Erred by Relying on Arguments Raised For the First Time in Petitioner's Reply

Finally, the Board erred by violating its own rules and relying on an

argument raised for the first time in Petitioner's Reply.  In response to Cresta's

argument that the SAW filter disclosed in Thomson could not have been integrated

21

into a monolithic circuit, Petitioner's reply advanced a new argument that excluded the SAW filter from the alleged frequency conversion circuit.  The Board relied on this new argument, in violation of its own rules forbidding a party from raising new issues in a reply.

# ARGUMENT

## I.    LEGAL STANDARDS AND STANDARD OF REVIEW

The Board's claim constructions are reviewed *de novo*.  *Teva Pharmaceuticals U.S.A., Inc. v. Sandoz*, Inc., 135 S. Ct. 831, 841 (2015).  The underlying factual determinations concerning extrinsic evidence are reviewed for substantial evidence.  *In re Cuozzo Speed Techs*., 778 F.3d 1271, 1282 (Fed. Cir. 2015) (citing *Teva*, 135 S. Ct. at 841).

The Court reviews the Board's factual findings for substantial evidence and reviews the Board's legal conclusions *de novo*.  *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed.Cir.2012).  The ultimate determination of invalidity under sections 102 or 103 is a question of law based on underlying factual findings.  *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).  The determination of what a reference teaches is a question of fact.  *Baxter*, 678 F.3d at 1361 (citing *Rapoport v. Demen*t, 254 F.3d 1053, 1063 (Fed. Cir. 2001)).

## II.    THE BOARD ERRED IN CONSTRUING THE CLAIMS OF THE '585 AND '792 PATENTS

### A.    The Proper Construction of "*Input RF Signal*" and "Tuner for Receiving *Input RF Signals*" in the '585 and '792 Patents Requires an External Signal With No Pre-Processing

The Board improperly construed the terms "input RF signals" and "tuner for receiving *input RF signals*" as any "signals that are input having a frequency between 10 kHz and 100 GHz.".   The plain and ordinary meaning of "input RF

signals," as evidence by its usage in the claims and description within the specification, requires an *external signal with no pre-processing*. Cresta's proposed construction is consistent with the claims, the specifications, and the understanding of one of ordinary skill in the art. A6; A42.

While the Board construes claims to have their broadest reasonable interpretation, it does not have "an unfettered license to interpret claims to embrace anything remotely related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Unless the inventor intended a claim term to cover more than its ordinary and customary meaning revealed by the intrinsic record, "it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise or other extrinsic source." *Nystrom v. TREX Co.*, 434 F.3d 1136, 1145 (Fed. Cir. 2005).

The claims themselves support Cresta's construction of "input RF signal" based on the meaning of the term, as a whole. The whole term "***input*** RF signal" is used in its entirety throughout the claims. *See, e.g.,* A89-A90, Claim 1; A99-A100, Claim 1. In the dependent claims, the patentee chose to focus on the character and source of the input RF signals, rather than their frequency or range. *See, e.g., Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333-34 (Fed. Cir. 2010) (dependent claims may provide guidance to define the scope of an independent claim.). For example, claim 16, which depends from claim 1, requires

that the input RF signals "comprise RF signals received from one of terrestrial broadcast, from satellite broadcast, and from cable transmission." A90, Claim 15. Thus, the patent distinguishes input RF signals from RF generally as being a particular type of signal received from an *external* transmission. *Id.* Input RF signals may also contain carrier signals, identifying its format. A90, Claim 20. Input RF signals may also comprise an analog television format, and a digital television format. *Id.,* Claim 18. These dependent claims demonstrate that the patentee intended to define input RF signals by the character and traits associated with such signals, rather than any particular range of frequency.

The specifications describe an "input RF signal" as an external signal that is received at the receiver prior to processing. The '792 patent explains that a television receiver includes two main components and that the first component receives an incoming signal and converts the incoming radio frequency (RF) signal into an intermediate frequency (IF) signal. A95, col. 1 ll. 34-38. Referring to Figure 1, the patent states that the "receiver 100 includes a frequency conversion circuit 110 (or tuner circuit 110)," that performs the necessary processing on previously unprocessed RF signals. *See, e.g.* A96, col. 4 ll. 52-57 (the "[f]requency conversion circuit 110 receives input RF signals … [and] operates to convert the input RF signal to an intermediate frequency (IF) signal.").

Figure 1 of the '585 Patent shows the "incoming RF signal" as an "RFIN" being input into terminal 102 of the frequency conversion circuit 110 without being pre-processed.  A92, FIG. 1; A96, '792 Patent at col. 4 ll. 52-53 (same).  The specification further explains that "the input RF signals can be received from terrestrial broadcast or on a cable line transmissions" (*i.e.,* a raw, unprocessed RF signal).  *See* A96, col. 4 ll. 51-55; *see also* A96, col. 4 ll. 53-55 (same).



While the Board found Cresta's arguments regarding the specification to be "***not without appeal***," it erred when it rejected Cresta's proposed construction in favor of a construction based only on an *extrinsic* dictionary definition.  A7-A8.  The Board may "rely on dictionary definitions when construing claim terms," only if "the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322-23 (Fed. Cir. 2005) (*en banc*).  "A claim should not rise or fall based upon the preferences of a particular dictionary editor."  *Id.* at 1322.  Indeed,

"the authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public...  The resulting definitions therefore do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it."  *Id.* (internal citations omitted).

In the Final Determinations, the Board erroneously relied on an extrinsic dictionary definition of RF to limit the claim term to signals within the range of 10 kHz and 100 GHz.  *See id*.  In doing so, the Board ignored the plain and ordinary meaning of "input," as well as the descriptions in the specification.  But a dictionary entry does not mean that the entry is a reasonable interpretation in light of the specification.  *See PPC Broadband, Inc. v. Corning Optical Comms. RF, LLC*, --- F.3d ----, 2016 WL 692369 at *3 (Fed. Cir. Feb. 22, 2016) ("The fact that 'around' has multiple dictionary meanings does not mean that all of these meanings are reasonable interpretations in light of this specification.  And we conclude that in this context the Board's construction is not reasonable.").  Here, the Board chose the dictionary definition and disregarded the claims and the specification.

The Board focused its analysis on the relatively straightforward "RF" term, which is a term that one of ordinary skill in the art would be well-acquainted and probably required no construction at all.  Furthermore, there is no evidence that the

one dictionary definition the Board chose to rely on accurately characterizes RF as it would be understood by a person of skill in the art. Dr. Opris testified on behalf of Cresta that RF can refer to any signal that can radiate from an antenna or be transmitted through a medium. A1105, A1127 ¶ 48. Light bulbs produce RF at 60 Hz. *Id*. The U.S. Navy uses low frequency RF at around 3 or 4 kHz to communicate with submarines. *Id.* The upper limit for the radio frequency spectrum, where reception is performed using photonic devices, is currently in the hundreds of GHz to THz range. *Id.* The widely varying range of signals fairly characterized as RF show that a person of skill in the art would not find it useful to define a term such as "input RF signal" in terms of frequency. They would instead read "input RF signal" in the context of the patent as a signal distinguished from other signals based on its character and source.

The Board also erred in its construction of "input RF signal" by failing to consider the *whole* claim term as one of ordinary skill in the art would. *See Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003) ("[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of invention."). The patents use the term "input RF signals" as a unified expression. "Input RF signal" is used 37 times in the '585 Patent. *See generally*, A81-A90. The patentee never uses another phrase in the claims to refer to the external signal received by the receiver. *See* A89-A90, Claims 1-2. By

28

discussing only the "RF signals," the Board did not address the complete limitation "input RF signal" in the context of the claims or the specifications of the '585 and '792 Patents. Accordingly, "input RF signals" should be construed, in accordance with its ordinary and customary meaning and the clear usage of the term within the intrinsic evidence, as "*a signal that is an incoming signal that comes out of the medium of propagation and is external to the frequency conversion circuit without any processing by the frequency conversion circuit*."

**B.    The Proper Construction of "Frequency Conversion Circuit" in the '792 Patent Requires Receiving a Transmitted RF Signal That Has Not Been Pre-Processed**

In its Final Determination with respect to the '792 Patent, the Board erred in construing "frequency conversion circuit" as "a circuit for converting the frequency of the input RF signal to an intermediate frequency signal having an intermediate frequency." A42-A43. The broadest reasonable interpretation of this claim limitation requires a frequency conversion circuit receiving a transmitted RF signal that has not been pre-processed or converted. Therefore, the term should be construed as "a frequency conversion circuit that receives an incoming signal that comes out of the medium of propagation and is external to the frequency conversion circuit without any processing." A4844-A4845.

Cresta's proposed construction for this term is supported by the plain and ordinary meaning of the claim terms in the context of the claims and the specification of the '792 Patent.

The claims of the '792 Patent demonstrate that the frequency conversion circuit receives the input RF signal from a medium of propagation without any pre-processing of the signal. For example, claim 1 states that the frequency conversion circuit is "for receiving an input RF signal *and for converting* the input RF signal to an intermediate frequency." A99-A100. Thus, the claims contemplate that it is the frequency conversion circuit, itself, that converts the input RF signal to another frequency.

The specification of the '792 Patent also confirms that Cresta's proposed construction is the broadest reasonable interpretation of the claim. Nowhere in the '792 Patent is an "input RF signal" described as being subject to pre-processing prior to being received by the frequency conversion circuit. For example, Figure 1 depicts the input RF signal being received at the input terminal 102, and then simply passed to the frequency conversion circuit. *See* A92, Fig. 1. The specification also states that the input RF signal is passed directly from the means of signal propagation directly to the frequency conversion circuit via the input terminal 102 without any intermediate processing. *See* A96, col. 4 l. 49 – col. 5 l. 2:

> ***Frequency conversion circuit 110 receives input RF signals on signal input terminal 102****. The input RF signals can be **received from terrestrial broadcast or cable transmissions.** Frequency conversion circuit 110 operates to convert the input RF signal to an intermediate frequency (IF) signal using one or more frequency conversions. In the present illustration shown in FIG. 1, the **input RF signal is first coupled to a RF tunable filter 111 which is a bandpass filter**.*

First, the passage indicates that the input RF signal is directly received from the input terminal, which directly receives the signal from a means of propagation, such as a "terrestrial broadcast or cable transmission." A96, col. 4 ll. 52-55. No signal pre-processing is described or contemplated. Second, the frequency conversion circuit begins the process of converting the signal to an intermediate frequency by "first" being "coupled to a RF tunable filter." *Id.* col. 4 ll. 55-58. Again, no signal processing is disclosed as being performed prior to or externally from the receiver. Because the specification is the "single best guide to the meaning of a disputed term," this claim term should be construed as proposed by Cresta. *See Phillips*, 415 F.3d at 1315 ("The specification is, thus, the primary basis for construing the claims.").

A person of ordinary skill in the art would understand that a frequency conversion circuit receives external signals that have not yet been processed by the frequency conversion circuit. The frequency conversion circuit is intended to receive signals directly from a medium of propagation (*e.g.*, atmosphere, cable, etc.) without any pre-processing. One of ordinary skill in the art would appreciate,

31

given the context of the claims, that the frequency conversion circuit is intended to "receiv[e] an input RF signal and [] convert[] the input RF signal to [an] intermediate frequency signal."  A99, Claim 1.  Any form of signal pre-processing would be inconsistent with the meaning of the claim term within the context of the claim.

The Board's construction is inconsistent with the words of the claim because it encompasses systems wherein the input RF signals are pre-processed.  The claim already requires "converting the input RF signal to an intermediate frequency." *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  Here, the Board's construction of the claim term is inconsistent with its meaning within the context of the claim.

Because the Board's construction is inconsistent with the claims and specification of the '792 Patent, it should be rejected by this Court.  "Frequency conversion circuit" should be construed to mean "*a frequency conversion circuit that receives an incoming signal that comes out of the medium of propagation and is external to the frequency conversion circuit without any processing*."

## III. CLAIMS 1-3, 5, 10 AND 16-19 OF THE '585 PATENT ARE PATENABLE OVER THOMSON ALONE OR IN COMBINATION

### A. The Board Erred in Finding Thomson Taught "Receiving Said Input RF Signals Encoding Information In One of a Plurality of Formats" and "Converting Input RF Signals to Intermediate Signals Having an Intermediate Frequency"

The Board erred in finding that Thomson disclosed "receiving said input RF signals encoding information in one of a plurality of formats" and "converting input RF signals to intermediate signals having an intermediate frequency." A17-A18. The Board's decisions with respect to both limitations rely entirely on its erroneous construction of the term "input RF signal," as set forth above. *Supra,* Part II.A. The Board's conclusions are not supported by substantial evidence in view of a proper construction of that term.

#### 1. *Thomson Merely Discloses Receiving an Intermediate Frequency Signal and Converting that Signal into a Second Intermediate Frequency Signal*

The receiver disclosed in Thomson relies on receiving a pre-processed signal that has already been converted to an intermediate frequency by an undisclosed outside source, and not a receiver capable of accepting an input RF signal. *See* A265, col. 1 l. 57 – col. 2 ll. 19. The receiver disclosed in Thomson accepts an IF signal, not an input RF signal. The Board's contrary finding is based solely on is erroneous construction of the term "input RF signal," which Cresta challenges on appeal. *Supra,* Part II.A.

33

Thomson disclosed receiving an IF input, identified as $IF_{SAT}$, and down converting the $IF_{SAT}$ signal using the SAW Filter and mixer to a second IF signal. A267, Fig. 1. The Board incorrectly found that this constituted the input RF signal required by the claims of the '585 Patent based solely on its construction of input RF signal:



> Although Thomson labels the input signal as "$IF_{SAT}$" to reflect that satellite channels have already been down-converted when received by the broadcast receiver, $IF_{SAT}$ is disclosed as having a radio frequency and is shown in Figure 1 of Thomson as input to SAW filter 1. As we note above, it is therefore an "input RF signal" as we have construed the term.

A17 (citing A265, col. 1, l. 56–col. 2, l. 1); *see also supra* Part II. The Board dismissed the evidence that Thomson merely disclosed **IF** signals, not input RF signals, concluding "although a reference must disclose each and every limitation in a claim to anticipate the claim, the reference need not satisfy an *ipsissimis verbis* test." *Id.* (citing *In re Gleave*, 530 F.3d 1331, 1334 (Fed. Cir. 2009)).

The difference here is more than mere word choice. The term "intermediate" in IF signal is not intended to suggest a particular radio frequency or range of frequencies. A1122-A1123 ¶ 40. Instead, a person of skill in the art

would understand that an "IF" signal is an intermediate signal in the sequence of frequencies that the signal takes between being received in unconverted form from an outside source, and being demodulated at the receiver output.  *Id.*

Both Thomson and the '585 Patent use the term IF to denote a signal that has undergone pre-processing or conversion.  *See* A265, col 1 l. 57 – col 2 l. 19; A87, col 1 ll. 52-64.  One purpose of this conversion is to standardize the frequency of the signal transmitted through the receiver.  A87, col. 1 ll. 64-67.  In the '585 Patent, for example, the tuner can use the same IF signal "for receiving analog or digital television signals in any standard."  *Id.*

In Thomson, the $IF_{SAT}$ signal is identified as an intermediate frequency because it has previously been down converted by an "outdoor unit" having undisclosed components.  A265, col. 1 l. 57 – col. 2 l. 1.  This *1st IF* then undergoes further down conversion to become a *2nd IF*.  *Id.*, col. 2 ll. 1-19.  The word choice in both cases is deliberate, as it signifies that the signal has undergone some processing either in the receiver or by external components, distinguishing it from a non-intermediate signal received from the medium of propagation.

Thomson itself *teaches away* from the notion that its $IF_{SAT}$ signal is equivalent or interchangeable with the input RF signal in the '585 Patent. Thomson acknowledges that its receiver would *not* be capable of handling a raw signal coming from the medium of propagation, without prior conversion into the

950-1750 Mhz range by an outdoor unit. *Id.* Indeed, this is one purpose for using an IF frequency. Cresta's expert, Dr. Opris, explained that because "the RF frequencies of many television stations are too high for one to digitize the signals at RF in a cost-effective manner, the signals must be "downconverted" to a lower intermediate frequency (IF) at which those signals can be easily and economically digitized." A1121-A1122 ¶ 38.

In other words, by distinguishing in the claims between an input RF signal and an intermediate frequency, the '585 Patent is not merely describing taking a signal of one frequency and converting it to another. Instead, the '585 Patent claims a receiver and a method that can process a signal from an external source, such as a "terrestrial broadcast, [a] satellite broadcast [or a] cable transmission." A90, Claim 16.

In contrast, Thomson discloses a more limited receiver, in which the receiver begins with a *pre-processed* signal that has been down converted by outside means into a manageable range. A265, col. 2 ll. 1-19. A system such as Thomson, which requires external components to down convert a signal, prior to further down conversion steps within the receiver, runs contrary to the objectives of the '585 Patent, which proposes a multi-standard receiver having fewer duplicated components. A87, col. 2 ll. 27-39.

36

## 2.     *The Board's Findings Are Not Supported by Substantial Evidence*

Under a proper construction of the term input RF signal, and the recognition that Thomson merely teaches the conversion of one ***IF*** signal to a ***second IF*** signal, the Board's findings are not supported by substantial evidence.  The Court should reverse the Board's determination with respect to these findings, and hold that claims 1-3, 5, 10 and 16-19 are not anticipated or rendered obvious by Thomson alone or in combination with any other reference.

The Board found that Thomson disclosed "receiving said input RF signals encoding information in one of a plurality of formats" because the $IF_{SAT}$ is disclosed as having a radio frequency and "it is therefore an 'input RF signal' as [the Board] ha[s] construed the term."  A17.  The Board cites no other evidence that would support its finding that the Thomson discloses this limitation.  *Id.*  Thomson does not disclose this limitation, as reasoned above, because the $IF_{SAT}$ signal is an intermediate signal, having an intermediate frequency, and not an input RF signal.  *Supra* Parts II.A, III.A.1.

The Board also found that Thomson disclosed "converting said input RF signals to intermediate signals having an intermediate frequency" because "the $IF_{SAT}$ signal of Thomson is further down converted by mixer stage 2 into an 'IF signal of around 75 MHz.'"  A18.  The Board offered no further rationale for finding that this limitation is present in Thomson.  Thomson does not disclose this

limitation because the signal converted into "an IF signal of around 75 MHz" is itself an IF signal of between 950 – 1750 MHz.  A265, col. 1 l. 56 – col. 2 l. 1.

In view of a proper construction of the term "input RF signal," the Board's findings with respect to these limitations are not supported by substantial evidence. To the contrary, substantial evidence exists that Thomson discloses a receiver that receives IF signals, having been pre-processed by an outside unit, and not input RF signals as required by the '585 Patent.  The Board's findings should be reversed with respect to all challenged claims on all grounds.

### B.    The Board Erred in Finding the Prior Art Disclosed a "Plurality of Demodulators . . . Each of Said Demodulators Generating Video and Audio Baseband Signals . . ."

The Board did not apply its own claim construction in finding that the Thomson reference and Figure 1 of the '585 Patent disclosed the claim limitation "demodulating using a *plurality* of demodulators . . . each of said demodulators generating video and audio baseband signals corresponding to said format of said input RF signal."  A89-A90, claim 1.  Neither reference discloses multiple demodulators that each generate ***both*** audio and video baseband signals. Accordingly, the Board's conclusion is not supported by substantial evidence.

In its Institution Decision, the Board construed the term "baseband signals to mean "a signal without transmission modulation."  A767.  In its Final Written Decision, the Board clarified its construction, stating that each "video and audio

baseband signal" means that the signal encodes both video and audio information at the same time:

> the plural language of the phrases ['video and audio baseband signals' and 'baseband signals'] is consistent with the plural recitation of 'input RF signals' that are received.  Consistent with the parallel pluralism of the claim language, we adopt a construction in which ***each "video and audio baseband signal" may correspond to a single signal that encodes both video and audio information without transmission modulation***.

A12.  Thus, in order to anticipate or render obvious claim 1, petitioners were required to show that the prior art discloses a *plurality* of demodulator generating baseband signals, with ***each baseband signal*** encoding ***both*** video and audio information.

In the Board's Final Determination, Figure 1 of the '585 Patent is alleged to disclose the "plurality of demodulators" with respect to grounds 3 and 4.  A5. With respect to all other grounds, the Board relied on Thomson as disclosing the claimed demodulators.  *Id.*  Because neither Thomson nor Figure 1 of the '585 Patent discloses a plurality of demodulators, as the Board has construed that term, the Board's findings should be reversed as to claims 1-3, 5, 10 and 16 on all grounds.

**1.** ***Thomson Does Not Disclose Multiple Demodulators Producing Baseband Signals Encoding Both Audio and Video Information***

39

The Board found that Thomson disclosed "demodulating using a plurality of demodulators . . . each of said demodulators generating video and audio baseband signals corresponding to said format of said input RF signal."  The two



demodulators identified by the Board are "an FM demodulator" and a "QPSK demodulator."  A22.  The FM demodulator was found to generate demodulated signals CVBS (composite video baseband signal), $S_{mod\,1}$ and $S_{mod\,2}$.  An excerpt from Figure 1 of Thomson shows the analog demodulator components 9, 10 and the sound selection filters, along with the corresponding outputs.

CVBS outputs a video-only baseband signal.  A89, col. 5 ll. 59-63.  $S_{mod\,1}$ and $S_{mod\,2}$ output audio-only baseband signals.  A266, col. 3 ll. 19-22.  There is no dispute that none of the three baseband signals output by the analog demodulator is a single baseband containing ***both*** audio and video information.

The Board erred in applying its own claim construction in finding that the analog demodulator in Thomson generates baseband signals containing both audio and video information.  The Board's findings should be reversed with respect to claims 1-3, 5, 10 and 16 of the '585 Patent.

1.    ***Figure 1 of the '585 Patent Does Not Disclose Multiple Demodulators Producing Baseband Signals Encoding Both Audio and Video Information***

Figure 1 of the '585 Patent describes a multi-standard television receiver that relies on a duplication of channel filters to process signals received in multiple formats and broadcast standards.  A87, col. 2 ll. 12-14.  Each channel filter, 18a to 18c, is disclosed as being coupled with a dedicated demodulator, 20a to 20c, designed specifically for a predetermined television signal format and a predetermined television standard.  *Id.* col. 2 ll. 8-11.  The patent describes two specific demodulators, generating baseband signals corresponding to audio television or digital television signal reception:



> To support multi-standard reception, a bank of demodulators 20a to 20c is also provided, each demodulator receiving filtered signals from a corresponding channel filter.  For analog television signal reception, the demodulator is a VIF/SIF module.  ***The VIF/SIF module provides a video output called CVBS (Composite Video Baseband Signal) and audio outputs, such as MPX or A2.***  For digital television signal reception . . . ***[t]he digital demodulator outputs data in an MPEG data stream.***

*Id.* col. 2 ll. 15-26.  Thus, the patent provides that the analog demodulator outputs a video-only signal in the form of CVBS, and audio-only outputs such has MPX or

41

A2. *Id.* The analog demodulator does not output any baseband signal having both audio and video information.

Under the Board's own construction, the analog demodulator of Figure 1 would not read on claims 1 and 17. Only one other demodulator is disclosed with respect to Figure 1 of the '585 Patent, the digital demodulator. *Id.* at 21-26. While this demodulator outputs a single MPEG data stream having both audio and video information, A23, the claim requires a plurality of such demodulators. No other demodulator is disclosed with respect to Figure 1 of the '585 Patent that produces signals encoding both audio and video information.

Because the Board erred in applying its own construction in finding that the analog demodulator in Figure 1 of the '585 Patent generates baseband signals containing both audio and video information, the Board's findings should be reversed with respect to claims 1, 2, 5, 10 and 16 of the '585 Patent.

### C. The Board Erred in Finding that Claim 3 is Obvious over Thomson and Kerth, or Thomson, Harris and Kerth

The Board erred in finding a motivation to combine Thomson and Kerth, with or without Harris, regarding claim 3 of the '585 Patent. A31-A33.

The Board found that Figure 1 of the '585 Patent provided a motivation to combine Thomson with the digital-to-analog converters in Kerth because it found "evidence of the use of *analog* demodulators in the prior art, as shown in Figure 1

42

of the '585 Patent."  A31-32.  However, the demodulators in claim 3 are *digital*, not analog.

Claim 3 depends from claim 1.  A90, Claim 3.  Claim 1 requires "a plurality of demodulators . . . each of said demodulators for demodulating ***digital output signals*** according to one of said formats of said input RF signals."  A89-A90, Claim 1.  The analog output of the digital-to-analog converter of claim 3 must be demodulated as a digital signal.  Such a system is not described in Thomson, Kerth, Harris or Figure 1 of the '585 Patent.  It was therefore clear error for the Board to disregard the fact that the proposed combination for claim 3 could not possibly obviate claim 1, from which claim 3 depends.

## IV.    THE BOARD ERRED IN FINDING CLAIMS 1-17, 26 AND 27 OF THE '792 PATENT TO BE INVALID

### A.    The Board Erred in Finding Thomson Taught "a Frequency Conversion Circuit" Required by Claim 1 of the '792 Patent

The Board erred in finding that Thomson discloses the "frequency conversion circuit" required by Claim 1.  The Board's finding is based on its constructions of the terms "input RF signal" and "frequency conversion circuit," which were erroneous for the reasons set forth above.  *Supra* Part II.A-II.B.  Thomson only discloses a system wherein pre-processed intermediate signals, not input RF signals, are received at a receiver.  A16-A52.  Furthermore, while the Board found Thomson's IF$_{SAT}$ signal to be the claimed input RF signal, it found

Thomson's outdoor unit, which **outputs** the IF$_{SAT}$ signal, to disclose the "frequency conversion circuit" that **receives** the input RF signal and **outputs** an intermediate frequency (IF) signal. The Board also erred by placing the burden of persuasion on Cresta to prove that Thomson **did not** disclose a frequency conversion circuit, rather than on petitioners.

### 1.    *Thomson Merely Discloses Receiving an IF Signal and Converting that Signal into a Second IF Signal*

Claim 1 of the '792 Patent requires "a frequency conversion circuit for receiving **an input RF signal**." A99-A100. The Board found that the IF$_{SAT}$ signal in Thomson disclosed "**an input RF signal**," as required by claim 1, because it was "an input signal in the RF frequency range." A50. The Board's determination lacked substantial evidence because the IF$_{SAT}$ signal of Thomson is a **pre-processed** Intermediate Frequency "IF" signal, not an "input" signal. *See supra* Part II.A. Thus, Thomson does not disclose the claimed frequency conversion circuit for "receiving an input RF signal and for converting the input RF signal to an intermediate frequency signal having an intermediate frequency (IF)." Thomson only teaches an apparatus for receiving a pre-processed, IF signal.

The only justification offered by the Board was that "[a]ll that is required is an input signal **in the RF frequency range**." A50. But the **first** IF$_{SAT}$ signal of Thomson (*i.e.* the signal identified by the Board) is an intermediary frequency signal, which disqualifies it from being an "**input** RF signal." The Board failed to

consider whether the first IF$_{SAT}$ signal of Thomson was an ***input*** signal at all. Here, one of ordinary skill in the art would not interpret an IF signal as being an input signal in the context of the claims of the '792 Patent.

The entire disclosure of Thomson is based on a receiver that is specifically designed to receive an ***intermediate frequency*** signal that has been pre-processed by an outdoor station by "down converting" the signal to a range of "950-1750 MHz," and not receiving an ***input RF signal***. Thomson claims a "[b]roadcast receiver adapted for analogue and digital transmitted signals . . . said signals being converted into an analogue IF-signal, characterized in that said IF signal is fed to a frequency down converter. . ." A266, Claim 1. The receiver is the invention, and it begins with an IF signal. *Id.* The invention depends on receiving a pre-processed, down converted signal from the outdoor unit, a component which is external to, and not a part of the receiver. A265, col. 1 l. 55 – col. 2 l. 1. To further emphasize that the outdoor unit is not a part of the receiver claimed in Thomson, none of outdoor unit's components, inputs, or processes is disclosed or described in Thomson. *See* A4857-A4858.

The required additional components that are external-to-the-receiver distinguish Thomson from the inventions of the '792 Patent, which claims a receiver capable of receiving terrestrial broadcast, cable television or satellite broadcast television signals as an input to an integrated unit. *See* A95, col. 1 ll. 14-

18.  One embodiment proposes integrating a large part of the components for this receiver into "a single integrated circuit," and an overall object of the invention is to design a television receiver that "can be built with minimal components, reducing the size and overall manufacturing cost of the television receiver system." A96, col. 3 ll. 30-45.  The invention of the '792 Patent accepts an input RF signal and does not require additional, third party components such as an outdoor unit to perform some prior undisclosed signal processing.

Dr. Opris stated that the $IF_{SAT}$ of Thomson fails to disclose, teach or suggest an "input RF signal" because RF is what comes out of the medium of propagation, not what comes out of a down conversion.  *See* A4938-A4939, ¶63. "In the Thomson patent, Thomson is very clearly teaching about an $IF_{SAT}$ signal which has been down converted."  *Id*.  The Board failed to consider Dr. Opris' testimony in this regard and failed to provide any reasonable basis for holding that an "input RF signal" could be disclosed by the presence of an intermediate frequency signal, which is different from an "input RF signal."

Because the Thomson ***receiver*** accepts an input ***IF*** signal, and not an ***input RF*** signal, as that term is properly construed, Thomson does not disclose a "frequency conversion circuit for receiving an input RF signal and for converting the input RF signal to an intermediate frequency signal having an intermediate frequency (IF)."  A99, Claim 1.

In its Final Determination, the Board relied on an "outdoor unit" discussed in Thomson, which is external to and prior to the receiver, as being the claimed frequency conversion circuit. However, Thomson provides no disclosure as to how the claimed frequency conversion is achieved by the "outdoor unit." *See* A265, col. 1 l. 55 – col. 2, l. 1:

> Nowadays, a multi-standard TV receiver should be able to function also as a satellite braodcast [sic] receiver. For that reason the outdoor unit supplies the satellite channels already down-converted in a frequency band covering 950 - 1750 MHz which should be handled by a multi- standard tuner. No additional disclosure is provided in Thomson as to how the outdoor unit supplies the above-mentioned down-conversion. Nor is the outdoor unit depicted in any of the figures of the referenced application.

*See also* A92, FIG. 1; A265, col. 2 ll. 30-39.

The only justification offered by the Board was that "[a]ll that is required is an input signal *in the RF frequency range*." *Id.* But Thomson discloses only one input signal – the signal being received *by the outdoor unit*. The *first* IF$_{SAT}$ signal of Thomson (*i.e.* the signal identified by the Board) is an intermediary frequency signal, which disqualifies it from being an "*input* RF signal." The Board failed to consider whether the first IF$_{SAT}$ signal of Thomson was an *input* signal at all. Here, one of ordinary skill in the art would not interpret an IF signal as being an input signal in the context of the claims of the '792 Patent. As such, the Board's determination regarding Thomson lacks substantial evidence.

47

## 2.    *The Board Improperly Placed the Burden on Cresta to Show that Thomson Does Not Disclose a Frequency Conversion Circuit*

The Board committed clear legal error by placing the burden of persuasion on Cresta to demonstrate that Thomson ***does not*** disclose "a frequency conversion circuit for receiving an input RF signal and for converting the input RF signal to an intermediate frequency signal. . . ." *See Motorola Mobility, LLC v. ITC*, 737 F.3d 1345, 1350 (Fed. Cir. 2013) ("At all times, the burden of persuasion rests on the party challenging the patent.").

The Board did not identify an enabling disclosure of a frequency conversion circuit within the Thomson reference. Instead, the Board held that there was simply no need to disclose "the ***precise*** circuitry used to establish the functionality. . . ." A51 (emphasis in original). The Board held that the Petitioner was entitled to a ***presumption*** that the outdoor unit was enabled and simply ***assumed*** that a circuit would be a part of an enabled structure. *Id.* As a result, the Board improperly held that it was Cresta's burden of production to show that the "outdoor unit" of Thomson does ***not*** disclose a frequency conversion circuit.

The Board 's decision is based on a misapplication of the presumptions set forth in *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). In *Amgen*, this Court held that "an accused infringer should be . . . entitled to have the district court presume ***the enablement*** of unclaimed (and

claimed) material in a prior art patent." *Id*. But in its Final Determination, the Board held that "[t]he burden of production as to whether the circuit must be ***disclosed*** in order for the disclosure to be enabled is on Patent Owner." A51. However, *Amgen* does not stand for the proposition that courts may ***presume*** that structure is ***disclosed*** within a prior art reference despite any reference to or description of such structure.

Disclosure and enablement are separate issues. Here, the outdoor unit is not ***disclosed*** as including any particular circuit. Even setting aside the issue of enablement, the threshold issue of disclosure was never addressed, and the Board committed clear legal error by requiring Cresta to show why it was necessary for a circuit to be disclosed at all.

The Board's misapplication of *Amgen* resulted in an erroneous decision because Thomson does not disclose a frequency conversion circuit within the outdoor unit either expressly or inherently. As the Board admits, "***both*** a 'circuit' and the required functionality *are necessary* to meet the construction" of "frequency conversion circuit." A51. Thomson discloses neither. With regard to a circuit, the "outdoor unit" is referenced twice in Thomson and neither reference mentions any circuitry. A265 at col. 1, lines 57-59 ("the outdoor unit supplies the satellite channels already down-converted in a frequency band covering 950 - 1750 MHz."); col. 2, lines 30-31 ("In Fig. 1 the incoming IF signal which may come

from an outdoor station is fed to SAW"). No figures even depict the outdoor unit at all, let alone including a circuit.

In addition, a circuit is not inherently disclosed in the outdoor unit because the outdoor unit does not necessarily have to be a frequency conversion circuit. As explained by Cresta's expert, the outdoor unit may generate the Thomson IF input signal by a variety of sources including a signal generator, which does not require a frequency conversion circuit. A4940, ¶68. *See also Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1355 (Fed. Cir. 2013) ("[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation, or the reference cannot inherently anticipate the claims").

Here, the missing disclosure, namely a frequency conversion circuit for receiving input RF signals and for converting said input RF signals to intermediate signals, is not expressly or inherently present in the Thomson. The Board incorrectly reassigned the burden of persuasion regarding the disclosure of a circuit to Cresta, and not the Petitioners. Had the Board properly applied the applicable burdens of persuasion, it would have found that Thomson does not disclose the claimed frequency conversion circuit.

**B.    There is No Evidence that Thomson Teaches a Signal Processor for Processing in Accordance with One Television Signal Format**

The Board also failed to properly determine whether Thomson includes "a signal processor for processing the digital representation of the intermediate frequency signal in accordance with the television signal format," as required by claim 1.  The Board construed this term as requiring "a digital module that processes signals in the digital domain *in the exactly one format* in which each received input RF signal is encoded."  A46.  Yet, Figure 1 of Thomson shows parallel pathways for the simultaneous processing of *two different* signal formats – analog and digital signals. *See* A267.

Petitioner identified the "bandpass filter 8" of Thomson as meeting the signal processor limitation, which discloses two parallel paths for processing, one for analog format and the other for digital television format processing.  A3019-A3020 (citing A3269-A3270 ¶¶ 21–22).  Thomson provides only a single passage describing a bandpass filter, which states that "bandpass filter 8 (see Fig. 2g) with an adaptively controlled bandwidth selects the designed signal with a minimal remainder of the adjacent channel signals." A266, col. 3 ll. 16-19.  Thomson is silent as to the apparatus through which the bandpass filter adapts itself.  However, Fig. 1 of Thomson shows that the bandpass filter feeds into *two* demodulators – one processing pathway for digital (labelled Q and I in Fig. 1) and a second processing pathway for analog signals (labelled CVBS, $S_{mod1}$ and $S_{mod2}$).  A267.

51



The presence of these parallel pathways demonstrates that bandpass filter 8 is processing **two different** signal formats, not one as required by the Board's construction.

Nothing in Thomson discloses that the bandpass filter processes intermediate signals in accordance with one television signal format. To the contrary, all of the evidence suggests that signals are processed along two parallel paths, one for analog format processing and the other for digital format processing. Dr. Opris explained that a bank of parallel bandpass filters, each processing the signal in accordance to a different format (*e.g.* analog format or digital format) in a parallel processing path was, at the time of the invention, the conventional means to provide a multi-format bandpass filter. A4944-A4945 ¶76. Upon cross examination, even Petitioner's expert Dr. Holberg admitted that the Thomson

bandpass filter 8 ***could*** operate as a bank of parallel bandpass filters. A5489-A5490. Dr. Opris explained that one of ordinary skill in the art reading Thomson would have understood that the Thomson bandpass filter 8 has two circuits in parallel (one for analog TV and one for digital TV). A4944-A4945, ¶ 76. Each of the outputs of each of these two circuits feeds its respective demodulator. *Id.*

In the absence of any expressed anticipatory disclosures regarding bandpass filter 8, the Petitioner simply ***assumed*** that the bandpass filter 8 of Thomson executes one filter function if the RF input signal is an analog TV format and another filter function if it is a digital TV format. A3018-A3019. This observation was ***not*** based on anything disclosed in Thomson regarding the bandpass filter 8 and appears to have been pure supposition. A4943 ¶ 74. The Petitioner and the Board simply assumed that because Figure 1 includes the words "TV Standard" near the box representing the bandpass filter 8, the bandpass filter was inherently disclosed as processing only one single format at a time. *See* A54 ("Patent Owner's position would "render[] the 'TV standard' input superfluous.").

However the mere presence of the words "TV Standard" in the proximity of the bandpass filter in the schematic of FIG. 1 does not inherently disclose, teach, or suggest that Thomson's bandpass filter processes only one signal format at a time. Furthermore, "inherent disclosure is appropriate only when the reference discloses prior art that must ***necessarily*** include the unstated limitation." *In re Omeprazole*

*Patent Litigation*, 483 F.3d 1364 (Fed.Cir.2007). Here, there was no evidence suggesting that the bandpass filter ***necessarily*** processes one signal at a time, and no expressed finding by the Board reached that conclusion. Instead, the Board only found that the Figure 1's parallel demodulators were "***not inconsistent*** with processing only one format at a time." *See* A54. But "[i]nherency ... may not be established by probabilities or possibilities. The mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient." *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011).

Here, the operation of the bandpass filter remains fatally unclear as it ***might*** or ***might not*** process signals in parallel or one at a time. Because only inherent disclosure has been asserted here, any ambiguity in Thomson supports Cresta's position, not the Petitioner's. The fact remains that the schematic of Fig. 1 discloses what was at the time a conventional demodulator configuration for processing digital and analog signals in parallel. A4943-A4944 ¶ 75. As such, all of the ***evidence*** before the Board confirms that one of ordinary skill in the art would recognize Thomson as disclosing parallel signal processing, and no evidence before the Board supports its finding of inherency.

## C.    The PTAB Improperly Combined Harris with Thomson

The Board also erred in its Final Determination, as a matter of law, by combining the Thomson reference with the Harris reference without providing a

clear reason to combine, and in a manner that would not have been obvious to one of ordinary skill in the art.  The Petitioner urged the Board to combine Thomson with Harris in an attempt to obviate the third element of claim 1 of the '782 patent, which requires that "the signal processor applies one of a plurality of finite impulse response filters… each of the plurality of finite impulse response filters corresponding to a format of the input RF signal."  The Petitioner admitted, and the Board agreed, that Thomson ***does not*** disclose the use of finite impulse response ("FIR") filters, but relied on the Harris reference for the teaching of FIR filters, generally.  *See* A3023-A3025.

However, it would *not* have been obvious to combine the Harris filter (in combination with an undisclosed microprocessor interface) with Thomson at least because the resulting combination would have been "inoperable for its intended purpose."  *See In re Urbanski*, 809 F.3d 1237, 1244 (Fed Cir. 2016).  For example, the Harris DDF is a *low pass filter* not a bandpass filter like the filter being replaced in Thomson.  A4947-A4948 ¶ 82.  Furthermore, the Harris DDF is not an adaptive filter; and there is no disclosure of an adaptive filter in Harris.  A4948-A4949 ¶ 83.  Because of the significant technical differences between the Harris DDF and the bandpass filter of Thomson, one of ordinary skill in the art would not have made the combination proposed by the Petitioner with an expectation of success and without the need for undue experimentation.

First, there is no dispute that the Harris DDF is a low pass filter not a bandpass filter like that of Thomson.  A4947-A4948 ¶82.  Harris states that the output of the ADC feeds a down converter and the down converter is comprised of two HSP43220 Digital Decimating Filters (DDFs).  A3173; A4947-A4948 ¶82.  Harris also states that "[t]he quadrature components of the NCOM output are each filtered by the DDFs which implement a low pass filter." A3173.

As explained by Dr. Opris, the Harris HSP43220 DDF is not a bandpass filter but instead "a linear phase low pass decimation filter" which is optimized for filtering narrow band signals."  A4947-A4948 ¶82; A5159.  Dr. Opris further explained that one of ordinary skill in the art would *not* have recognized that the substitution of the Harris DDF for the Thomson filter would have yielded the desired results.  A4947-A4948 ¶82.  The Harris DDF would be inoperable if combined with Thomson because the HSP45116 is limited to a maximum of 33Msps input data sampling and Harris does not provide an apparatus to up convert to the original frequency of the signal down converted by the HSP45116. *Id*.

**Neither the Petitioner nor the Board disputed that the combination of Thomson and Harris would be inoperable**.  Instead, the Board simply dismissed this critical flaw in Petitioner's theory by stating that "Harris teaches **generally** the use of DSP components to replace 'analog intermediate frequency (IF) processing

56

stage in wideband receivers.'"  A59.  However, "general" teachings cannot

overcome the fact that if the disclosures of Harris were combined with Thomson,

Thomson "would be rendered inoperable for its intended purpose."  *In re Gordon*,

733 F. 2d 900, 902 (Fed. Cir. 1984); *McGinley v. Franklin Sports, Inc.*, 262 F.3d

1339 (Fed. Cir. 2001).  One of skill in the art would not seek to replace a bandpass

filter with the lowpass filter such as the HSP43220 DDF of Harris and have any

expectation of success.  Because the proposed combination would have resulted in

an inoperable receiver, one of ordinary skill would not look to the combination

cited by the Board because such a combination would not have predictably yielded

the inventions of the '792 Patent.

 Furthermore, unlike bandpass filter 8 of Thomson, the Harris DDF is not an

adaptive filter and therefore would not be operable within Thomson's architecture.

As explained by Dr. Opris, Harris does not disclose a signal processor running a

program because Harris does not disclose any Arithmetic Logic Unit or other

computing means.  A4948-A4949 ¶83.  Rather, Harris discloses that the

coefficients are stored on the DDF chip prior to operation and therefore is hard-

wired to function as a filter.  *See* A4948-A4949 ¶83 ("The coefficients are loaded

into the Coefficient RAM over the control bus (C_BUS).").  Furthermore, there is

no provision or suggestion for adaptively changing the coefficients of the Harris

DDF chip while maintaining uninterrupted, proper filter operation. A4948-A4949

¶83 (citing A5163-A5164, Figs. 1-3).

While the Board clearly apprehended this irreconcilable incompatibility

between Thomson and Harris, the Board simply cited to the fact that the Harris

DDF includes "a standard microprocessor interface." A57-A58.  The Board

disregarded clear evidence that the Harris DDF cannot be made adaptive by the

Harris microprocessor interface.  For example, the general disclosure of "a

standard microprocessor interface" does not mean that the microprocessor interface

can be used to make the Harris DDF adaptive or that such modifications were

within the general knowledge of one of ordinary skill.  As explained by Dr. Opris,

there is **no mechanism** through which the microprocessor interface of the Harris

HSP43220 DDF would somehow extract information from the incoming signal,

and "adapt" the coefficients of the filter accordingly.  A4949 ¶84.  Because "a

standard microprocessor interface" of Harris only allows for the provision of static

coefficients that cannot be adapted, there is no finding or evidence to suggest that

the Harris DDF could be made adaptive for use within the architecture of

Thomson.  *Id.*; A3174.  Again, because Cresta's arguments regarding inoperability

were never overcome, or even addressed by the Board, one of ordinary skill would

not have looked to combine Thomson and Harris because such a combination

would not have predictably yielded the inventions of the '792 Patent.

Finally, the Board failed to explicitly articulate the reasons why the claimed invention would have been obvious. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Under *KSR*, a "rejection on obviousness cannot be sustained with mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Neither Thomson nor Harris provides any teaching, motivation, or suggestion for one of ordinary skill to modify the Thomson bandpass filter 8 with the Harris DDF processor because, as explained above, there would not have been any reasonable expectation of success at the time of the invention. The Board's sole discussion in this regard was a block quotation from the Petition, wherein the Petitioner simply argued that one of skill in the art would have selected FIR filters as opposed to infinite impulse response (IIR) filters because of hindsight design advantages. *See A58.* But the Petitioner *never* put forth a reason why one of skill in the art would seek to replace the bandpass filter of Thomson at all. The question is whether one of skill would have been motivated to seek to modify Thomson at all, not whether, in hindsight, the cited reference was a superior design choice.

The evidence before the Board shows not only that one of ordinary skill would not have had a reasonable expectation of success by substituting the Thomson bandpass filter 8 with the Harris DDF, but that Harris would have

rendered Thomson inoperable for its intended purpose. As such, one of ordinary skill would not have been motivated to use the Harris DDF processor as a substitute for the Thomson bandpass filter 8 and the Board's decision to the contrary was clear error.

### D. The Board Erred in Cancelling Claim 3 of the '792 Patent Based on Arguments Raised for the First Time in Petitioner's Reply

In its Final Determination, the Board violated its own rules by relying on an argument first raised in Petitioner's reply regarding claim 3 of the '792 Patent.

The Administrative Procedure Act ("APA") sets forth standards governing judicial review of findings of fact made by the PTAB. *See Dickinson v. Zurko*, 527 U.S. 150, 154 (1999). Under the APA, the Board "has broad authority to issue rules and regulations governing administration of its cases, but 'it is a familiar rule of administrative law that an agency must abide by its own regulations.'" *Align Tech. v. ITC*, 771 F.3d 1317, 1322 (Fed. Cir. 2014) (quoting *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990)). While the Board may "relax or modify its procedure rules for the orderly transaction of business before it," *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970), where the Board "did not exercise its authority to waive or suspend" a rule, an action violating that rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," *See Align*, 771 F.3d at 1325 n. 7.

Under the Board's rules, "[a] ***reply may only respond to arguments raised in the corresponding opposition or patent owner response***."  37 C.F.R. 42.23.  "[A] reply that raises a new issue or belatedly presents evidence will not be considered and may be returned."  Office Patent Trial Practice Guide, Part II.I, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012).

Petitioner's Corrected Petition for Review identified the "frequency conversion circuit" in claim 1 as including the SAW filter disclosed in Thomson.  *See* A4603-4604 A3614; *see also* A3314 (claim chart showing "frequency conversion circuit" limitation) (citing A265 col. 2 ll. 30-33 ("[T]he incoming IF signal which may come from an outdoor station is fed to SAW(surface acoustic wave) filter 1 and then to a mixer 2 which is fed by oscillator LO having a frequency of 70 MHz.").

Claim 3 recites the system of claim 1, "wherein the television receiver is formed as a monolithic integrated circuit."  A100, Claim 3.  In order to meet this limitation, Petitioner argued that "[a] POSITA at the time of the patent would have been motivated to reduce the tuner of Thomson and Harris . . . onto a single monolithic IC in order to save printed circuit board space."  Cresta responded that "[a]t the time of the '792 patent invention . . . it was not possible to integrate a SAW filter on a monolithic integrated circuit."  A4890 (citing A4966 ¶ 110).  SAW filters were "bulky analog device" and "a POSITA would have been faced

with the same barriers that the '792 patent inventors faced with attempts to integrate a receiver that employ[ed] the SAW filter analog components onto a monolithic integrated circuit, and thereby a POSITA would not have had a reasonable expectation of success." A4966-A4967 ¶ 110.

In its Reply, Petitioner argued for the first time that the SAW filter was not required to satisfy the "frequency conversion circuit" limitation of Claim 1, and thus, the remaining components alone could meet this limitation and be incorporated on a single integrated circuit. A5701. The Board agreed with Petitioner's reply argument, finding "that Thomson's SAW filter is not part of what is cited to meet the limitations of claim 1." A70-71.

By permitting Petitioner to advance an argument for the first time in its reply, and relying on that argument as part of its finding with respect to claim 3 of the '792 Patent, the Board effectively denied Cresta its procedural rights, in violation of the Board's own rules regarding replies. The Board's findings with respect to claim 3 of the '792 Patent should be reversed.

## CONCLUSION

For the reasons state above, the judgment of the Patent Trial and Appeal Board should be **REVERSED**.


Dated:  March 28, 2016                Respectfully submitted,

By:  <u>*/s/ Craig R. Smith*</u>
Craig R. Smith (*Lead Counsel*)
Eric P. Carnevale
William J. Seymour
**LANDO & ANASTASI, LLP**
Riverfront Office Park
One Main Street – 11th Floor
Cambridge, MA 02142
Tel: (617) 395-7000
Fax: (617) 395-7070
Email:  csmith@lalaw.com
ecarnevale@lalaw.com
wseymour@lalaw.com

*Attorneys for Petitioner Cresta Technology Corporation*

ADDENDUM

# TABLE OF CONTENTS

Final Written Decision, IPR No. 2014-00728 ('585 Patent) .......................A000001

Final Written Decision, IPR No. 2014-00809 ('792 Patent) .......................A000034

U.S. Patent No. 7,075,585...............................................................A000081

U.S. Patent No. 7,265,792...............................................................A000091

Trials@uspto.gov                                        Paper 53
571-272-7822                              Entered: October 21, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SILICON LABORATORIES, INC.,
Petitioner,

v.

CRESTA TECHNOLOGY CORPORATION,
Patent Owner.

_____

Case IPR2015-00728
Patent 7,075,585 B2

_____

Before PHILLIP J. KAUFFMAN, GREGG I. ANDERSON, and
PATRICK M. BOUCHER, *Administrative Patent Judges*.

BOUCHER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00728
Patent 7,075,585 B2

# I. INTRODUCTION

## A. Background

Silicon Laboratories, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–3, 5, 10, 13, 14, and 16–19 of U.S. Patent No. 7,075,585 ("the '585 patent"). After consideration of a Preliminary Response (Paper 8) filed by Cresta Technology Corporation ("Patent Owner"), the Board instituted trial on October 24, 2014. Paper 9 ("Dec.").

During the trial, Patent Owner timely filed a Patent Owner Response (Paper 30, "PO Resp."), and Petitioner timely filed a Reply to the Patent Owner Response (Paper 37, "Reply"). An oral hearing was held on July 7, 2015 (Paper 50, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has demonstrated by a preponderance of the evidence that claims 1–3, 5, 10, and 16–19 are unpatentable.

## B. Related Proceedings

Patent Owner has asserted the '585 patent against Petitioner in the following two actions: *Cresta Technology Corp. v. MaxLinear, Inc.*, 1:14-cv-00079-RGA (D. Del.); and *Certain Television Sets, Television Receivers,*

2

IPR2014-00728
Patent 7,075,585 B2

*Television Tuners, and Components Thereof*, Investigation No. 337-TA-910 (USITC). Pet. 1.

### C.  The '585 Patent

The '585 patent "relates to a broadband television signal receiver for receiving multi-standard analog television signals, digital television signals and data channels." Ex. 1101, col. 1, ll. 16–19. Figure 2 of the '585 patent is reproduced below.



Figure 2 provides a block diagram of television receiver 50 that receives input radio frequency (RF) signals at input terminal 52. *Id.* at col. 1, l. 52; col. 3, ll. 44–48. Tuner 54 converts an input RF signal to an intermediate-frequency signal that is filtered and processed by anti-aliasing filter 60. *Id.* at col. 3, ll. 48–51; col. 4, ll. 3–7. The center frequency of anti-aliasing filter 60 is selected based on the intermediate frequency of the intermediate signal. *Id.* at col. 4, ll. 31–33. After filtering, the intermediate signal is sampled and

3

IPR2014-00728
Patent 7,075,585 B2

digitized by analog-digital converter 62. *Id.* at col. 4, ll. 17–20. The
resulting digital representation is processed by digital signal processor 64
"according to the television standard to which the input RF signal is
encoded." *Id.* at col. 4, ll. 41–54. Specifically, the digital signal processor
applies a filter function that depends on a manually or automatically
established state of a standard selection circuit used to select among "the
several analog television standards and the several digital television
standards." *Id.* at col. 4, ll. 55–64; col. 5, ll. 7–22. A bank of demodulators
generates appropriate video and audio baseband signals from the digitally
processed signals. *Id.* at col. 6, ll. 42–44.

### D. Illustrative Claim

Claim 17 of the '585 patent is illustrative of the claims at issue:

17. A method for receiving input RF signal[s] comprising:
    receiving said input RF signals encoding information in
one of a plurality of formats;
    converting said input RF signals to intermediate signals
having an intermediate frequency;
    applying a first filter function to said intermediate
signals, said first filter function being an anti-aliasing filter and
having a center frequency;
    digitizing said filtered intermediate signals at a sampling
frequency;
    processing said digitized signals in accordance with said
format of said input RF signals and generating digital output
signals indicative of information encoded in said input RF
signals; and

4

IPR2014-00728
Patent 7,075,585 B2

demodulating using a plurality of demodulators said processed digitized signals to generate baseband signals corresponding to said format of said input RF signals.

### E. Grounds of Unpatentability

Petitioner relies on the following references to support the grounds on which we instituted review.

| | | | |
|---|---|---|---|
| Thomson | EP 0696854 A1 | Feb. 14, 1996 | Ex. 1004 |
| Kerth | US 6,804,497 B2 | Oct. 12, 2004 | Ex. 1011 |

Clay Olmstead and Mike Petrowski, *A Digital Tuner for Wideband Receivers*, DSP Applications Magazine (Sept. 1992) (Ex. 1005) ("Harris")

Prior art shown in Figure 1 of the '585 patent and related description (Ex. 1001).

We instituted this proceeding based on the following grounds.

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Thomson | § 102(b) | 1, 2, 5, and 16–19 |
| Thomson and Harris | § 103(a) | 1, 2, 5, 10, and 16 |
| Thomson and Figure 1 of the '585 patent | § 103(a) | 1, 2, 5, and 16 |
| Thomson, Harris, and Figure 1 of the '585 patent | § 103(a) | 1, 2, 5, 10, and 16 |
| Thomson and Kerth | § 103(a) | 3 |
| Thomson, Harris, and Kerth | § 103(a) | 3 |

5

IPR2014-00728
Patent 7,075,585 B2

## II. ANALYSIS

### A. Claim Construction

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, at 1277–79 (Fed. Cir. 2015); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).[1]

### 1. *"input RF signals" and "tuner for receiving input RF signals"*

Independent claims 1 and 17 respectively recite "a tuner for receiving input RF signals" and "receiving said input RF signals." In the Institution Decision, we adopted a preliminary construction of "RF signals" as signals having a frequency between 10 kHz and 100 GHz. Dec. 6 (citing Ex. 3001, *The Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000), 912, for a definition of "radio frequency").

Patent Owner contends that that construction is inappropriate because "the Board is dissecting the claim term by not addressing that the complete claim limitation which is recited as 'input RF signals.'" PO Resp. 10. Patent Owner proposes that the full term "input RF signal" be construed as

---

[1] Patent Owner argued in its Patent Owner Response that the standard for claim interpretation should be the judicial standard established by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), but withdrew that argument at the oral hearing after the Federal Circuit decided *Cuozzo*. PO Resp. 16–18, Tr. 70:12–22.

6

IPR2014-00728
Patent 7,075,585 B2

"a signal that is an incoming signal that comes out of the medium of propagation and is external to the tuner without any processing by the tuner." *Id.* at 11. Patent Owner similarly proposes that "tuner for receiving input RF signals" be construed as a tuner that receives an incoming signal that comes out of the medium of propagation and is external to the tuner without any processing. *Id.* at 12. Patent Owner supports its proposed constructions by identifying disclosures in the '585 patent that relate to the receipt and conversion of an input RF signal to an intermediate frequency signal. *Id.* at 10–11.

Petitioner responds that "[t]he word 'input' cannot bear the weight [Patent Owner] places upon it." Reply 3. Petitioner supports its contention that "the terms 'input' and 'input signals' should be construed as signals that are input to a circuit or device" with testimony by Douglas Holberg, Ph.D. *Id.* (citing Ex. 1072 ¶ 9). Petitioner also observes that claim 16 recites specific sources for the input RF signals, "mak[ing] clear that neither the source nor the medium of the input RF signal is a limitation on the term." *Id.* at 3–4 (citing *Trebro Mfg., Inc. v. Firefly Equipment, LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014)).

Although Patent Owner's proposed construction is not without appeal, we disagree that it corresponds to the broadest reasonable interpretation in light of the specification. Patent Owner's implication that "input RF signal" can be considered only as an undivided expression is belied by references

7

IPR2014-00728
Patent 7,075,585 B2

within the '585 patent that parse the expression, such as in Figures 1 and 2, which identify an "Input Signal" with a parenthetical notation of frequency.[2]

We construe "input RF signals" as signals that are input having a frequency between 10 kHz and 100 GHz, and we construe "tuner for receiving input RF signals" as a tuner that receives signals that are input having a frequency between 10 kHz and 100 GHz.

### 2. "said input RF signals encoding information in one of a plurality of formats"

Independent claims 1 and 17 recite "said input RF signals encoding information in one of a plurality of formats." In the Institution Decision, we adopted a preliminary construction of "format" such that analog and digital signals are examples of distinct formats. Dec. 7. After considering the submissions of the parties during the trial, we see no compelling reason to alter that construction.

Patent Owner contends that the phrase "said input RF signals encoding information in one of a plurality of formats" requires "receiving one format RF signal at a time." PO Resp. 13. It is unclear what Patent Owner means by "format RF signal," which appears nowhere in the '585 patent, including its claims.

The claims unambiguously require receipt of a plural number of "input RF signals." In describing the function of standard selection circuit

---

[2] *See also* Ex. 1001, col. 1, l. 60 (referring to "the RF signal").

8

IPR2014-00728
Patent 7,075,585 B2

68, the specification of the '585 patent makes clear that different received input RF signals may encode information in different formats, but that each received input RF signal encodes information in exactly one format: "Each demodulator in bank **66** generates a signal which is fed back to standard selection circuit **68** indicating *which television standard the input signal is encoded*." Ex. 1001, col. 5, ll. 18–20 (emphasis added). Thus, applying the broadest reasonable interpretation in light of the specification for purposes of this Decision, we construe "said input RF signals encoding information in one of a plurality of formats" as requiring that each received input RF signal encode information in exactly one format.

> 3. *"processing said digital representation of said intermediate signals in accordance with said format" and*
> *"processing said digitized signals in accordance with said format"*

Independent claim 1 recites "processing said digital representation of said intermediate signals in accordance with said format" and independent claim 17 recites "processing said digitized signals in accordance with said format." Patent Owner contends that, under the broadest reasonable interpretation in light of the specification, the phrases exclude processing a plurality of formats in parallel. PO Resp. 13, 16. We agree, and, accordingly, construe the phrases to require processing in accordance with the exactly one format in which each received input RF signal is encoded.

9

IPR2014-00728
Patent 7,075,585 B2

*4. "signal processor"*

Independent claim 1 recites a "signal processor," which we construed in the Institution Decision as "a digital module that processes signals in the digital domain." Dec. 8–9. Patent Owner contends that "the signal processor processes only **one** format RF signal and does not process a plurality of formats in parallel." PO Resp. 13. We address Patent Owner's contention that "the signal processor processes only **one** format RF signal and does not process a plurality of formats in parallel" above. *See* PO Resp. 13. We otherwise see no compelling reason to modify that construction, and construe "signal processor" as a digital module that processes signals in the digital domain.

*5. "receiver"*

The preamble of independent claim 1 recites "A receiver comprising . . . ," and each of challenged dependent claims 2, 3, 5, 10, 13, 14, and 16 refers back to "[t]he receiver." No claim otherwise relies on the recitation of a "receiver" for antecedent basis.

Patent Owner proposes that "receiver" be construed as "an apparatus that first converts the incoming radio frequency (RF) signals to intermediate frequency (IF) signals and then second, it converts the intermediate frequency (IF) signals to baseband signals." *Id.* at 15. We disagree with Patent Owner's proposed construction because, as Petitioner asserts, "[r]ather than 'breathing life into the claims,' the term 'receiver' merely

10

IPR2014-00728
Patent 7,075,585 B2

recites a purpose or intended use for the invention, and thus is not a claim limitation." Reply 5 (citing *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). Petitioner's position is supported by the testimony of Dr. Holberg, who states his opinion that "the term 'receiver' is not a necessary part of the claim" and that "the body of the claims recite a complete invention without reference to the word 'receiver' in the preamble." Ex. 1072 ¶ 21.

Because recitation of the term "receiver" does not limit the claims, we do not construe it.

### 6. *"video and audio baseband signals" and "baseband signals"*

Independent claims 1 and 17 respectively recite "generating video and audio baseband signals corresponding to said format of said input RF signals" and "to generate baseband signals corresponding to said format of said input RF signals." In the Institution Decision, we construed "baseband signal" as a signal without transmission modulation. Dec. 7–8.

Although Patent Owner asserts that it "provides and argues claim construction for . . . 'each of said demodulators generating video and audio baseband signals,'" we do not discern any specific claim construction proposed by Patent Owner in its Response. PO Resp. 8. Instead, as Petitioner observes, Patent Owner "did not provide an explicit definition of this term in its response, but its expert apparently disagrees with the Board's construction of 'baseband signals.'" Reply 6 (citing Ex. 2003 ¶ 59). Petitioner otherwise contends that a person of ordinary skill in the art

11

IPR2014-00728
Patent 7,075,585 B2

"would interpret 'baseband signals' consistent with the Board's previous construction" but that "baseband signaling does not preclude some form of modulation." *Id.* (citing Ex. 1072 ¶ 22; Ex. 1001, col. 5, ll. 59–65; Ex. 1020, col. 11, ll. 43–44).

We take this opportunity to clarify an aspect of our construction, noting that the plural language of the phrases in the claims is consistent with the plural recitation of "input RF signals" that are received. Consistent with the parallel pluralism of the claim language, we adopt a construction in which each "video and audio baseband signal" may correspond to a single signal that encodes both video and audio information without transmission modulation.

### B.  Patent Owner's Motion to Exclude

Dr. Holberg's support of the Petition appears in two declarations, filed as Exhibits 1009 and 1072. Patent Owner moves to exclude both declarations because Dr. Holberg's "knowledge is below what one of ordinary skill in the relevant art would know, and would have to know to understand the relevance of the prior art and the invention" and because "his testimony clearly shows lack of credibility." Paper 40, 1. Patent Owner clarified at the oral hearing that "credibility" does not refer to Dr. Holberg's honesty, but to his ability to put support for his opinions on the record. Tr. 76:9–77:24. Petitioner opposes, contending that Dr. Holberg is qualified as an expert in the relevant field. Paper 46, 3–4.

12

IPR2014-00728
Patent 7,075,585 B2

The parties disagree in their characterization of the relevant field in evaluating whether Dr. Holberg is "qualified as an expert by knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702. Patent Owner contends that a person of ordinary skill in the art at the time of the invention of the '585 patent

> would be familiar with: 1) fundamental RF circuit design concepts, e.g. heterodyne, superheterodyne, tuner, baseband, intermediate frequency, 2) fundamental RF television circuit design criteria, e.g. sensitivity, signal-to-noise ratio, linearity, 3) the required signal-to-noise ratio for an analog TV tuner, and 4) basic usage of the Cadence design platform (the most widespread RF integrated circuit design tool).

Paper 40, 3–4. We find Patent Owner's characterization of the relevant field too narrow. The '585 patent characterizes the field of the invention as follows, notably lacking the strong focus of Patent Owner's characterization on RF circuit design:

> The present invention relates to a television signal receiver, and in particular, the present invention relates to a broadband television signal receiver for receiving multi-standard analog television signals, digital television signals and data channels.

Ex. 1001, col. 1, ll. 15–19. As Petitioner observes, the only RF component of the claimed receiver is the "tuner for receiving input RF signals and for converting said input RF signals to intermediate signals having an intermediate frequency." Paper 46, 2 (citing Ex. 1001, col. 6, ll. 52–55). The '585 patent describes the tuner as "a commercially available discrete component" that "can perform a single or dual super-heterodyne

13

IPR2014-00728
Patent 7,075,585 B2

conversion." Ex. 1001, col. 3, ll. 51–55. Patent Owner's expert, Dr. Opris, further acknowledged that heterodyne and superheterodyne conversion has been known for about 100 years. Ex. 1056, 26:11–20. These factors weigh significantly against defining the field of *invention* as narrowly as Patent Owner proposes. Instead, we agree with Petitioner, and find that a person of ordinary skill in the art would have held at least a Masters of Science or higher degree in electrical engineering, have at least four years of experience with mixed signal system design, including analog front ends and subsequent digital signal processing of various analog and digital signal formats of video and audio content. Pet. 16–17.

Dr. Holberg's education and experience exceed these qualifications. Ex. 1009 ¶ 3, App. A. We also have considered Patent Owner's contention that Dr. Holberg's cross-examination testimony shows that he lacks ordinary skill in the art of the invention, and have reviewed that testimony. We conclude that Dr. Holberg is an expert in the relevant field of the invention.

Accordingly, we deny Patent Owner's Motion to Exclude.

### C. Thomson

Thomson describes a broadcast receiver. Ex. 1004, col. 1, ll. 3–4. Figure 1 of Thomson is reproduced below.

14

IPR2014-00728
Patent 7,075,585 B2



Figure 1 is a block diagram showing components of the broadcast receiver, which may receive incoming signal $IF_{SAT}$ from an outdoor station. *Id.* at col. 2, ll. 30–31. Incoming signal $IF_{SAT}$ results from the outdoor station supplying satellite channels already down-converted in a frequency band covering 950–1750 MHz. *Id.* at col. 1, l. 56–col. 2, l. 1. Incoming signal $IF_{SAT}$ is, therefore, an "input RF signal" as we have construed the term. Thomson teaches that the "proposed architecture allows a digitising of the Sat-If signals no matter that they are analog or digital ones." *Id.* at col. 1, ll. 42–43.

Incoming signal $IF_{SAT}$ is down-converted by SAW filter 1 and mixer 2, which respectively suppress adjacent channel components and achieve a "frequency transposition into an IF signal of around 75 MHz." *Id.* at col. 2, ll. 30–33; col. 2, ll. 47–57. AGC amplifier 5 includes "an internal bandpass limitation" (*id.* at col. 2, ll. 58–59) that prevents aliasing when A/D

15

IPR2014-00728
Patent 7,075,585 B2

converter 7 digitizes the IF signal at a sampling frequency. *Id.* at col. 3, ll. 1–14. Bandpass filter 8 applies "an adaptively controlled bandwidth [to] select[] the desired signal with a minimal remainder of the adjacent channel signals." *Id.* at col. 3, ll. 16–19. FM demodulator 9 and low-pass filter 10 output a CVBS ("composite video baseband signal"), and synchronous demodulators 12 and 13 effect QPSK ("quadrature phase shift keying") demodulation to provide quadrature ("Q") and in-phase ("I") signals. *Id.* at col. 2, ll. 37–44.

### 1. *Anticipation of Claims 1, 2, 5, and 16–19 by Thomson*
#### *a. Claim 17*

Petitioner contends that the broadcast receiver disclosed by Thomson performs all steps recited in independent claim 17. Pet. 21–27. We address each limitation of the claim as follows.

#### *i. Preamble: "A method for receiving input RF signal[s]"*

Petitioner contends that the preamble of "[a] method for receiving input RF signal[s]" is not limiting. Pet. 22. We agree and find that the body of the claim fully and intrinsically sets forth all limitations of the claimed invention. *See Pitney Bowes, Inc. v. Hewlett Packard Co.*, 182 F.3d 1293, 1305 (Fed. Cir. 1999). The preamble merely states the purpose of the claimed invention rather than any distinct definition of the invention's limitations.

16

IPR2014-00728
Patent 7,075,585 B2

### ii. *"receiving said input RF signals encoding information in one of a plurality of formats"*

Petitioner contends that Thomson teaches "receiving said input RF signals encoding information in one of a plurality of formats" because the multi-standard tuner of Thomson can receive RF signals in a plurality of formats, including analog and digital. Pet. 22 (citing Ex. 1004, col. 1, ll. 42–43). Patent Owner contends that "Thomson does not teach a receiver for receiving input RF signals," but instead "describes an apparatus that receives input *IF* signals." PO Resp. 23. We agree with Petitioner.

Although Thomson labels the input signal as "$IF_{SAT}$" to reflect that satellite channels have already been down-converted when received by the broadcast receiver, $IF_{SAT}$ is disclosed as having a radio frequency and is shown in Figure 1 of Thomson as input to SAW filter 1. Ex. 1004, col. 1, l. 56–col. 2, l. 1. As we note above, it is therefore an "input RF signal" as we have construed the term. *See In re Gleave*, 530 F.3d 1331, 1334 (Fed. Cir. 2009) (although a reference must disclose each and every limitation in a claim to anticipate the claim, the reference need not satisfy an *ipsissimis verbis* test).

17

IPR2014-00728
Patent 7,075,585 B2

> ### iii. "converting said input RF signals to intermediate signals having an intermediate frequency"

Petitioner contends that Thomson discloses "converting said input RF signals to intermediate signals having an intermediate frequency" because the $IF_{SAT}$ signal of Thomson is further downconverted by mixer stage 2 into "an IF signal of around 75 MHz." Pet. 23 (citing Ex. 1004, col. 2, ll. 53–57). Patent Owner's argument that the limitation is not taught by Thomson relies on its proposed construction of "input RF signal," which we have not adopted. *See* PO Resp. 24–26. We agree with Petitioner and find that the limitation is taught by Thomson for the reasons Petitioner expresses.

> ### iv. "applying a first filter function to said intermediate signals, said first filter function being an anti-aliasing filter and having a center frequency"

Petitioner contends that Thomson discloses "applying a first filter function to said intermediate signals" because the intermediate signal of Thomson is directed to AGC amplifier 5, which has an internal bandpass limitation. Pet. 23–34 (citing Ex. 1004, col. 2, l. 58–col. 3, l. 1). Petitioner further contends that Thomson discloses "said first filter function being an anti-aliasing filter and having a center frequency" because Thomson's bandpass filter is designed to avoid aliasing and because a bandpass filter also inherently has a center frequency in the middle of the bandpass. *Id.* at 24 (citing Ex. 1004, col. 3, ll. 9–16). Petitioner supports its contentions with testimony by Dr. Holberg. Ex. 1009 ¶ 35.

18

IPR2014-00728
Patent 7,075,585 B2

Patent Owner responds that "it is uncertain . . . that Thomson
discloses a bandpass filter as part of the amplifier." PO Resp. 31. Patent
Owner notes that "the sole allusion to a filtering function is the two letters
'BP' placed inside [the] amplifier symbol for element 5," and cites
Dr. Opris's opinion that there is no indication in Thomson of any specific
filtering being performed. *Id.* at 31–32 (citing Ex. 2003 ¶ 77). Although we
do not discount Dr. Opris's opinion, the "BP" indication on AGC amplifier 5
is at least suggestive, and we are persuaded by Petitioner that further
indications in Thomson support its position. In particular, Figure 2 of
Thomson shows frequency spectra for the conversion of the analog $IF_{SAT}$
signal into a digital IF signal, and includes a dashed arrow that Dr. Holberg
explains represents the "'sum' signal has been removed by the 'internal
bandlimiting function' of the AGC." Reply (citing Ex. 1072 ¶ 44).
Furthermore, during the related ITC proceeding, Patent Owner's witness,
Dr. Caloyannides, testified that unless these spectra were removed, they
would cause aliasing. *See* Ex. 1054, 30.

Weighing these various considerations, we conclude that Petitioner
has established, by a preponderance of the evidence, that Thomson discloses
the claim limitation. We further note our agreement with Petitioner that the
bandpass filter disclosed by Thomson has a center frequency. In its Patent
Owner Response, Patent Owner does not advocate for any construction of
"center frequency" different than the plain and ordinary meaning of a

19

IPR2014-00728
Patent 7,075,585 B2

"frequency in the middle of the bandpass," which the AGC amplifier necessarily has. *See* Pet. 24 (citing Ex. 1009 ¶ 35).

 *v. "digitizing said filtered intermediate signals at a sampling frequency"*

 Petitioner contends that Thomson discloses "digitizing said filtered intermediate signals at a sampling frequency" because the filtered output of the AGC amplifier is coupled to an analog-to-digital converter that performs the recited digitizing. Pet. 25 (citing Ex. 1004, col. 1, l. 47, Fig. 1). We agree with Petitioner's contention.

 *vi. "processing said digitized signals in accordance with said format of said input RF signals and generating digital output signals indicative of information encoded in said input RF signals"*

 Petitioner contends that Thomson discloses "processing said digitized signals in accordance with said format of said input RF signals and generating digital output signals indicative of information encoded in said input RF signals" because adaptive filter 8 makes a selection of analog or digital formats based on a "TV standard" input to the filter. Pet. 25–26.

 First, Patent Owner contends that "Thomson does not teach a signal processor that processes in accordance with **one** format instead of processing in accordance with a plurality of formats." PO Resp. 36; *see id.* at 48. We are not persuaded by this contention because the argument is not commensurate with the claim construction we have adopted. Above, we express our agreement with Patent Owner that "processing said digitized

20

IPR2014-00728
Patent 7,075,585 B2

signals in accordance with said format" requires processing in accordance with the exactly one format in which each received input RF signal is encoded. But that construction does not require that processing of different RF signals all be performed in accordance with the same format. Indeed, an expressed objective of the '585 patent is processing of television signals received "in a variety of television standards and formats." Ex. 1001, col. 2, ll. 43–46.

Second, Patent Owner contends that "[n]othing in Thomson discloses that the Thomson bandpass filter 8 processes in accordance with the TV standard of the signal." PO Resp. 37 (citing Ex. 2003 ¶ 86); *see id.* at 48. Petitioner's and Patent Owner's experts disagree whether processing in accordance with the "TV standard" is reasonably inferred from that designation at adaptive filter 8 in Figure 1 of Thomson. *Compare* Ex. 1009 ¶ 37 *with* Ex. 2003 ¶ 86. But Petitioner's expert, Dr. Holberg, further observes that the output of adaptive filter 8 is fed to two modulators in parallel. Ex. 1072 ¶ 49. Dr. Holberg explains that the symbol used with the "TV standard" designation would be understood by one of skill in the art as representing "a tuning or control mechanism for the filter." *Id.* ¶ 50. We give greater weight to the testimony of Dr. Holberg because Dr. Opris's characterization of this aspect of Thomson provides insufficient explanation for the "TV standard designation" and would render that designation superfluous.

21

IPR2014-00728
Patent 7,075,585 B2

We conclude that Petitioner has demonstrated, by a preponderance of the evidence, that Thomson discloses the claim limitation.

*vii. "demodulating using a plurality of demodulators said processed digitized signals to generate baseband signals corresponding to said format of said input RF signals"*

Petitioner contends that Thomson discloses "demodulating using a plurality of demodulators said processed digitized signals" because digitized output signals of adaptive filter 8 are input to "an FM demodulator" and a "QPSK demodulator." Pet. 26–27 (citing Ex. 1004, col. 4, ll. 10–11). Petitioner further contends that Thomson discloses "to generate baseband signals corresponding to said format of said input RF signals" because the FM demodulator demodulates digital signals broadcast in the analog TV format, and the QPSK demodulator demodulates digital signals broadcast in the digital TV format. *Id.* (citing Ex. 1004, col. 1, ll. 10–13, col. 1, l. 27–28, col. 3, l. 55). Petitioner contends that demodulated signals, namely CVBS ("composite video baseband signal"), $S_{mod\,1}$, $S_{mod\,2}$, and Q and I, are baseband signals. *Id.* Petitioner supports its analysis with testimony by Dr. Holberg. Ex. 1009 ¶¶ 38, 39.

Patent Owner contends that Petitioner has not established that the digital demodulator of Thomson outputs audio signals in addition to video signals. PO Resp. 41–42. We are not persuaded by this argument. As Dr. Holberg explains, one of skill in the art would understand from Thomson

22

IPR2014-00728
Patent 7,075,585 B2

that it describes a QPSK encoded MPEG signal that includes both video and audio information.  Ex. 1072 ¶ 52, 53.

We also are not persuaded by Patent Owner's contentions that I and Q "cannot be baseband signals" because they are not in the same QPSK format that they were before transmission.  PO Resp. 43.  The construction of "baseband signal" that we have adopted requires removal of the original transmission carrier, not all forms of modulation.  As Petitioner notes, the '585 patent expressly acknowledges that modulated signals can be baseband signals.  Reply 12 (citing Ex. 1001, col. 5, ll. 59–62 (describing AM, FM, or intercarrier modulation)).

### viii.  Summary

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that claim 17 is anticipated by Thomson.

### b.  Claim 18

Claim 18 depends from claim 17 and recites that "said plurality of formats comprise an analog television format and a digital television format."  Petitioner identifies disclosure in Thomson of an architecture that allows digitizing both analog and digital television signals.  Pet. 27–28.  We note that the claim does not require both that signals encoding information in an analog format be received and that signals encoding information in a

23

IPR2014-00728
Patent 7,075,585 B2

digital format be received, only that the received input RF signals encode in

formation in "one" of the formats identified by claim 18.

We conclude that Petitioner has shown by a preponderance of the

evidence that claim 18 is anticipated by Thomson.

*c. Claim 19*

Claim 19 recites that "said processing said digital signals is performed

in response to a select signal indicative of said format of said RF signal."

Petitioner contends that this limitation is disclosed by Thomson's bandpass

filter 8, which has an adaptively controlled bandwidth and which "selects the

desired signal with a minimal remainder of the adjacent channel signals."

Pet. 28 (citing Ex. 1004, col. 3, ll. 17–19). Petitioner identifies the "TV

standard" signal shown in Figure 1, contending that "[t]he processing of the

'desired signal' is performed in response to the setting of the 'TV standard'

signal provided to the bandpass filter 8." Pet. 28. Petitioner supports its

argument with declaration testimony of Dr. Holberg. Ex. 1009 ¶ 42.

Patent Owner responds that it is "far from clear or convincing" that

the notation of "TV standard" on the drawing has the meaning that Petitioner

and Dr. Holberg ascribe to it. PO Resp. 48–51. Patent Owner's contentions

parallel those that we address *supra* with respect to claim 17's recitation of

"processing said digitized signals in accordance with said format of said

input RF signals and generating digital output signals indicative of

24

IPR2014-00728
Patent 7,075,585 B2

information encoded in said input RF signals." For the reasons we express there, we are not persuaded by Patent Owner's position.

Patent Owner also responds that Thomson's bandpass filter "is not a signal processor because it cannot fulfill . . . the 'adaptive' function." PO Resp. 47. Specifically, Patent Owner cites testimony by its expert, Dr. Opris, that a person of ordinary skill in the art "would have serious difficulties in implementing an undisclosed method for the adaptive filter 8 in Thomson because the only indication [in] Thomson about the adaptation is Figure 2 g) that shows that the bandpass filter can have a variable shape." *Id.* (citing Ex. 2003 ¶ 100).

Petitioner's expert, Dr. Holberg, disagrees that a person of ordinary skill in the art would have such difficulty, "given the vast body of work in that area." Ex. 1072 ¶ 58. Petitioner cites the testimony of Dr. Holberg, which provides examples of implementations that would be within ordinary skill. Reply 13 (citing Ex. 1072 ¶ 52). We credit that testimony and conclude that Petitioner has demonstrated, by a preponderance of the evidence, that claim 19 is anticipated by Thomson.

### d. Claims 1, 2, 5, and 16

Both Petitioner and Patent Owner advance arguments directed at claims 1 and 2 that parallel those we address above for claims 17 and 18. *See* Pet. 28–33; PO Resp. 22–45. With respect to the recited "signal processor," we are persuaded that the adaptive bandpass filter disclosed by

25

IPR2014-00728
Patent 7,075,585 B2

Thomson is a "signal processor" as we have construed the term because it is a digital module that processes signals in the digital domain. *See* Pet. 30. For the reasons we express above, we disagree with Patent Owner's contention that "bandpass filter 8 is not a signal processor because it cannot fulfill, as shown in Fig. 1, the 'adaptive' function." PO Resp. 37. Specifically, we credit Dr. Holberg's testimony, which provides examples of such implementations within the skill of an ordinary artisan. With respect to other limitations of claims 1 and 2, we incorporate our analysis for claims 17 and 18. We conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 2 are anticipated by Thomson.

Claim 5 recites that "said intermediate frequency comprises a frequency value other than those specified by one or more television standards." Petitioner identifies the 75-MHz intermediate frequency disclosed by Thomson, observing that the intermediate frequency "specified for the United States is 41 to 47 MHz." Pet. 34 (citing Ex. 1001, col. 1, l. 67). We conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 5 is anticipated by Thomson.

Claim 16 recites that "said input RF signals comprise RF signals received from one of terrestrial broadcast, from satellite broadcast, and from cable transmission." Petitioner identifies disclosure in Thomson of a "multi-standard" tuner capable of receiving satellite-broadcast, terrestrial, and cable transmissions. *Id.* at 34–35 (citing Ex. 1004, col. 1, l. 55–col. 2, l. 19). We

26

IPR2014-00728
Patent 7,075,585 B2

conclude that Petitioner has demonstrated by a preponderance of the
evidence that claim 16 is anticipated by Thomson.

### 2. Obviousness of Claims 1, 2, 5, 10, and 16 over Thomson and Harris

Harris discloses a digital tuner that uses "standard off the shelf DSP
[integrated circuits] as digital replacements for the analog intermediate
frequency (IF) processing stage in wideband receivers." Ex. 1005, 1. As
illustrated in Figure 6 of Harris, such wideband channelized receivers use an
analog-to-digital converter to convert an incoming RF signal to an IF signal,
which subsequently is processed by a set of finite impulse response filters.
*Id.* at 5–6. Harris further teaches that "[i]n systems where the second IF
filter stage consists of a bank of filters to support various operational modes,
cost and board space can be saved [by] reconfiguring a single DDF [digital
decimation filter] to implement the filter required by each operational
mode." *Id.* at 5.

Petitioner contends that each of claims 1, 2, 5, 10, and 16 is
unpatentable under 35 U.S.C. § 103(a) over Thomson and Harris,
contending that it would have been obvious for one of ordinary skill in the
art "use a single reprogrammable FIR filter, memory, and processor of
Harris to implement the adaptive filter in [Thomson] because the adaptive
filter is designed 'to support various operational modes' such as analog and
digital TV formats." Pet. 37 (citing Ex. 1009 ¶ 56). Patent Owner responds

27

IPR2014-00728
Patent 7,075,585 B2

that the combination would not teach all the limitations of the claims, and that Petitioner has not articulated a sufficient reason to make the combination. PO Resp. 51. We disagree with Patent Owner's first contention because we find that Thomson discloses all limitations of the claims for the reasons explained *supra*.

Patent Owner identifies four bases for its second contention: (1) the Harris DDF is a low-pass filter rather than a bandpass filter; (2) the Harris DDF is not an adaptive filter; (3) the Harris DDF cannot be made adaptive by the Harris microprocessor interface; and (4) substitution of Thomson's bandpass filter 8 with the Harris DDF would not have obtained predictable results. *Id.* at 52. We are not persuaded by these bases because "Petitioner is not relying on the specific Harris DDF component, but rather on Harris's overall teaching of programmable, digital FIR filters to implement a 'channelized receiver' in various communications applications." Reply 14 (citing Pet. 9–10). Petitioner articulates sufficient reasoning underpinned by the testimony of Dr. Holberg to support the legal conclusion of obviousness. *See* Ex. 1072 ¶¶ 59–64; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

28

IPR2014-00728
Patent 7,075,585 B2

We conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 5, 10, and 16 are unpatentable under 35 U.S.C. § 103(a) over Thomson and Harris.

### 3. Obviousness of Claims 1, 2, 5, and 16
### over Thomson and Figure 1 of the '585 Patent

Petitioner challenges claims 1, 2, 5, and 16 as unpatentable under 35 U.S.C. § 103(a) over Thomson and Figure 1 of the '585 patent. Pet. 43–47. Specifically, Petitioner contends that Figure 1 of the '585 patent demonstrates that "it was well known in the art to use separate demodulators for each separate television format or standard," and that the demodulators shown in the drawing "produced audio and video baseband signals . . . so that they could produce sound and video on the television receiver." Pet. 44 (citing Ex. 1001, Fig. 1, col. 2, ll. 12–26; Ex. 1009 ¶ 66). We agree with Petitioner's contention.

Patent Owner's response relies on testimony by Dr. Opris that the demodulators in Figure 1 cannot be combined with the Thomson apparatus "because the description of Fig. 1 of the [']585 patent states that the IF is 41 to 47 MHz . . . and those IF values are clearly used only in cable or terrestrial TV and do not work in satellite TV." PO Resp. 61 (citing Ex. 2003 ¶ 118). We are not persuaded by this response because "[t]he test for obviousness is not whether the features of a secondary reference may be

29

IPR2014-00728
Patent 7,075,585 B2

bodily incorporated into the structure of the primary reference." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

We conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 5, and 16 are unpatentable under 35 U.S.C. § 103(a) over Thomson and Figure 1 of the '585 patent.

*4. Obviousness of Claims 1, 2, 5, 10, and 16*
*over Thomson, Harris, and Figure 1 of the '585 Patent*

Petitioner challenges claims 1, 2, 5, 10, and 16 as unpatentable under 35 U.S.C. § 103(a) over Thomson, Harris, and Figure 1 of the '585 patent. Pet. 43–47. Petitioner applies the same rationale for combining the teachings of Figure 1 of the '585 patent in this challenge as in its challenge of claims 1, 2, 5, and 16 over Thomson and Figure 1 of the '585 patent. *Id.* Patent Owner reiterates its previous responses regarding the teachings of Harris and of Figure 1 of the '585 patent. For the reasons expressed above, we are persuaded by Petitioner's arguments.

We conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 5, 10, and 16 are unpatentable under 35 U.S.C. § 103(a) over Thomson, Harris, and Figure 1 of the '585 patent.

30

IPR2014-00728
Patent 7,075,585 B2

*5. Obviousness of Claim 3 over Thomson and Kerth and
over Thomson, Harris, and Kerth*

Claim 3 depends from independent claim 1 and recites "a digital-to-analog converter coupled between said signal processor and a first one of said plurality of demodulators, said digital-to-analog converter converting said digital output signals to an analog format." Petitioner challenges claim 3 as unpatentable under 35 U.S.C. § 103(a) over Thomson and Kerth, and challenges claim 3 as unpatentable under 35 U.S.C. § 103(a) over Thomson, Harris, and Kerth. Pet. 46–47. Petitioner cites Kerth as disclosing a digital-to-analog converter ("DAC") between a signal processor and baseband processor circuitry. Pet. 46 (citing Ex. 1011, col. 9, ll. 13–17, Fig. 4). Petitioner reasons that "one of ordinary skill in the art would be motivated to include a DAC between a signal processor and one or more demodulators in any system where an analog signal into a demodulator is desired or required." *Id.* at 47.

In addition to reiterating its position that Thomson does not disclose all limitations of underlying independent claim 1, Patent Owner responds that "Petitioner has failed to point to substantial evidence that a [person of ordinary skill in the art] would have a reason to combine the teaching of Thomson and Kerth." PO Resp. 62; *see id.* at 63–64. We disagree that Petitioner has identified insufficient evidence to support its position because Petitioner supplements its reasoning with evidence of the use of analog

31

IPR2014-00728
Patent 7,075,585 B2

demodulators in the prior art, as shown in Figure 1 of the '585 patent. Pet.
47.

We conclude that Petitioner has shown by a preponderance of the
evidence that claim 3 is unpatentable under 35 U.S.C. § 103(a) over
Thomson and Kerth and that claim 3 is unpatentable under 35 U.S.C.
§ 103(a) over Thomson, Harris, and Kerth.

### III. ORDER

In consideration of the foregoing, it is

ORDERED that based on a preponderance of the evidence, claims 1–
3, 5, 10, and 16–19 of U.S. Patent No. 7,075,585 are held to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude
Exhibits 1009 and 1072 is *denied*; and

FURTHER ORDERED that, because this is a final written decision,
parties to this proceeding seeking judicial review of our decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

32

IPR2014-00728
Patent 7,075,585 B2

PETITIONER
Peter Ayers
Brian Mangum
John Shumaker
Lee & Hayes, PLLC
peter@leehayes.com
brianm@leehayes.com
JShumaker@leehayes.com

PATENT OWNER
Michael R. Fleming
Benjamin Haber
Irell & Manella LLP
mfleming@irell.com
bhaber@irell.com

33

Trials@uspto.gov
571-272-7822

Paper 56
Entered: October 21, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SILICON LABORATORIES, INC.,
Petitioner,

v.

CRESTA TECHNOLOGY CORPORATION,
Patent Owner.

_____

Case IPR2014-00809
Patent 7,265,792 B2

_____

Before PHILLIP J. KAUFFMAN, GREGG I. ANDERSON, and
PATRICK M. BOUCHER, *Administrative Patent Judges*.

ANDERSON, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

A000034

# I. INTRODUCTION

## *A. Background*

Silicon Laboratories, Inc. ("Petitioner") filed a Petition and Corrected Petition pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–17, 26, and 27 of U.S. Patent No. 7,265,792 B2 ("the '792 patent"), filed July 1, 2004.  Papers 1 and 32 ("Pet.").[1]  Cresta Technology Corporation ("Patent Owner") filed a Preliminary Response.  Paper 8.  Based on these submissions, we granted the Petition and instituted trial for claims 1–17, declining to institute trial on claims 26 and 27.  Paper 10 and Paper 28 (collectively "Institution Decision" or "Dec.").

After institution of trial, Patent Owner filed a Patent Owner Response.  Paper 35 ("PO Resp.").  Petitioner filed a Reply.  Paper 40 ("Pet. Reply").  In addition, the parties rely upon expert testimony.  Petitioner proffered the Declaration of Dr. Douglas Holberg ("Holberg Declaration," Ex. 1009) with the Petition and the Declaration of Douglas Holberg with Petitioner's Reply ("Holberg Reply Declaration," Ex. 1072).  Patent Owner proffered the Declaration of Dr. Ion E. Opris ("Opris Declaration," Ex. 2003) with its

---

[1]  Petitioner filed a Motion to Correct the Petition and Modify the Institution Decision based on a mistake relating to evidence supporting Petitioner's challenge to claim 3.  Paper 22 ("Motion to Correct").  We granted the Motion to Correct in our Decision on Motion to Correct.  Paper 28.  Petitioner filed the Corrected Petition and Exhibit 1038, replacing expert declaration Exhibit 1009.  Notwithstanding the preceding, Patent Owner cites to the Petition in its Response and not the Corrected Petition.  *See* PO Resp. 26.  Both the Corrected Petition and the Patent Owner's Motion to Exclude the Holberg Declaration and Holberg Reply Declaration (Paper 43, "Mot. Exclude") incorrectly continue to cite Exhibit 1009 and not Exhibit 1038.  *See* Corrected Petition 25; Mot. Exclude 1.  Nonetheless, to remain consistent with papers filed by both parties, unless otherwise indicated, all citations are nominally to the original Petition and Exhibit 1009.

2

IPR2014-00809
Patent 7,265,792 B2

Response.  A transcript of Dr. Opris's deposition ("Opris Dep.," Ex. 1056) was submitted by Petitioner.  A transcript of Dr. Holberg's deposition ("Holberg Dep.," Exhibits 2048 and 2049) was submitted by Patent Owner.

Patent Owner filed its Motion to Exclude the Holberg Declaration (Exhibit 1009) and Holberg Reply Declaration (Exhibit 1072).  Paper 43 ("Mot. Exclude").  Petitioner filed an Opposition to the Motion to Exclude (Paper 49, "Pet. Opp. Mot. Exclude") and Patent Owner filed a Reply.  Paper 50 ("PO Reply Mot. Exclude").

An oral hearing was held on June 12, 2015.  The transcript of the hearing has been entered into the record.  Paper 53 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  We conclude for the reasons that follow that Petitioner has shown by a preponderance of the evidence that claims 1–3 and 4–17 of the '792 patent are unpatentable.

### B.  Related proceedings

Patent Owner has asserted the '792 patent against Petitioner in the following two actions:  *Cresta Technology Corporation v. Maxlinear, Inc. et al.*, 1:14-cv-00079-RGA (D. Del.); *Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*, Investigation No. 337-TA-910 (USITC).  Pet. 1.

### C.  The '792 patent (Ex. 1001)

The '792 patent is directed towards "a broadband television signal receiver for receiving multi-standard analog television signals and digital television signals."  Ex. 1001, 1:7–10.  A dual-format television receiver includes a signal input terminal for receiving an incoming radio frequency ("RF") signal.  *Id.* at 3:57–59.  A frequency conversion circuit converts the

3

IPR2014-00809
Patent 7,265,792 B2

input RF signal to an intermediate frequency ("IF") signal. *Id.* at 4:55–57.
The analog IF signal generated by the frequency conversion circuit is
converted to a digital signal that digitizes an IF circuit. *Id.* at 5:22–23. The
receiver processes the digitized signal entirely in the digital domain. *Id.* at
5:23–25.

    Figure 1 of the '792 patent is reproduced below.



## Fig. 1

    Figure 1 depicts a schematic diagram of a dual-format television
receiver. As shown in Figure 1, in addition to frequency conversion circuit
110 and digitizing IF circuit 120, receiver 100 includes digital signal
processor (DSP) circuit 130 and signal output circuit 140. *Id.* at 4:49–52.
"By applying . . . the appropriate signal processing functions at DSP circuit
**130**, receiver **100** can handle television signals in any format (analog or
digital) and in any standard (e.g.[,] NTSC, PAL, SECAM, DVB or ATSC)."
*Id.* at 5:25–29.

    The receiver disclosed in the '792 patent processes all signals in the
digital domain, and it therefore eliminates the need for analog components
like a Surface Acoustic Wave ("SAW") filter. *Id.* at 1:55–56, 3:32–35. In

4

IPR2014-00809
Patent 7,265,792 B2

addition, a single signal processing path is used to process television signals in either the analog format or the digital format. *Id.* at 3:45–49.

### D. Illustrative claim

Claim 1 is the only independent claim of the '792 patent and is illustrative of the claims at issue:

> 1. A television receiver comprising:
> a frequency conversion circuit for receiving an input RF signal and for converting the input RF signal to an intermediate frequency signal having an intermediate frequency (IF), the input RF signal encoding information in one of a plurality of television signal formats;
> an analog-to-digital converter for sampling the intermediate frequency signal and generating a digital representation thereof;
> a signal processor for processing the digital representation of the intermediate frequency signal in accordance with the television signal format of the input RF signal, the signal processor generating digital output signals indicative of information encoded in the input RF signal, wherein the signal processor applies one of a plurality of finite impulse response filters to the digital representation of the intermediate frequency signal, each of the plurality of finite impulse response filters corresponding to a format of the input RF signal; and
> a signal output circuit for receiving the digital output signals from the signal processor and for providing one or more output signals corresponding to the digital output signals.

Ex. 1001, 10:51–11:6.

### E. Grounds upon Which Trial Was Instituted

*Inter partes* review was instituted on the following grounds:

(1) claims 1, 2, 4, 10, and 11 as obvious over Thomson[2] and Harris[3] under

_____

[2] EP 0696854 A1 to Thomson, published Feb. 14, 1996 ("Thomson," Ex.

5

IPR2014-00809
Patent 7,265,792 B2

35 U.S.C. § 103; (2) claim 3 as obvious over Thomson, Harris, and Gunter[4] under 35 U.S.C. § 103; (3) claims 5 and 6 as obvious over Thomson, Harris and Cirrus Logic[5] under 35 U.S.C. § 103; (4) claims 7 and 12 as obvious over Thomson, Harris, and Kerth[6] under 35 U.S.C. § 103; (5) claims 13–17 as obvious over Thomson, Harris, Kerth, and Oku[7] under 35 U.S.C. § 103; and (6) claims 8 and 9 as obvious over Thomson, Harris, Kerth, and Cirrus Logic under 35 U.S.C. § 103.  Dec. 30; Paper 28 at 8.

## II.  ANALYSIS

### A.  Claim Construction

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275–76 (Fed. Cir. 2015), *reh'g en banc denied*, 793 F.3d 1297 (Fed. Cir. 2015); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012) (Claim Construction).[8]

---

1004).

[3]  Clay Olmstead and Mike Petrowski, *A Digital Tuner for Wideband Receivers*, DSP Applications Magazine (Sept. 1992) ("Harris," Ex. 1005).

[4]  US 4,782,385 to G. Gunter et al., issued Nov. 1, 1988 ("Gunter," Ex. 1022).

[5]  Cirrus Logic, Product Bulletin CS92288 (2002) (Ex. 1015), Cirrus Logic, Data Sheet CS4223/CS4224 (April 2000) (Ex. 1016), Cirrus Logic, Data Sheet CS4954/CS4955 (April 1999) (Ex. 1017) (collectively "Cirrus Logic").

[6]  US 6,804,497 B2 to D. Kerth et al., issued Oct. 12, 2004 ("Kerth," Ex. 1011).

[7]  US 2002/0057366 A1 to M. Oku et al., published May 16, 2002 ("Oku," Ex. 1018).

[8]  Patent Owner's Response argues that the claim interpretation standard for *inter partes* review should be judicial standard established by the Federal

6

IPR2014-00809
Patent 7,265,792 B2

Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a special definition or other consideration, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Petitioner contended originally that all terms save "signal processor" should be given their plain and ordinary meaning. Pet. 12. Patent Owner proposes constructions for several terms. PO Resp. 9–14. Petitioner continues to argue the terms should be given their plain and ordinary meaning and that Patent Owner's construction is not the broadest reasonable interpretation. Pet. Reply 2–5.

### *1. Disputed Terms*

Patent Owner argues the construction of four terms as part of its arguments regarding patentability. PO Resp. 9–14.

### *a. "input RF signals"*

The term "input RF signal" appears in claim 1 and, thus, in all of the challenged dependent claims. In the Institution Decision we construed "RF

---

Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). PO Resp. 15–19. Patent Owner's Response was filed prior to the *Cuozzo* decision, which considered the proper claim construction standard and affirmed the standard is broadest reasonable interpretation. *See Cuozzo*, 793 F.3d at 1275–77. The issue has been decided by our reviewing court and we need not address Patent Owner's argument.

7

signals" as "signals having a frequency between 10 kHz and 100 GHz."
Dec. 7. Neither the Petition nor the Preliminary Response (Paper 8)
proposed a construction for either "RF signals" or "input RF signal." We
relied on the definition of "RF" in the '792 patent as an abbreviation for
"radio frequency" (Ex. 1001, 1:36), which *The Authoritative Dictionary of
IEEE Standards Terms* identifies as a frequency roughly between 10 kHz
and 100 GHz. Dec. 7 (citing Ex. 3001, 912).

Patent Owner argues that our preliminary construction of "RF signal"
improperly dissected the claim term "input RF signal" by relying solely on
the "RF" portion of the term. PO Resp. 10. Patent Owner argues the '792
patent is not limited to the referenced frequency range. *Id.* Patent Owner
contends that the fact that "RF" means "radio frequency" does not define
"input RF signal" of claim 1, noting the Specification of the '792 patent
states that "the receiver receives the incoming television signal in radio
frequency (RF)." *Id.* (citing Ex. 1001, 1:35–38, Fig. 1). Patent Owner also
argues that the "input RF signal" is "received from terrestrial broadcast or on
a cable line transmissions." *Id.* at 11 (quoting Ex. 1001, 4:51–55). Patent
Owner concludes that the preceding necessitates that the "input RF signal" is
an "external signal to the frequency conversion circuit" of claim 1. *Id.* at
11–12. Patent Owner proposal for construction of "input RF signal" is "a
signal that is an incoming signal that comes out of the medium of
propagation and is external to the frequency conversion circuit without any
processing by the frequency conversion circuit." *Id.* at 12.

Petitioner adopts the construction from the Institution Decision. Pet.
Reply 2. Citing to the Holberg Reply Declaration, Petitioner contends that
"input RF signals" do not incorporate the source of those signals or the

8

IPR2014-00809
Patent 7,265,792 B2

medium over which the signal is propagated. *Id.* at 3 (citing Ex. 1072
¶¶ 10–12). Petitioner further notes that "the specification and the claims use
permissive language when referring to the source of that signal—'input RF
signals *can be received* from terrestrial broadcast or cable transmissions.'"
*Id.* (emphasis added) (citing Ex. 1001, 4:53–55, 14:50–53; *Trebro Mfg., Inc.
v. Firefly Equipment, LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014)).

The Specification of the '792 patent describes "input signal" without
reference to "RF" or the RF spectrum of frequencies. *See* Ex. 1001, 4:3–7,
4:18–23, 4:28–31. Conversely, the Specification acknowledges separately
that "RF" is understood to mean radio frequency. *Id.* at 1:35–38, Fig. 1
("RFIN"). Relying almost totally on incorporating the word "input," the
additional language Patent Owner proposes regarding transmission of the
signal is not supported by any evidence beyond attorney argument.[9] Patent
Owner's implication that "input RF signal" can only be considered as an
undivided expression is belied by the preceding description, which does
parse the expression. Thus, we are not persuaded that Patent Owner's
proposal corresponds to the broadest reasonable interpretation in light of the
Specification. We construe "input RF signals" as signals that are input
having a frequency between 10 kHz and 100 GHz.

b. *"frequency conversion circuit"*

Claim 1 recites, in part, "a *frequency conversion circuit* for receiving
an input RF signal and for converting the input RF signal to an intermediate

---

[9]  As discussed above, Petitioner has provided expert testimony that Patent
Owner's construction is unsupported in the Specification. Ex. 1072 ¶¶ 10–
12. However, given the underlying rationale for our construction, we need
not rely on this evidence.

9

IPR2014-00809
Patent 7,265,792 B2

frequency signal having an intermediate frequency (IF)" (emphasis added).
We did not construe the term in the Institution Decision.

Patent Owner contends "a frequency conversion circuit receiv[es] a transmitted RF signal that has not been further processed or converted." PO Resp. 12–13. Patent Owner contends that "the frequency conversion circuit receives external signals that have not been processed by the frequency conversion circuit comprised of signals that have been provided by a medium of propagation (e.g. atmosphere, cable, etc.)." *Id.* at 13. Thus, Patent Owner's proposed construction of "a frequency conversion circuit" is a circuit "that receives an incoming signal that comes out of the medium of propagation and is external to the frequency conversion circuit without any processing." *Id.* Petitioner argues Patent Owner's proposal improperly reads "medium of propagation" into the construction of the term and does so without adequate support. Pet. Reply 3–4.

Absent sufficient showing, we decline to read "medium of propagation" into the construction of the term. We agree with Petitioner that the plain and ordinary meaning of "frequency conversion circuit" is found in the claim language itself. Pet. Reply 4 (citing Ex. 1072 ¶ 17[10]). Thus, we construe "frequency conversion unit" to mean "a circuit for converting the frequency of the input RF signal to an intermediate frequency signal having an intermediate frequency."

---

[10] We rely on the plain and ordinary meaning of the claim language and its broadest reasonable interpretation without resort to the Holberg Reply Declaration.

A000043

IPR2014-00809
Patent 7,265,792 B2

> c. "input RF signals encoding information in
> one of a plurality of formats"

Independent claim 1 recites "the input RF signal encoding information in one of a plurality of television signal formats." Patent Owner contends that the phrase "the input RF signals encoding information in one of a plurality of television signal formats" requires "receiving one television format RF signal at a time." PO Resp. 13. It is unclear what Patent Owner means by "format RF signal," which appears nowhere in the '792 patent, including its claims. Petitioner proposes the term receives its ordinary meaning, and that "a" or "an" is open ended and means one or more. Pet. Reply 4.

In describing the function of standard signal processing circuit, the '792 patent Specification makes clear that different received input RF signals may encode information in different formats. Ex. 1001, 3:9–16. However, each received input RF signal encodes information in exactly one format: "Dual-format TV receiver 100 processes the incoming RF signal and provides output signals *depending on the television format* of the incoming RF signal." *Id.* at 4:30–33 (emphasis added). Thus, applying the broadest reasonable interpretation in light of the specification for purposes of this Decision, we construe "the input RF signal encoding information in one of a plurality of television signal formats" as requiring that each received input RF signal encode information in exactly one format.

> d. "signal processor for processing ... in accordance with the
> television signal format"

Independent claim 1 recites a "signal processor," which we construed in the Institution Decision as "a digital module that processes signals in the digital domain." Dec. 8–9. The parties do not dispute our construction of

11

IPR2014-00809
Patent 7,265,792 B2

signal processor but focus on the functionality of the signal processor. Pet. Reply 4–5, PO Resp. 13–14. Responding to the functionality recited, Petitioner asserts that this term is not a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. *See* Pet. 13. Patent Owner does not respond or discuss the issue. We agree that claim 1's recitation of a signal processor, on this record, does not require construction under 35 U.S.C. § 112, ¶ 6.[11]

Apart from the section 112 question, Patent Owner points to the remaining claim language of claim 1, i.e., "a signal processor for processing . . . in accordance with the television signal format . . . the signal processor applies one of a plurality of finite impulse response filters . . . each of the plurality of finite impulse response filters corresponding to a format" and argues "that the claim limitation requires that the signal processor processes only **one** format and does not process a plurality of formats in parallel." PO Resp. 13–14. Patent Owner relies not only on the claim language but also on the Specification, which it alleges supports that the DSP 131 ("digital signal processor") operates to process only analog or digital formats depending on the input RF signal. *Id.* at 14 (citing Ex. 1001, 6:24–48).

Petitioner disagrees and argues that, even if Patent Owner's proposal is supported by the Specification, it is not the broadest reasonable interpretation. Pet. Reply 4–5. Petitioner concludes that a plain reading of

---

[11] The term does not include the word "means" and presumptively is not a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. However, that presumption can be overcome, such as when the phrase does not recite sufficiently definite structure. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc). There is insufficient evidence in this record to overcome the presumption.

12

IPR2014-00809
Patent 7,265,792 B2

the term does not limit it to "one and only one" format. *Id.* at 5 (citing Ex.
1072 ¶ 19).

We are persuaded that Patent Owner's construction of processing
"only **one** format and does not process a plurality of formats in parallel" is
supported by the Specification. Petitioner's citation to the Holberg Reply
Declaration does not alter our determination, as it relies on an unpersuasive
legal principle and not a technical argument. Accordingly, we construe
"signal processor for processing . . . in accordance with the television signal
format" to mean "a digital module that processes signals in the digital
domain in the exactly one format in which each received input RF signal is
encoded."

### 2. Previously Construed Terms

In the Institution Decision we construed the terms "format" and
"baseband signal." Dec. 7–9. Neither party takes issue with our
construction nor proposes a different construction. Our analysis from the
Institution Decision is repeated below.

### a. "format"

Independent claim 1 recites that the input RF signals encode
information "in one of a plurality of television signal formats." The
Specification draws a distinction between "formats" and "standards":
"Television signals are transmitted in analog or digital *formats* and in
accordance with a variety of *standards*." Ex. 1001, 1:18–20 (emphasis
added). Further, the Specification expressly states "the television signal
formats include an analog television format and a digital television format."
Ex. 1001, 2:46–47. Based on the preceding, in the Institution Decision we
concluded that analog and digital signals are examples of distinct "formats."

13

IPR2014-00809
Patent 7,265,792 B2

Dec. 7–8. We therefore adopt the conclusion from the Institution Decision for purposes of this Decision.

### b. "baseband signal"

Claims 4, 5, 8, and 14 recite the claim term "baseband signal(s)." Neither party proposes a construction of this term. *The Authoritative Dictionary of IEEE Standards Terms* defines "baseband signaling" as "[t]he transmission of a signal at its original frequency, that is, not changed by modulation. *Note:* It can be an analog or a digital signal." Ex. 3001, 87. We discern nothing in the '792 patent Specification inconsistent with this ordinary meaning. Accordingly, we construe "baseband signal" as a signal without transmission modulation.

### B. Obviousness of Claims 1, 2, 4, 10, and 11 over Thomson and Harris

Petitioner contends that claims 1, 2, 4, 10, and 11 of the '792 patent would have been obvious under 35 U.S.C. § 103 over Thomson and Harris. Pet. 13–25. To support this position, Petitioner cites to the Holberg Declaration. Ex. 1009 ¶¶ 16–36.[12] The invention recited in claim 1 of the '792 patent includes a frequency conversion circuit, an analog-to-digital converter, a signal processor, and a signal output circuit. Ex. 1001, Fig. 1 (elements 110, 120, 130, and 140).

### 1. Overview of Thomson

Thomson describes a broadcast receiver. Ex. 1004, 1:3–4. Figure 1 of Thomson is reproduced below.

---

[12] Patent Owner argues Dr. Holberg is not a qualified expert because, *inter alia*, he does not possess the level of ordinary skill in the art. PO Resp. 20–22. We disagree for the reasons discussed below in our decision on Patent Owner's Motion to Exclude.

14

IPR2014-00809
Patent 7,265,792 B2



Figure 1 is a block diagram showing components of the broadcast receiver, which may receive incoming signal IF$_{SAT}$ from an outdoor station. *Id.* at 2:24–26, 30–31. Incoming signal IF$_{SAT}$ results from the outdoor station supplying satellite channels already down-converted in a frequency band covering 950–1750 MHz. *Id.* at 1:56–2:1. Incoming signal IF$_{SAT}$ is, therefore, an "RF signal" as we have construed the term. Thomson teaches that the "proposed architecture allows a digitising of the Sat-IF signals no matter that they are analog or digital ones." *Id.* at 1:42–43.

Incoming signal IF$_{SAT}$ is down-converted by SAW filter 1 and mixer 2, which respectively suppress adjacent channel components and achieve a "frequency transposition into an IF signal of around 75 MHz." *Id.* at 2:56–57; *see also id.* at 2:30–33, 47–57. AGC amplifier 5 includes "an internal bandpass limitation" (*id.* at 2:58–59) that prevents aliasing when A/D converter 7 digitizes the IF signal at a sampling frequency. *Id.* at 3:1–14. Bandpass filter 8 applies "an adaptively controlled bandwidth [to] select[] the desired signal with a minimal remainder of the adjacent channel signals." *Id.* at 3:17–19. FM demodulator 9 and low-pass filter 10 output a CVBS ("composite video baseband signal"), and synchronous demodulators 12 and 13 effect QPSK ("quadrature phase shift keying") demodulation to provide quadrature ("Q") and in-phase ("I") signals. *Id.* at 2:37–44.

15

IPR2014-00809
Patent 7,265,792 B2

### 2. Claims 1, 2, 4, 10, and 11

We have reviewed Petitioner's analysis of claims 1, 2, 4, 10, and 11, and conclude that Petitioner has shown, by a preponderance of the evidence that these claims would have been obvious over Thomson and Harris. Pet. 13–25. Patent Owner raises the following issues in responding to Petitioner's argument.

### a. "frequency conversion circuit"

As recited in claim 1, Patent Owner argues Thomson does not expressly teach a frequency conversion circuit for receiving input RF signals. PO Resp. 22–26. While Patent Owner acknowledges Thomson "purports to deal with digital television, most of the claimed [disclosed] architecture is analog." *Id.* at 22. Patent Owner's acknowledgement that Thomson deals with digital television is enough to find Thomson is in the relevant field of endeavor.

Patent Owner argues Thomson receives an *input IF signal* and not an *input RF signal* as recited in the frequency conversion circuit limitation of claim 1. PO Resp. 23–25. Among other things, Patent Owner points to Figure 1 of Thomson which shows the input signal as $IF_{SAT}$. *Id.* at 23. Patent Owner also notes that Figure 1 describes the incoming IF signal as coming from an outdoor station and then fed to SAW (surface acoustic wave) filter 1 and has "already undergone down conversions by undisclosed components." *Id.* at 23–24 (citing Ex. 1004, 2:30–32). Patent Owner concludes the input IF signal cannot be the input RF signal because the input RF signal is "what comes out of the medium of propagation, not what comes out of a down conversion." *Id.* at 24 (citing Ex. 2003 ¶ 63).

16

The input IF signal argument is not persuasive because it is based on Patent Owner's proposed construction of input RF signal, i.e., "a signal that is an incoming signal that *comes out of the medium of propagation and is external to the frequency conversion circuit* without any processing by the frequency conversion circuit." PO Resp. 12 (emphasis added). We rejected Patent Owner's proposal as detailed in section II.A.1. above. Patent Owner restates the argument, contending that Thomson's IF signal has already been down converted whereas under Patent Owner's proposed construction the down conversion happens from the medium of propagation. PO Resp. 25 (citing Ex. 2003 ¶ 65). To the extent there is a difference, this argument is likewise unpersuasive as there is nothing about our construction of input RF signal that limits how the RF signal is downloaded or otherwise processed before it is input to the frequency conversion circuit. All that is required is an input signal in the RF frequency range.

Patent Owner notes that Petitioner argues that the outdoor unit of Thomson that feeds the $IF_{SAT}$ signal to the frequency conversion circuit of Figure 1 would meet Patent Owner's construction of input RF signal. PO Resp. 25–26 (citing Pet. 23); s*ee* Pet. Reply 7–8 (the outdoor unit expressly discloses a "frequency conversion unit" under Patent Owner's construction of "input RF signal"). However, Patent Owner contends the description of the circuitry of the outdoor unit is "skeletal at best." *Id.* at 26 (citing Ex. 2003 ¶¶ 66, 67). The argument appears to be Thomson does not expressly disclose a frequency conversion circuit. Patent Owner contends the outdoor unit cannot be used to teach an input RF signal because it does not expressly disclose the circuitry.

17

IPR2014-00809
Patent 7,265,792 B2

Our construction of "frequency conversion circuit" is "a circuit for converting the frequency of the input RF signal to an intermediate frequency signal having an intermediate frequency." Both a "circuit" and the required functionality are necessary to meet the construction.

We determine that the required functionality is present in the outdoor unit of Thomson. Thomson discloses that the "outdoor unit supplies the satellite channels *already down-converted* in a frequency band covering 950-1750 MHz." Ex. 1004, 1:56–59 (emphasis added). Patent Owner does not dispute the functional part of what Thomson discloses.

We are not persuaded that the *precise* circuitry used to establish the functionality must be disclosed in Thomson in order for the "frequency conversion circuit" limitation to be rendered obvious. Patent Owner agrees that there is a circuit, albeit "skeletal." PO Resp. 26. Regardless, Petitioner is entitled to presume the enablement of the prior art, i.e., the circuit associated with the outdoor unit. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). The burden of production as to whether the circuit must be disclosed in order for the disclosure to be enabled is on Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, No. 2015-1214, 2015 WL 5166366, at *2–3 (Fed. Cir. Sept. 4, 2015). Patent Owner has not carried its burden on the issue.

Paragraph 66 of the Opris Declaration (Ex. 2003) is a conclusory denial, i.e., "Thomson does not teach the circuitry." Patent Owner has not persuaded us that Petitioner failed to meet its burden of persuasion. Thus, even if we were to adopt Patent Owner's construction of input RF signal, the outdoor unit of Thomson expressly teaches receiving and converting an input RF signal from the medium of propagation.

18

IPR2014-00809
Patent 7,265,792 B2

Patent Owner then argues the outdoor unit of Thomson does not inherently disclose the frequency conversion circuit.  PO Resp. 26–28 (citing *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999–1000 (Fed. Cir. 2006) (inherent disclosure requires that the prior-art reference "necessarily include the unstated [frequency] limitation").  Petitioner does not rely on inherency (Pet. Reply 7–8) and, having determined that the frequency conversion circuit is rendered obvious in Thomson over the preceding arguments of Patent Owner, we need not address inherency.

> *b. frequency conversion element—"input RF signal encoding*
> *information in one of a plurality of television signal formats" and signal*
> *processor element—"a signal processor for processing ... in accordance*
> *with the television signal format"*

Patent Owner continues to assert that the limitations of the claimed frequency conversion circuit are not found in Thomson.  It next focuses on claim 1's recitation that the frequency conversion circuit includes an "input RF signal encoding information in one of a plurality of television signal formats."  PO Resp. 28–33.  Patent Owner's argument intertwines with the signal processor element, which recites "a signal processor for processing . . . in accordance with the television signal format." [13]  *Id.*

Patent Owner first argues the bandpass filter does not process "in accordance with **one** television signal format instead of processing in accordance with a plurality of formats."  PO Resp. 29.  Patent Owner then argues Petitioner has not shown the bandpass-filter 8 shown in Figure 1 of Thomson is an adaptive filter, and thereby is a signal processor.  *Id.* at 29 (citing Pet. 15–16).  Petitioner contends that an adaptive filter would be

---

[13]  We note that we construed both of these limitations above as limited to one format.

19

understood by one of ordinary skill in the art to be a signal processor. Pet. 17 (citing Ex. 1009 ¶ 22).

We first analyze whether Thomson teaches processing in accordance with **one** television signal format or a plurality of formats. Petitioner's expert, Dr. Holberg, testifies that Thomson describes a "bandpass filter 8" that has "an adaptively controlled bandwidth" that passes the analog or digital TV encoded information. Ex. 1009 ¶ 21 (citing Ex. 1004, 3:16–25). In addition, Dr. Holberg testifies the analog or digital input selection is based on the "TV standard" input to the filter. *Id.* (citing Ex. 1004, Fig. 1). Patent Owner's expert, Dr. Opris, finds the position of Dr. Holberg unconvincing and unsupported in the Thomson specification. Ex. 2003 ¶ 74. While Dr. Opris states in paragraphs 71 and 72 of the Opris Declaration that Thomson does not teach processing in accordance with one format, there is no discussion of why that is the correct conclusion. Dr. Holberg explains in the Holberg Reply Declaration that:

> As Fig. 2 of Thomson clearly illustrates, the output of the tuner shows the desired channel tuned to $IF_{SAT}$ (at 140MHz). This desired channel is either a digital or analog transmission—not both. The SAW filter then limits adjacent channel interference and the LO mixes this channel down to 75MHz where it is digitized and processed by filter 8 based on the known TV standard (format) of the desired channel. Thus, the adaptive filter 8 processes only one channel at a time and thus processes only one format at a time.

Ex. 1072 ¶ 40.

We are not persuaded of the relevance of Patent Owner's argument that Thomson discloses "two parallel paths for processing, one for analog format processing and the other for digital television format processing after

20

IPR2014-00809
Patent 7,265,792 B2

the Thomson bandpass filter 8." PO Resp. 31–33. For support, Patent
Owner points to the outputs of Figure 1 of Thomson, digital (Q and I) and
analog (CVBS, $S_{mod1}$ and $S_{mod2}$). Dr. Opris testified that parallel processing
path was the conventional means to provide a multi-format bandpass filter.
Ex. 2003 ¶ 76. Patent Owner's argument is not relevant because Dr.
Holberg testified that Thomson's use of parallel demodulators is not
inconsistent with processing only one format at a time. *Id.* ¶¶ 40–42. Dr.
Holberg also testified that Patent Owner's position would "render[] the 'TV
standard' input superfluous." *Id.* ¶ 41. We agree and note separately
Thomson teaches that "[f]or the reception of digitally transmitted video
signals the analogue pre-processing blocks can be kept." Ex. 1004, 3:40–41.
Thus, the same circuitry is used for "pre-processing" whether the input is
digital or analog. In sum, while both digital and analog signals can be
processed in Thomson, the input is via one format. We are persuaded that
Thomson discloses processing in accordance with one television signal
format.

Patent Owner also argues Thomson does not disclose the signal
processor claimed. PO Resp. 29–30. Petitioner identifies the bandpass filter
as meeting the signal processor limitation. Pet. 15–16 (citing Ex. 1009
¶¶ 21–22). Patent Owner disagrees that the bandpass filter is the claimed
signal processor. PO Resp. 29–30. Patent Owner explains that the only
description of the bandpass filter in Thomson is as follows: "The following
bandpass filter 8 (see Fig. 2g) with an adaptively controlled bandwidth
selects the designed signal with a minimal remainder of the adjacent channel
signals." *Id.* at 29 (quoting Ex. 1004, 3:16–19). Patent Owner concludes
that, because Thomson is silent as to "the apparatus through which the filter

21

IPR2014-00809
Patent 7,265,792 B2

8 adapts itself," the bandpass filter is not a signal processor because it cannot fulfill the "adaptive" function. *Id.* (citing Ex. 2003 ¶ 72). Patent Owner adds that the person of ordinary skill would "have serious difficulties in implementing the adaptive filter 8 in Thomson." *Id.* (citing Ex. 2003 ¶ 72). In support of its position, Dr. Opris testifies Thomson is silent about the criteria for changing the filter shape and "the algorithm and apparatus for doing so automatically, as required by the term 'adaptive.'" *Id.* (citing Ex. 2003 ¶ 72).

Petitioner responds that the bandpass filter of Thomson is an adaptive filter because it includes "adaptively controlled bandwidth." Pet. Reply 7–8 (citing Ex. 1072 ¶¶ 40–43). Based on Thomson's disclosure that the incoming signal is a "TV standard" signal, i.e., analog or digital, the bandpass filter "would then be used to control the bandwidth . . . so that it could adapt the filter characteristics to the particular bandwidth of the incoming TV signal." Ex. 1072 ¶ 42.

We agree with Petitioner that, because Thomson discloses receiving both digital and analog TV signals (Ex. 1004, 1:26–33), the "TV standard" signal is either analog or digital. We quote Dr. Opris's deposition testimony as follows:

> Q. Okay. What do you think TV standard represents in Figure 1?
> A. I have no idea.

Ex. 1056, 152:18–20. The Opris Declaration is similarly unenlightening when it states:

> Holberg claims that the words "TVstandard" on Figure 1 indicate that the bandpass filter is processing in accordance

22

IPR2014-00809
Patent 7,265,792 B2

> with format. This is far from clear or convincing, in light of the
> total absence of any support for the same in the specification.

Ex. 2003 ¶ 74. Patent Owner's expert in the related proceeding, identified
above, testified that "[t]hat the variability in the specification of filter
number 8 is TV standard-dependent." Ex. 1054, 1230:17–21.[14] Dr. Opris's
lack of knowledge in response to the deposition question and contention that
there is no support for what a TV standard signal is in Thomson are
conclusory denials. Indeed, there is support for Petitioner's contention
regarding what is meant by "TV standard" in the Specification.
Accordingly, and contrary to Dr. Opris's testimony, Patent Owner's bald
statements that Dr. Holberg's testimony is unsupported are not borne out.
*See* PO Resp. 30–31. Thus, we credit Petitioner's evidence, including the
Holberg Reply Declaration, and determine that the bandpass filter of
Thomson is adaptive in that it adapts the filter characteristics to the
particular bandwidth of the incoming TV signal.

   Petitioner's alternative argument for showing the "signal processor" is
that it would have been obvious to a person of ordinary skill in the art to
implement the Thomson adaptive filter using a digital signal processor
("DSP") as taught by Harris. Pet. 16–17 (citing Ex. 1009 ¶ 23; Ex. 1005, 1).
Harris describes a digital signal processor to convert and filter IF signals.
Ex. 1005, 3. We determine Petitioner's evidence that there are rational
underpinnings for combining Thomson and Harris in the manner suggested
sufficient for two reasons. First, digital signal processor circuitry was
available and would be resorted to by the person of ordinary skill to replace

---

[14] Partial transcript of trial testimony of Dr. Caloyannides, citing to the page
in the related trial record, which is page 35 of Exhibit 1054.

other circuit components, like the adaptive filter of Thomson. *Id.* Second, below we find rational underpinnings are shown to combine Harris's finite impulse response ("FIR") filter with Thomson. We are persuaded that a rational basis for the combination is shown where the same reference is otherwise shown to be combined. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (common sense can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements). Patent Owner's position regarding the combination was not presented in connection with its arguments regarding the limitation under consideration but is analyzed in section II.B.2.c. below.

Patent Owner's argument that the person of ordinary skill would "have serious difficulties in implementing the adaptive filter 8 in Thomson" appears to be predicated on a determination that the bandpass filter is not an adaptive filter in the first instance. A simple digital filter with two filter characteristics—one for digital and one for analog—is something well within the level of the person of ordinary skill. Ex. 1072 ¶ 43 ("numerous text books and patents on the design of such filters"). As was the case above, Dr. Opris does not provide adequate underlying basis for his conclusion to the contrary. *See* 37 C.F.R. § 42.65(a).

*c. "the signal processor applies one of a plurality of finite impulse response filters… each of the plurality of finite impulse response filters corresponding to a format"*

Petitioner relies on the Harris reference for implementing the functions of bandpass filter 8 of Thomson with the Harris disclosure of finite impulse response ("FIR") filters. Pet. 16–21. Like Thomson's band pass filter, Harris teaches as digital decimation filter ("DDF"), including an FIR filter. *Id.* at 19. Petitioner argues the DDF "can be rapidly reconfigured via

24

a standard microprocessor interface." *Id.* (citing Ex. 1005, 5). Dr. Holberg concludes that this filter and microprocessor can retrieve the FIR filter coefficients from memory and store those in the "coefficient RAM." *Id.* at 19–20 (citing Ex. 1009 ¶ 27). This is "just like the '792 Patent." *Id.* at 20 (citing Ex. 1001, 5:59–63).

> Petitioner's asserts the following rationale for the combination.
>
> Although both FIR and infinite impulse response (IIR) filters were well known in the art, (*See, e.g.*, Ex. 1006; Ex. 1009, ¶ 28), a POSITA would have been motivated to choose a FIR filter over an IIR filter for several reasons. A FIR filter produces "a linear phase, and only FIR filters can be designed to have linear phase," which is a critical parameter in audio and video applications such as Thomson. (*Id.* (quoting TI App Note, Ex. 1006 at 21)). FIR filters are also more stable and have less sensitivity to coefficient quantization than IIR filters. (Ex. 1009, ¶ 28).

Pet. 20. Petitioner also contends the combination would have been an obvious design choice. *Id.*

In response, Patent Owner refers, in part, to arguments previously made, which arguments we rejected and need not repeat again. *See* PO Resp. 34. Patent Owner also disagrees that Harris would have been combined with Thomson by the person of ordinary skill in the art. *Id.* at 34–43. Patent Owner's legal arguments are principally based on *KSR* that the combination would not achieve the desired results, focusing on differences between Harris and the claimed invention. *KSR*, 550 U.S. at 416–417; PO Resp. 38–40. Patent Owner's arguments will be addressed in the order presented in Patent Owner's Response.

First, Patent Owner argues Harris is low pass filter and not a bandpass filter. PO Resp. 35–36 (citing Ex. 2003 ¶ 83). In Figure 4, Harris references

A000058

the Harris HSP43220 DDF datasheet (Ex. 2050, 1). Patent Owner cites to
Dr. Opris's testimony based on the datasheet to conclude the Harris
HSP43220 DDF is not a bandpass filter but instead "a linear phase low pass
decimation filter" and the person of ordinary skill in the art would not have
recognized that the substitution of the Harris DDF for the Thomson filter 8
would have yield desired results. PO Resp. 35 (citing Ex. 2003 ¶ 82). To
show further that Harris cannot be combined with Thomson, Patent Owner
argues the maximum input data sampling rate for Harris is limited to 33
Msps and there is no apparatus to "up convert" the signal downconverted in
Harris. *Id.* at 35– 36 (citing Ex. 2003 ¶ 82).

We are not persuaded that the details of the Harris DDF should cause
us to ignore the other teachings of Harris. Harris teaches generally the use
of DSP components to replace "analog intermediate frequency (IF)
processing stage in wideband receivers." Ex. 1005, 1. While Figure 4
references the Harris HSP43220 DDF, the teaching of Harris is much
broader. In addition to the general teaching clearly suggesting the use of
DSP, Harris Figure 1 shows a single channel receiver including a band pass
filter and in Figure 4 an FIR connected to "Coefficient RAM." Petitioner
cites to both Harris's DSP and FIR teachings. Pet. Reply 10; Pet. 19.

Patent Owner's remaining arguments directed to Harris include: (1)
the Harris DDF is not an adaptive filter (PO Resp. 36–37); (2) the Harris
DDF cannot be made adaptive by the microprocessor interface argued by
Petitioner (PO Resp. 37 (citing Pet. 37)); and (3) Harris is a cellular phone
application (PO Resp. 37–39). Arguments (1) and (2) are interrelated and,
as detailed above in analyzing the low pass filter argument, the details of
Harris do not detract from the general teachings of Harris relied on by

26

IPR2014-00809
Patent 7,265,792 B2

Petitioner. As to (3), the analysis above also applies. We observe separately
that the overall teaching of Harris is directed to wideband receivers
generally, including cellular phones, mobile radio, and wireless LANs as "a
few examples of potential applications." Ex. 1005, 1.

We determine that Petitioner's citation to the above teachings of
Harris is sufficient to show the FIR claim limitation and, further that there
was motivation to combine Harris with Thomson and that the result would
be predictable. Thomson requires an adaptive filter that operates in the
digital domain when the input RF signal is in the digital TV format. As
Dr. Holberg testified, the "industry already recognized the benefits of
processing communication signals in the digital domain using 'standard off
the shelf DSP IC's as digital replacements for the analog intermediate
frequency (IF) processing state in wideband receivers.'" Ex. 1072 ¶ 45
(citing Ex. 1005, 1). A person of ordinary skill would be directed by Harris
to use DSP and FIR in a wideband receiver, like Thomson. Patent Owner's
expert acknowledges (Ex. 1056, 181:5–19) the linear phase characteristics of
a FIR can be advantageous, further reinforcing the motivation behind this
combination.

Patent Owner's argument tying reasonable expectation of success into
the lack of predictable result analysis (PO Resp. 40–42) is not persuasive
because Petitioner has shown success would be expected and that the
modification to Thomson amounts to little more than substituting a digital
component, with known desirable characteristics, into the disclosed circuit.
Dr. Opris's testimony that the person of ordinary skill would have had no
reason to substitute the Harris FIR for the band pass filter of Thomson (Ex.
2003 ¶ 90) is belied by his testimony cited above that the person of ordinary

27

IPR2014-00809
Patent 7,265,792 B2

skill in the art would know that a digital filter could be implemented using an FIR filter and the linear phase of an FIR filter is helpful in processing TV signals. Ex. 156, 181:8–19. Dr. Opris testifies that there are other reasons that combining Harris with Thomson would not achieve predictable results. PO Resp. 39–40 (citing Ex. 2003 ¶ 86). However, details about the differences, for example, between the TV receivers and cellular systems are, as discussed above, not the basis for the challenge. *Id.* at 40 (citing Ex. 2003 ¶ 87 (comparing sampling rates)).

Patent Owner does not separately argue claims 2, 4, 10, and 11.

### d. Summary (claims 1, 2, 4, 10, and 11)

Based on the foregoing discussion and evidence of record, Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4, 10, and 11 would have been obvious over Thomson and Harris.

### C. Obviousness of Claims 5 and 6 Over Thomson, and Cirrus Logic

Petitioner contends that claims 5 and 6 of the '792 patent would have been obvious under 35 U.S.C. § 103 over Thomson, Harris, and Cirrus Logic. Pet. 31–35. To support this position, Petitioner cites to the Holberg Declaration. Ex. 1009 ¶¶ 43–47. The invention recited in claim 1 of the '792 patent includes a frequency conversion circuit, an analog-to-digital converter, a signal processor, and a signal output circuit. Ex. 1001, Fig. 1 (elements 110, 120, 130, and 140).

Claim 5 depends from claim 4, which depends from claim 1, and recites as an additional limitation "a *first decoder circuit* . . . for providing video display signals corresponding to the analog television format; and a *second decoder circuit* . . . for providing audio signals corresponding to the analog television format" (emphasis added).

28

IPR2014-00809
Patent 7,265,792 B2

Petitioner contends that "[m]erely designing a decoder circuit to process video and audio signals according to a known analog television format was well known in the prior art so processing (or decoding) the data into known analog audio and video television formats (such as PAL/NTSC/SECAM) was within the skill of a POSITA."  Pet. 31–32 (citing Ex. 1001, 1:52–2:3 (NTSC, PAL, and SECAM formats known in the prior art); Ex. 1009 ¶ 43).  Petitioner cites to Cirrus Logic product CS92288, a USB-DVR 2.0 reference design, for its teaching of an "audio/video encoder/decoder (CODEC)."  *Id.* at 32 (citing Ex. 1015, 4).  The USB-DVR 2.0 design is further described in Exhibit 1016, a CODEC circuit which outputs audio at baseband, and Exhibit 1017, a CODEC circuit which outputs video at baseband.  *Id.* at 32–33 (citing Ex. 1016, 1; Ex. 1017, 1).

Patent Owner takes exception to Petitioner's characterization of the language from column 1 line 52 to column 2 line 3 of the '792 patent, that decoder circuit to process video and audio signals according to a known analog television format was well known in the prior art.  PO Resp. 43–44 (citing Pet. 31–32).  Patent Owner says the description cited only "address[es] demodulators and not decoders for decoding the output of the demodulators."  *Id.* at 44.  The '792 patent does state the video and audio "baseband signals are coupled to appropriate video and audio *decoders* to generate the display video signals (e.g. RGB) or sound."  *See* Pet. Reply 11 (quoting Ex. 1001, 1:34–42) (emphasis added).

Patent Owner's principal argument is that there is no reason to combine the Cirrus Logic teachings in Exhibits 1015–1017, which relate to editing and storing audio and video material on a computer with the analog audio and video signals necessary for analog television.  PO Resp. 46 (citing

29

IPR2014-00809
Patent 7,265,792 B2

Ex. 2003 ¶ 95).  Additionally, there would be no expectation of success and such could not be a design choice.  *Id.*

We are not persuaded that the person of ordinary skill would not consult Cirrus Logic.  Cirrus Logic describes a video editing board that receives broadcast and cable TV and produces video display on "a standard NTSC/PAL video monitor."  Ex. 1015, 1.  Further, Dr. Holberg has articulated rational underpinnings to combine Cirrus Logic with Thomson and Harris.  *See* Ex. 1009 ¶ 46.

Claim 6 depends from claim 5 and recites, "wherein the first decoder circuit comprises a PAL/SECAM/NTSC decoder circuit."  Petitioner cites to Exhibit 1017 as describing an NTSC and PAL decoder.  Pet. 35 (citing Ex. 1017, 1; *see also* Ex. 1009 ¶ 47).[15]  Patent Owner provides insufficient factual or legal justification for its argument that "PAL/SECAM/NTSC" should be interpreted as requiring that all three standards be supported, as opposed to any one.  PO Resp. 46–47.  In the Institution Decision we determined, on that record, that the virgules in "PAL/SECAM/NTSC" mean the disjunctive, not the conjunctive, and we see no compelling reason to alter that determination based on the development of issues during the trial.[16]  Patent Owner does not object to that determination nor does it propose any contrary construction or legal argument.  Patent Owner's citation to paragraph 96 of the Opris Declaration restates Patent Owner's argument and

---

[15]  Petitioner also points to the '792 patent disclosure that television receivers are capable of receiving multiple different standards such NTSC, PAL, and SECAM.  Pet. 35 (citing Ex. 1001, 1:20–24).
[16]  Dec. 18 n.3: "Virgule.  'A diagonal mark (/) used especially to separate alternatives, as in *and/or.*'  *The American Heritage Dictionary of the English Language*, 1431 (1981).  Ex. 3002."

IPR2014-00809
Patent 7,265,792 B2

does not change the outcome. Accordingly, Cirrus Logic teaches one of the claimed standards, which is all that is required by the claim.

Based on the foregoing discussion and evidence of record, Petitioner has shown by a preponderance of evidence that claims 5 and 6 would have been obvious over Thomson, Harris, and Cirrus Logic.

### D. Obviousness of Claims 7 and 12 over Thomson, Harris, and Kerth

Petitioner contends that claims 7 and 12 of the '792 patent would have been obvious under 35 U.S.C. § 103(a) over Thomson, Harris, and Kerth. Pet. 35–38. To support this position, Petitioner presents the testimony of Dr. Holberg. Ex. 1009 ¶¶ 48–51.

Claim 7 depends from claim 1 and recites, "wherein the signal output circuit provides a *first output signal* and a *second output signal* corresponding to the digital output signals, the first output signal and the second output signal being *differential output signals* corresponding to a digital television format" (emphasis added).

Petitioner argues the limitation is taught by Kerth's disclosure of "differential I and Q components capable of carrying video and audio using a well-known quadrature demodulation technique. (Ex. 1011, 14:58–15:7; Ex. 1009, ¶ 49)." Pet. 36. In further support, Petitioner points to first and second differential output signals (RX-I 448 and RX-Q 451 of Figs. 1 and 8) of Kerth's digital-to-analog converter (DAC) circuitry. *Id.* (citing Ex. 1011, 8:63.

Patent Owner argues Kerth relates to telephony and not television and has an entirely different purpose and the person of ordinary skill would have no reasonable expectation of success. PO Resp. 48–49. Patent Owner also contends that the problems presented are different. *Id.* at 49 (citing Ex. 2003

31

IPR2014-00809
Patent 7,265,792 B2

¶ 99).  Petitioner responds that Kerth is not limited to telephony.  Pet. Reply
13 (citing Ex. 1072 ¶ 60).  Kerth is in the field of "radio-frequency (RF)
receivers and transceivers."  Ex. 1011, 1:21–27.  We agree with Petitioner
that Kerth's field of invention is either within the same field as the '792
patent or "reasonably pertinent" thereto.  Pet. Reply 13 (citing *In re Klein*,
647 F.3d 1343, 1348 (Fed. Cir. 2011)).  Petitioner also cites to deposition
testimony from Dr. Opris that the use of differential outputs: "(1) 'was well
known' to a POSITA; and (2) 'particularly well-suited' in '[a]ny high-
accuracy system.'"  *Id.* (citing Ex. 1056, 206:22–25).

We are persuaded by Petitioner that Kerth is analogous prior art that
would be consulted for its showing of differential outputs.  Television
systems fall within the high accuracy systems where differential outputs are
useful.  Ex. 2003 ¶ 102 (e.g., "heightened TV design requirements
[including] video signal-to-noise ratio").  Petitioner has articulated adequate
rational underpinnings for the combination of Kerth with Thomson and
Harris.  *See* Ex. 1009 ¶ 50.  Neither are we are persuaded that there would
not be a reasonable expectation of success were the person of ordinary skill
make the asserted combination.

Claim 12 depends from claim 1 and recites, "wherein the signal output
circuit comprises one or more output terminals, each of the one or more
output terminals of the signal output circuit comprises *a single-ended output
terminal or a differential output terminal*" (emphasis added).

Petitioner relies on the teachings of Thomson of a single output
terminal and Kerth regarding differential output terminal, as discussed
above.  Pet. 37–38 (citing Ex. 1009 ¶ 59).  Patent Owner argues Petitioner
has not shown that Thomson teaches a single-ended signal output circuit or

32

address the claim limitation, "a single-ended output terminal." PO Resp.
50–51. However, Kerth discusses both single-ended and differential
outputs. Ex. 1011, 8:57–60. Petitioner does argue that Thomson discloses a
single-ended output circuit. Pet. 38 (citing Ex. 1009 ¶ 51; Pet. 21–22
(section V(A)(6))).

Based on the foregoing discussion and evidence of record, Petitioner
has shown by a preponderance of evidence that claims 7 and 12 would have
been obvious over Thomson, Harris, and Kerth.

*E. Obviousness of Claims 13–17 Over Thomson, Harris, Kerth, and Oku*

Petitioner contends that claims 13–17 of the '792 patent could have
been obvious under 35 U.S.C. § 103 over Thomson, Harris, Kerth, and Oku.
Pet. 38–44. To support this position, Petitioner presents the testimony of
Dr. Holberg. Ex. 1009 ¶¶ 52–63.

Claim 13 depends from claim 1 and recites as a first additional
limitation first and second "digital-to-analog converter[s]" "coupled to
receive digital output signals from the signal processor and convert the
digital output signals to analog output signals." First, second and third
driver circuits that drive analog output signals to output terminals are also
recited. Claim 13 recites (emphases added):

> wherein the first and second output terminals provide signals
> *indicative of video and audio information* encoded in the input
> RF signal and the third output terminal provides signals
> *indicative of audio information* encoded in the input RF signal.

Figure 4 of Oku is reproduced below.

33

IPR2014-00809
Patent 7,265,792 B2

*FIG. 4*



Figure 4 of Oku is a block diagram of a digital broadcasting receiver.
Ex. 1018 ¶ 22. Petitioner argues Figure 4 discloses first and second digital-
to-analog converters ("DAC") 16 and 21 and first, second, and third driver
circuits 22, 26, and 17. Pet. 38–39. As discussed above, Kerth is cited by
Petitioner as teaching first and second outputs from a DAC. *Id.* at 39. Oku
also discloses an audio output 23 and driving circuit from DAC 21. *Id.* at
40. Oku also teaches a video output. Ex. 1018, Fig. 4, element 18. Citing
to the preceding disclosures from Figure 4 of Oku, Petitioner alleges "[i]t
would have been obvious to one of ordinary skill in the art to combine the
teachings of Kerth and Oku for any receiver where multiple outputs from a
DAC was desired or required." Pet. 39. Petitioner further contends that this
would have been a simple design choice, relying on '792 patent, column
6:51–56, and the Holberg Declaration. *Id.* (citing Ex. 1009 ¶ 54). Petitioner
also asserts Kerth and Oku would be combined based on disclosure from the
'792 patent that:

> [desired output signals] can assume various configurations to
> provide output signals in different formats. A configuration for
> signal output circuit 140 can be selected based on factors such

34

IPR2014-00809
Patent 7,265,792 B2

> as the desired pin count for receiver 100 and the desired format
> for the output signals.

Ex. 1001, 6:51–52, *cited in* Pet. 39.

Patent Owner argues the preceding does not articulate a reason to combine Kerth and Oku. PO Resp. 53. Patent Owner asserts there is no rational basis for the combination outside attorney argument, including the Holberg Declaration. *Id.* at 54. Patent Owner notes additionally that Thomson does not use a digital to analog converter (DAC) and a "POSITA would not have a reason or be motivated to include the Oku digital-to-analog converters in the Thomson system to obtain the receiver as recited in '792 patent claim 13." *Id.* at 55.

We are persuaded that person of ordinary skill would indeed have combined Thomson, Kerth, and Oku based on the evidence. Dr. Holberg says use of a digital-to-analog converter is a matter of design choice. Ex. 1009 ¶ 54. Dr. Opris testified the combination would not be considered because "minimizing the number of electronic components would have led a POSITA away from using another digital-to-analog converter." Ex. 2003 ¶ 105. We are persuaded that what components to use is a matter of design choice that would be within the skill of the person of ordinary skill in the art.

In addition to the arguments relating to whether or not Kerth, Oku, and Thomson should be combined, Patent Owner contends that Petitioner relied only on Oku to teach a signal output circuit comprising "first and second output terminals." PO Resp. 56. Without citation, Patent Owner contends the Board went beyond the Petition in relying on Kerth, not Oku, to teach "the first and second output terminals." PO Resp. 56. But Kerth is cited by Petitioner as teaching first and second outputs from a DAC. Pet. 39.

35

IPR2014-00809
Patent 7,265,792 B2

Regardless, Oku was cited by Petitioner to teach the digital-to-analog converter and the first and second driving circuits. Pet. 38–39 (citing Ex. 1018, Fig. 4 (references 21, 26, DAC 21, DAC 25), ¶ 46).

Claims 14–17 all depend from claim 13 and are not separately argued.

Based on the foregoing discussion and evidence of record, Petitioner has shown by a preponderance of evidence that claims 13–17 would have been obvious over Thomson, Harris, Kerth, and Oku.

### F. Obviousness of Claims 8 and 9 Over Thomson, Harris, Kerth, and Cirrus Logic

Petitioner contends that claims 8 and 9 of the '792 patent would have been obvious under 35 U.S.C. § 103 over Thomson, Harris, Kerth, and Cirrus Logic. Pet. 45–48. To support this position, Petitioner presents the testimony of Dr. Holberg. Ex. 1009 ¶¶ 64–68.

Claim 8 depends from claim 7, which depends from claim 1, and recites as a first limitation a "demodulator circuit" to demodulate the first and second output signals to video and audio baseband signals corresponding to the input RF signal. As a second limitation, claim 8 recites "a decoder circuit coupled to decode the video and audio baseband signals for providing video and audio display signals corresponding to the digital television format."

As addressed above, Petitioner cites to Thomson's output circuit with a demodulator to teach the first limitation. Pet. 45 (citing Ex. 1009 ¶ 64); *see* Ex. 1004, Fig.1, elements 9, 12, and 14. As to the second limitation, Petitioner relies on the decoder circuits taught by Cirrus Logic (Exs. 1015–1017). *Id.* Petitioner argues the person of ordinary skill in the art would be motivated to combine Thomson's digital TV signals, which would be

36

IPR2014-00809
Patent 7,265,792 B2

encoded in MPEG, with the MPEG circuitry of Cirrus Logic, which decodes both audio (Ex. 1016) and video (Ex. 1017) signals.

Patent Owner argues that the prior art references are "not combinable." PO Resp. 56–67. No specific argument is made beyond referencing the arguments made in connection with claims 5 and 6, which also involve Cirrus Logic. For reasons stated previously, these arguments are not persuasive.

Based on the foregoing discussion and evidence of record, Petitioner has shown by a preponderance of evidence that claims 8 and 9 would have been obvious over Thomson, Harris, Kerth, and Cirrus Logic.

G. *Obviousness of claim 3 over Thomson, Harris, and Gunter*

Petitioner contends that claim 3 of the '792 patent would have been obvious under 35 U.S.C. § 103 over Thomson, Harris, and Gunter. Pet. 29–31.[17] To support this position, Petitioner presents the testimony of Dr. Holberg. Ex. 1009[18] ¶¶ 41–42.

Claim 3 depends from claim 1 and recites, "wherein the television receiver is formed as a *monolithic integrated circuit*" (emphasis added).

Petitioner relies on Gunter (Ex. 1022) to teach the "monolithic integrated circuit" limitation. Pet. 29 (citing Ex. 1022, 3:50–55, Abstract; Ex. 1009 ¶ 41).

Patent Owner disputes whether Thomson's circuit could be modified because Thomson uses an analog SAW filter. PO Resp. 58–59. We agree with Petitioner that Thomson's SAW filter is not a part of what is cited to meet the limitations of claim 1. Pet. Reply 15. The input signal to mixer 2

---

[17]  As in Corrected Petition.
[18]  As corrected in Exhibit 1038.

37

in Thomson is a signal centered around 140 MHz. The mixer 2 converts the RF signal to an intermediate frequency signal "which realizes a frequency transposition into an IF signal of around 75 MHz (see Fig. 2d and 2e)." Ex. 1004, 2:55–57. Thus, as Petitioner argues (Pet. Reply 15) the mixer 2 and LO ("local oscillator frequency," Ex. 1004, 2:53–54) themselves satisfy the "frequency conversion circuit" element of claim 1.

Based on the foregoing discussion and evidence of record, Petitioner shows by a preponderance of evidence that claim 3 would have been obvious over Thomson, Harris, and Gunter.

### H. Secondary Considerations of Nonobvious Subject Matter

Patent Owner shows evidence of alleged secondary considerations of nonobvious subject matter. PO Resp. 59–60. However, for objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (citing *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

Patent Owner fails to show the required nexus to any of the claimed subject matter. Because Patent Owner's evidence fails to show any nexus with the invention, we do not consider it in our obviousness analysis.

### I. Patent Owner's Motion to Exclude

Dr. Holberg's support of the Petition appears in two declarations, filed as Exhibits 1009 and 1072. Patent Owner moves to exclude both declarations because Dr. Holberg's "knowledge is below what one of ordinary skill in the relevant art would know, and would have to know to understand the relevance of the prior art and the invention" and because "his testimony clearly shows lack of credibility." Mot. Exclude 1. Patent Owner

38

IPR2014-00809
Patent 7,265,792 B2

clarified at the oral hearing that "credibility" does not refer to Dr. Holberg's honesty, but to his ability to put support for his opinions on the record. Tr. 76:9–77:24. Petitioner opposes, contending that Dr. Holberg is qualified as an expert in the relevant field. Pet. Opp. Mot. Exclude 3–4.

The parties disagree in their characterization of the relevant field in evaluating whether Dr. Holberg is "qualified as an expert by knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702. Patent Owner contends that a person of ordinary skill in the art at the time of the invention of the '792 patent

> would be familiar with: 1) fundamental RF circuit design concepts, e.g. heterodyne, superheterodyne, tuner, baseband, intermediate frequency, 2) fundamental RF television circuit design criteria, e.g. sensitivity, signal-to-noise ratio, linearity, 3) the required signal-to-noise ratio for an analog TV tuner, and 4) basic usage of the Cadence design platform (the most widespread RF integrated circuit design tool).

Mot. Exclude 3–4. We find Patent Owner's characterization of the relevant field too narrow. The '792 patent characterizes the field of the invention as follows, notably lacking the strong focus of Patent Owner's characterization on RF circuit design:

> The present invention relates to a television signal receiver, and in particular, the present invention relates to a broadband television signal receiver for receiving multi-standard analog television signals and digital television signals.

Ex. 1001, 1:5–9. As Petitioner observes, the only RF component of the claimed receiver is the "tuner for receiving input RF signals and for converting said input RF signals to intermediate signals having an intermediate frequency." Pet. Opp. Mot. Exclude 2. Patent Owner's expert,

39

IPR2014-00809
Patent 7,265,792 B2

Dr. Opris, acknowledged that heterodyne and superheterodyne conversion has been known for about 100 years. Ex. 1056, 26:11–20. These factors weigh significantly against defining the field of *invention* as narrowly as Patent Owner proposes. Instead, we agree with Petitioner and find that a person of ordinary skill in the art would have held at least a master of science or higher degree in electrical engineering, have at least four years of experience with mixed signal system design, including analog front ends and subsequent digital signal processing of various analog and digital signal formats of video and audio content. Pet. 11.

Dr. Holberg's education and experience exceed these qualifications. Ex. 1009 ¶ 3, App. A. We have also considered Patent Owner's contention that Dr. Holberg's cross-examination testimony shows that he lacks ordinary skill in the art of the invention, and have reviewed that testimony. We conclude that Dr. Holberg is an expert in the relevant field of the invention.

Patent Owner's Motion to Exclude is denied.

### III.  ORDER

For the reasons given, it is

ORDERED that Petitioner has shown by a preponderance of the evidence that claims 1–17 of U.S. Patent No. 7,265,792 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

40

IPR2014-00809
Patent 7,265,792 B2

PETITIONER

Peter Ayers
Brian Mangum
John Shumaker
Lee & Hayes, PLLC
peter@leehayes.com
brianm@leehayes.com
JShumaker@leehayes.com

PATENT OWNER

Michael R. Fleming
Benjamin Haber
Irell & Manella LLP
mfleming@irell.com
bhaber@irellI.com

Mihai Murgulescu
Cresta Technology Corporation
mihai.murgulescu@crestatech.com

41

US007075585B2

(12) **United States Patent**
Favrat et al.

(10) Patent No.: **US 7,075,585 B2**
(45) Date of Patent:     **Jul. 11, 2006**

(54) **BROADBAND RECEIVER HAVING A MULTISTANDARD CHANNEL FILTER**

(75) Inventors: **Pierre Favrat**, Sunnyvale, CA (US); **Didier Margairaz**, Saratoga, CA (US); **Alain-Serge Porret**, Sunnyvale, CA (US); **Dominique Python**, Sunnyvale, CA (US)

(73) Assignee: **Xceive Corporation**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 592 days.

(21) Appl. No.: **10/236,645**

(22) Filed: **Sep. 6, 2002**

(65) **Prior Publication Data**

US 2004/0061804 A1     Apr. 1, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/322,548, filed on Sep. 17, 2001.

(51) **Int. Cl.**
*H04N 3/27*     (2006.01)
*H04N 5/455*     (2006.01)

(52) **U.S. Cl.** ...................... **348/554**; 348/726; 348/725; 375/340; 455/189.1

(58) **Field of Classification Search** ................ 348/554, 348/555, 558, 725, 726; 375/316, 340, 343; 455/189.1, 245.2, 179.1, 188.1, 192.1, 334
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,737,035 A     4/1998 Rotzoll ........................ 348/725

| 5,784,414 | A | * | 7/1998 | Bruekers et al. | ............ | 375/324 |
| 6,118,499 | A | * | 9/2000 | Fang | ............................ | 348/726 |
| 6,177,964 | B1 | | 1/2001 | Birleson et al. | ............ | 348/725 |
| 6,369,857 | B1 | * | 4/2002 | Balaban et al. | .............. | 348/555 |
| 6,424,683 | B1 | * | 7/2002 | Schollhorn | .................. | 375/332 |
| 6,643,502 | B1 | | 11/2003 | Van De Plassche et al. | | |
| 2002/0051091 | A1 | * | 5/2002 | Dedieu et al. | .............. | 348/723 |

FOREIGN PATENT DOCUMENTS

WO     WO 01/20792 A1     3/2001

* cited by examiner

*Primary Examiner*—Victor R. Kostak
(74) *Attorney, Agent, or Firm*—Patent Law Group LLP; Carmen C. Cook

(57)     **ABSTRACT**

A television (TV) receiver includes a multi-standard channel filter with a programmable intermediate frequency adapted to receive television signals in a variety of television standards and formats. In one embodiment, a receiver includes a tuner and a channel filter. The tuner receives input RF signals encoding information in one of a number of formats and converts the input RF signals to intermediate signals having an intermediate frequency (IF). The intermediate signals are coupled to the channel filter. The channel filter includes an anti-aliasing filter for filtering the intermediate signals, an analog-to-digital converter for sampling the filtered intermediate signals and generating a digital representation thereof, and a signal processor for processing the digital representation of the intermediate signals in accordance with the format of the input RF signal. The signal processor generates digital output signals indicative of information encoded in the input RF signal.

**21 Claims, 5 Drawing Sheets**



U.S. Patent

Jul. 11, 2006

Sheet 1 of 5

US 7,075,585 B2

A000082



*__Figure 1__*     *(Prior Art)*

A000083



## Figure 2



*Figure 3*



*Figure 4*



Frequency (Hz)

## *Figure 5*

US 7,075,585 B2

| 1 | 2 |

# BROADBAND RECEIVER HAVING A MULTISTANDARD CHANNEL FILTER

## CROSS-REFERENCE TO RELATED APPLICATION

The present application claims the benefit of U.S. Provisional Patent Application No. 60/322,548, filed Sep. 17, 2001, and entitled "Broadband Receiver for Multistandard Analog TV, Digital TV, and Data Channels", which application is incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

The present invention relates to a television signal receiver, and in particular, the present invention relates to a broadband television signal receiver for receiving multistandard analog television signals, digital television signals and data channels.

## DESCRIPTION OF THE RELATED ART

A television or video recorder includes a television signal receiver (or television receiver) to receive terrestrial broadcast, cable television or satellite broadcast television signals and to process the television signals into the appropriate video signals for display or for recording. Television signals are transmitted in analog or digital formats and in accordance with a variety of standards. For analog television transmission, the NTSC (National Television Standards Committee) standard, the PAL (Phase Alternate Lines) standard, and the SECAM (Sequential Couleur Avec Memoire) standard are widely adopted. On the other hand, for digital television transmission, the DVB (Digital Video Broadcast) format and the ATSC (Advanced Television Standards Committee) format are available. Because the different television formats and different television standards are incompatible, television receivers are traditionally made specifically for the analog or digital format and for a specific standard. Thus, televisions or video recording equipments are dedicated equipments which can only be used in the geographic regions in which the television standard is broadcasted.

Multi-standard equipments are known. In most instances, multi-standard equipments are built by duplicating the hardware necessary to receive television signals in different formats and in several standards, increasing the complexity and the cost of manufacturing the equipments.

FIG. 1 is a block diagram of a conventional television receiver. The operation of television receiver 10 includes two main components. First, receiver 10 receives the incoming signal and converts the incoming radio frequency (RF) signal to an intermediate frequency (IF) signal. Then, receiver 10 converts the IF signal to the baseband signals. The baseband signals are coupled to appropriate video and audio decoders to generate the display signals (e.g. RGB) or sound.

Referring to FIG. 1, television receiver 10 includes a tuner 14 for receiving the input RF signal on input terminal 12 and converting the RF signal to an IF signal by one or more frequency conversions. The frequency conversions are generally implemented as single or dual super-heterodyne conversions. In conventional television receivers, the intermediate frequency is dictated by the geographical area the receivers are to be used. Currently, there are five intermediate frequencies being used in the world. For example, in the United States, the IF is 41 to 47 MHz.

Television receiver 10 includes a channel filter 18 and a demodulator 20 for converting the IF signal to video and audio baseband signals. Channel filter 18 is typically a discrete filter implemented as a SAW (Surface Acoustic Wave) filter. The shape of the SAW filter is designed specifically for the format (analog or digital TV) and the television standard (NTSC, PAL or SECAM) of the television signals being received. Demodulator 20 is typically a dedicated component and designed specifically for a predetermined television signal format and a predetermined television standard.

When television receiver 10 is a multi-standard receiver, a bank of channel filters 18a to 18c is provided, each of the channel filters designed for a specific format and standard. To support multi-standard reception, a bank of demodulators 20a to 20c is also provided, each demodulator receiving filtered signals from a corresponding channel filter. For analog television signal reception, the demodulator is a VIF/SIF module. The VIF/SIF module provides a value output called CVBS (Composite Video Baseband Signal) and audio outputs, such as MPX or A2. For digital television signal reception, the demodulator is a digital demodulator typically including a down-converter, an analog-to-digital converter and other supporting circuitry to perform the demodulation. The digital demodulator outputs data in a MPEG data stream.

The conventional multi-standard television receivers have several shortcomings. First, conventional television receivers use discrete analog and digital components. The receivers are typically bigger in size and more costly to manufacture. Second, the conventional multi-standard television receivers require duplicate components to support the different television standards. Consequently, such multi-standard television receivers are large in dimensions and costly to manufacture.

Therefore, it is desirable to provide a multi-standard television receiver that is cost effective to manufacture and has acceptable performance when receiving television signals from a variety of sources.

## SUMMARY OF THE INVENTION

A television (TV) receiver includes a multi-standard channel filter with a programmable intermediate frequency adapted to receive television signals in a variety of television standards and formats.

According to one embodiment of the present invention, a receiver includes a tuner and a channel filter. The tuner receives input RF signals encoding information in one of a number of formats and converts the input RF signals to intermediate signals having an intermediate frequency (IF). The intermediate signals are coupled to the channel filter. The channel filter includes an anti-aliasing filter for filtering the intermediate signals, an analog-to-digital converter for sampling the filtered intermediate signals and generating a digital representation thereof, and a signal processor for processing the digital representation of the intermediate signals in accordance with the format of the input RF signal. The signal processor generates digital output signals indicative of information encoded in the input RF signal.

In one embodiment, the formats of the input RF signals include analog television signals and digital television signals.

In another embodiment of the present invention, the receiver further includes a bank of demodulators, each coupled to receive digital output signals from the signal processor. Each of the demodulators operates to demodulate

US 7,075,585 B2

3

the digital output signals according to one of the formats of the input RF signal and generates the corresponding video and audio baseband signals.

The present invention is better understood upon consideration of the detailed description below and the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a conventional multistandard television receiver.

FIG. 2 is a block diagram of a television receiver according to one embodiment of the present invention.

FIG. 3 is a circuit diagram of an anti-aliasing filter which can be used to construct the anti-aliasing filter of FIG. 2.

FIG. 4 is a circuit diagram of an anti-aliasing filter which can be used to construct the anti-aliasing filter of FIG. 2.

FIG. 5 is a waveform of a filter function that can be implemented in the DSP of FIG. 2 for processing analog television signals.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

In accordance with the principles of the present invention, a television (TV) receiver includes a multi-standard channel filter with a programmable intermediate frequency adapted to receive television signals in a variety of television standards and formats. In one embodiment, the channel filter accepts a preselected intermediate frequency regardless of the standards or formats of the television signals. In operation, the channel filter digitizes the incoming television signals and perform signal processing of the incoming signals in the digital domain. By processing all signals in the digital domain, the TV receiver of the present invention eliminates the need for analog components, such as SAW filters. Thus, the TV receiver of the present invention can be readily integrated in one integrated circuit to reduce the size and the manufacturing cost of the receiver. Furthermore, the TV receiver of the present invention reconfigures the same circuit modules to support multi-standard reception, obviating the need to provide duplicate components.

FIG. 2 is a block diagram of a television receiver according to one embodiment of the present invention. Referring to FIG. 2, television receiver 50 receives input RF signals, such as those received on an antenna or on a cable line, on an input terminal 52. The input RF signals are coupled to a tuner 54 which operates to convert the input RF signal to an intermediate signal using one or more frequency conversions. For example, tuner 54 can perform a single or dual super-heterodyne conversion. In one embodiment of the present invention, tuner 54 is a commercially available discrete component and outputs intermediate signals having an intermediate frequency (IF) that is determined by the geographic region of interest. That is, the IF of tuner 54 is based on worldwide standards specified for each geographic region.

In another embodiment of the present invention, tuner 54 is an integrated component of receiver 50. In that case, tuner 54 can be designed to generate intermediate signals having an intermediate frequency of any values. The IF used by tuner can be the same as or different than the IF specified by the worldwide standards. More importantly, because TV receiver 50 includes a multi-standard channel filter 58, tuner 54 can use the same IF for receiving analog or digital television signals in any standards. The value of the IF in an

4

integrated tuner is a matter of design choice. In one embodiment, the IF is selected to be 20 MHz or higher.

Next, TV receiver 50 includes multi-standard channel filter 58 for filtering and processing the intermediate signals from tuner 54. Multi-standard channel filter 58 includes an anti-aliasing filter 60, an analog-to-digital converter (ADC) 62 and a digital signal processor (DSP) 64. As described above, channel filter 58 is capable of receiving intermediate signals from tuner 54 having any intermediate frequency. Furthermore, channel filter 58 digitizes the incoming televisions signals and performs subsequent processing in the digital domain entirely. Thus, by applying the appropriate sampling frequency at the ADC circuit and the appropriate signal processing functions at the DSP circuit, channel filter 58 can handle television signals in any format (analog or digital) and in any standard (NTSC, PAL or ATSC).

Anti-aliasing filter 60 performs pre-processing of the intermediate signals from tuner 54 to prevent aliasing from occurring when the intermediate signals are subsequently sampled and digitized by ADC 62. In one embodiment, anti-aliasing filter 60 can be realized with a SAW filter. In another embodiment, anti-aliasing filter 60 is implemented as shown in FIG. 3 using capacitors and inductors. In yet another embodiment, anti-aliasing filter 60 is realized with transconductors (gmC) 99 as shown in FIG. 4. After the filtering operation, ADC 62 operates to sample the filtered intermediate signals to generate a digital representation thereof. In the present embodiment, ADC 62 is a 10-bit converter and has a sampling rate of up to 40 megasamples per second.

The center frequency of anti-aliasing filter 60 and the sampling frequency of ADC 62 are selected based on the intermediate frequency of the intermediate signal. In one embodiment, both the center frequency of anti-aliasing filter 60 and the sampling frequency of ADC 62 are set to be at least twice the bandwidth of the intermediate frequency signal. When anti-aliasing filter 60 is constructed using transconductors as shown in FIG. 4, the center frequency of anti-aliasing filter 60 can be adjusted by varying the voltage Vctrl of transconductors 99. The sampling frequency of ADC 62 can be adjusted by using a voltage controlled oscillator and a phase locked loop. In the present embodiment, a tuning control circuit 67 is included for adjusting the center frequency of anti-aliasing filter 60 and the sampling frequency of ADC 62. Tuning control circuit 67 can receive a control signal external to TV receiver 50, such as a manual control signal from a user. Tuning control circuit 67 can also perform auto-detection of the intermediate frequency of the intermediate signals and adjust the operating frequencies of the anti-aliasing filter and the ADC accordingly.

After the intermediate signal is filtered and digitized, the digital representation of the signal is processed by DSP 64. DSP 64 processes the digital signals according to the television standard to which the input RF signal is encoded.

In the present embodiment, channel filter 58 includes a standard selection circuit 68 for selecting between the several analog television standards and the several digital television standards. DSP 64 applies the appropriate filter function, such as an impulse response, to the digital signals depending on the state of standard selection circuit 68. In one embodiment, the coefficients of the filter functions are stored in a look-up table in a memory 70. DSP 64 retrieves the coefficients from memory 70 to be applied to the incoming digital signals.

DSP 64 is a programmable and reconfigurable processor. In the present embodiment, DSP 64 implements a finite impulse response (FIR) filter which is reconfigured based on

US 7,075,585 B2

5

the TV standard selected. Furthermore, in the present embodiment, DSP **64** includes two computing units to speed up the computation time. Specifically, the filtering operations of the real and imaginary parts in the frequency domain are carried out in parallel. In other embodiments, DSP **64** may include only one computing unit.

Standard selection circuit **68** can be implemented in one of many ways. The selection of the correct standard can be made manually by the user of the television system, such as by activating a switch, or the selection can be made automatically by providing an auto-detection capability in TV receiver **50**. In the present embodiment, auto-detection is implemented by detecting in the baseband signals the presence or absence of carrier signals which uniquely identify the television standards. For example, analog television signals can be identified by the analog visual carrier signal while digital television signals can be identified by the pilot carrier. Each demodulator in bank **66** generates a signal which is fed back to standard selection circuit **68** indicating which television standard the input signal is encoded. In other embodiments, other means for selecting between the different standards can be used.

When the input RF signal is an analog television signal, DSP **64** applies a video filter function and a sound filter function to the digitized signals to separate the video signals from the audio signals. The video and sound filters can be implemented as FIR filters. An example of such filter function is shown in FIG. **5**. DSP **64** can also implement other filter functions such as ghost cancellation for reducing the interference of the input signal. The filter response is then derived from the measured channel response.

When the input RF signal is a digital television signal, DSP **64** applies a filter function to the digitized signals. The filter function can be implemented as a FIR filter. An example is the ATSC-VSB standard where the filter response is specified as raised root cosine with 0.114 roll-off (refer to the ATSC A-83 specification). Furthermore, additional filter functions, such as an equalizer for echo cancellation (multipath), can also be implemented in DSP **64**. The filter response is then derived from the measured channel response.

The output signals from channel filter **58** are coupled to a bank of demodulators **66** for generating into the appropriate video and audio baseband signals. The video and audio baseband signals are usually coupled to video and audio decoders before being displayed or playback on a view screen.

In the present embodiment, demodulators **66** include a demodulator for analog television signals **66a**, a demodulator for digital television signals **66b** and a demodulator **66c** for digital data channels.

Analog demodulator **66a** performs demodulation of the analog television signals in the digital domain. In cases where analog demodulator **66a** receives analog input signals only, a digital-to-analog converter (DAC) (not shown) can be included between the output terminal of DSP **64** and the input terminal of analog demodulator **66a**.

Analog demodulator **66a** provides three output signals: a Composite Video Baseband Signal (CVBS) containing the video information, and audio **1** and audio **2** containing the audio information. Audio **1** and audio **2** signals can be AM modulated, FM modulated or Intercarrier signals. The intercarrier signal is a signal that can contain any format of modulated sound. It is usually connected to an external audio decoder. By using standard output signals, TV receiver **50** can readily interface with other standard components,

6

such as a video and sound decoder, thereby providing compatibility with existing television components. An additional digital-to-analog converter may be coupled to the output terminal of demodulator **66a** if analog output signals are desired.

Digital demodulator **66b** operates to decode the incoming digital television signal. Typically, digital television signals are modulated in a VSB, QAM or COFDM scheme. Digital demodulator **66b** generates an MPEG data stream as output signals, thereby providing compatibility with other existing television components.

In one embodiment of the present invention, TV receiver **50** is an integrated circuit where tuner **54**, channel filter **58** and demodulators **66** are all integrated onto the same piece of integrated circuit. In another embodiment, TV receiver **50** can be manufactured as two or more integrated circuits.

The advantages of the television receiver of the present invention are numerous.

First, the television reciever of the present invention can be configured as a broadband receiver for receiving multi-standard analog or digital television signals, and broadcast data channels. Furthermore, the receiver can be configured to receive analog television channels from different television standards. Thus, the television receiver can be readily adaptable for use worldwide for television reception.

Second, the television receiver of the present invention can be used to receive television signals distributed in any manner and provides excellent reception performance. Thus, the TV receiver of the present invention can be used for the reception of terrestrial broadcast and cable transmission.

Third, the television reciever of the present invention eliminates the needs for analog components, such as SAW filters. Therefore, all the circuit modules of the TV receiver, including filtering functions, equalizer, ghost cancellation and video and sound splitter can be integrated onto the same integrated circuit. Increasing the level of component integration has the effect of reducing the size of the receiver and the manufacturing cost thereof.

Lastly, the television receiver of the present invention provides interfaces that are compatible with interfaces of existing components. Specifically, the television receiver of the present invention provides video, audio and MPEG output signals that are compatible with analog or digital television standards so that the receiver can be readily adapted into existing television systems.

The above detailed descriptions are provided to illustrate specific embodiments of the present invention and are not intended to be limiting. Numerous modifications and variations within the scope of the present invention are possible. The present invention is defined by the appended claims.

We claim:

1. A receiver comprising:

a tuner for receiving input RF signals and for converting said input RF signals to intermediate signals having an intermediate frequency (IF), said input RF signals encoding information in one of a plurality of formats; and

a channel filter for receiving the intermediate signals, said channel filter comprising:

an anti-aliasing filter for filtering said intermediate signals;

an analog-to-digital converter for sampling said filtered intermediate signals and generating a digital representation thereof;

a signal processor for processing said digital representation of said intermediate signals in accordance with said format of said input RF signal, said signal

US 7,075,585 B2

7

processor generating digital output signals indicative of information encoded in said input RF signal; and

a plurality of demodulators, each coupled to receive output signals from said signal processor, each of said demodulators for demodulating said digital output signals according to one of said formats of said input RF signal, each of said demodulators generating video and audio baseband signals corresponding to said format of said input RF signal.

2. The receiver of claim 1, wherein said plurality of formats comprise an analog television format and a digital television format.

3. The receiver of claim 1, further comprising:

a digital-to-analog converter coupled between said signal processor and a first one of said plurality of demodulators, said digital-to-analog converter converting said digital output signals to an analog format.

4. The receiver of claim 1, wherein said intermediate frequency comprises a frequency value specified by one or more television standards.

5. The receiver of claim 1, wherein said intermediate frequency comprises a frequency value other than those specified by one or more television standards.

6. The receiver of claim 1, wherein a center frequency of said anti-aliasing filter and a sampling frequency of said analog-to-digital converter are functions of said intermediate frequency.

7. The receiver of claim 6, wherein said channel filter further comprises a tuning control circuit for adjusting said center frequency and said sampling frequency to frequency values derived from said intermediate frequency.

8. The receiver of claim 1, wherein said anti-aliasing filter comprises a transconductance (gmC) filter function.

9. The receiver of claim 1, wherein said analog-to-digital converter is a 10-bit converter.

10. The receiver of claim 1, wherein said signal processor applies one of a plurality of finite impulse response filters to said digital representation of said intermediate signal, each of said plurality of finite impulse response corresponding to a format of said input RF signal.

11. The receiver of claim 10, wherein said plurality of finite impulse response filters are stored in a memory, and said signal processor indexes said memory to retrieve one of said plurality of finite impulse response filters.

12. The receiver of claim 10, wherein said signal processor comprises a first computing unit and a second computing unit, said first computing unit processing a real part of said finite impulse response filter operation while said second computing unit processing an imaginary part of said finite impulse response filter operation.

8

13. The receiver of claim 10, wherein said channel filter further comprises a standard selection circuit coupled to said signal processor, said standard selection circuit generating a select signal indicative of a format of said input RF signal and said signal processor selecting a finite impulse response filter in response to said select signal.

14. The receiver of claim 13, wherein said standard selection circuit generates said select signal in response to an input signal from a user.

15. The receiver of claim 13, wherein said standard selection circuit generates said select signal by detecting carrier signals identifying one of said formats of said input RF signals.

16. The receiver of claim 1, wherein said input RF signals comprise RF signals received from one of terrestrial broadcast, from satellite broadcast, and from cable transmission.

17. A method for receiving input RF signal comprising:

receiving said input RF signals encoding information in one of a plurality of formats;

converting said input RF signals to intermediate signals having an intermediate frequency;

applying a first filter function to said intermediate signals, said first filter function being an anti-aliasing filter and having a center frequency;

digitizing said filtered intermediate signals at a sampling frequency;

processing said digitized signals in accordance with said format of said input RF signals and generating digital output signals indicative of information encoded in said input RF signals; and

demodulating using a plurality of demodulators said processed digitized signals to generate baseband signals corresponding to said format of said input RF signals.

18. The method of claim 17, wherein said plurality of formats comprise an analog television format and a digital television format.

19. The method of claim 17, wherein said processing said digital signals is performed in response to a select signal indicative of said format of said input RF signal.

20. The method of claim 19, further comprising:

generating said select signal by detecting carrier signals in said input RF signal identifying said format of said input RF signal.

21. The method of claim 17, wherein said center frequency and said sampling frequency are functions of said intermediate frequency.

\* \* \* \* \*

(12) **United States Patent**
Favrat et al.

(10) Patent No.: **US 7,265,792 B2**
(45) **Date of Patent:**        **Sep. 4, 2007**

(54) **TELEVISION RECEIVER FOR DIGITAL AND ANALOG TELEVISION SIGNALS**

(75) Inventors: **Pierre Favrat**, Milpitas, CA (US); **Alain-Serge Porret**, Sunnyvale, CA (US); **Dominique Python**, Sunnyvale, CA (US); **Friederich Mombers**, San Jose, CA (US); **Richard P. Perring**, San Jose, CA (US); **Philippe Duc**, Santa Clara, CA (US); **Benito Carnero**, Santa Clara, CA (US); **Didier Margairaz**, San Jose, CA (US)

(73) Assignee: **Xceive Corporation**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 481 days.

(21) Appl. No.: **10/884,347**

(22) Filed: **Jul. 1, 2004**

(65) **Prior Publication Data**

US 2006/0001779 A1    Jan. 5, 2006

(51) **Int. Cl.**
*H04N 3/27*        (2006.01)
*H04N 5/46*        (2006.01)

(52) **U.S. Cl.** ...................................... **348/554**; 348/558

(58) **Field of Classification Search** ................ 348/554, 348/558, 725, 726, 705, 706; 375/316, 340; 455/189.1, 245.2, 179.1, 188.1, 192.1, 334
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,872,054 A * 10/1989 Gray et al. ................. 348/441

6,369,857 B1    4/2002 Balaban et al.
6,643,502 B1 * 11/2003 Van De Plassche et al. 455/339
2002/0057366 A1    5/2002 Oku et al.
2004/0061804 A1    4/2004 Favrat et al.

FOREIGN PATENT DOCUMENTS

EP    0 516 216 A2    5/1992

OTHER PUBLICATIONS

International Search Report including written opinion, 11 pages.

* cited by examiner

*Primary Examiner*—Victor R. Kostak
(74) *Attorney, Agent, or Firm*—Patent Law Group LLP; Carmen C Cook

(57)        **ABSTRACT**

A television receiver includes a frequency conversion circuit, an analog-to-digital converter, a signal processor, and a signal output circuit. The frequency conversion circuit receives an input RF signal in one of several television signal formats and converts the input RF signal to an intermediate frequency signal. The analog-to-digital converter samples the intermediate frequency signal and generates a digital representation thereof. The signal processor processes the digital representation of the intermediate frequency signal in accordance with the television signal format of the input RF signal and generates digital output signals indicative of information encoded in the input RF signal. Finally, the signal output circuit receives the digital output signals from the signal processor and provides one or more output signals corresponding to the digital output signals. The signal output circuit can be configured to provide output signals corresponding to an analog television format or a digital television format or both.

**29 Claims, 3 Drawing Sheets**



U.S. Patent

Sep. 4, 2007

Sheet 1 of 3

US 7,265,792 B2

A000092



**Fig. 1**

A000093











Fig. 2

U.S. Patent

Sep. 4, 2007

Sheet 3 of 3

US 7,265,792 B2

A000094

206
208
200
106
Digital
demodulation
section
MPEG decoding
section
To TV
102
Dual-Format
Receiver
DTV low-IF
210
RFIN
104
202
PAL/SECAM/
NTSC decoder
section
To TV
100
CVBS
204
105
212
Sound decoder
To TV
Sound IF
214

**Fig. 3A**

256
258
250
Digital
demodulation
section
MPEG decoding
section
To TV
102
Receiver
708
260
RFIN
252
CVBS or
DTV low-IF
PAL/SECAM/
NTSC decoder
section
To TV
100
254
709
262
Sound decoder
To TV
Sound IF
264

**Fig. 3B**



US 7,265,792 B2

1

## TELEVISION RECEIVER FOR DIGITAL AND ANALOG TELEVISION SIGNALS

### FIELD OF THE INVENTION

The present invention relates to a television signal receiver, and in particular, the present invention relates to a broadband television signal receiver for receiving multi-standard analog television signals and digital television signals.

### DESCRIPTION OF THE RELATED ART

A television (TV) or video recorder includes a television signal receiver (or television receiver) to receive terrestrial broadcast, cable television or satellite broadcast television signals and to process the television signals into the appropriate video signals for display or for recording. Television signals are transmitted in analog or digital formats and in accordance with a variety of standards. For analog television transmission, the NTSC (National Television Standards Committee) standard, the PAL (Phase Alternate Lines) standard, and the SECAM (Sequential Couleur Avec Memoire) standard are widely adopted. On the other hand, for digital television transmission, the DVB (Digital Video Broadcast) format and the ATSC (Advanced Television Standards Committee) format are available. Because the different television formats and different television standards are incompatible, television receivers are traditionally made specifically for the analog or digital format and for a specific standard. Thus, televisions or video recording equipments are dedicated equipments which can only be used in the geographic regions in which the television standard is broadcasted.

The operation of a conventional television receiver includes two main components. First, the receiver receives the incoming television signal in radio frequency (RF) and converts the incoming RF signal to an intermediate frequency (IF) signal. Then, the receiver converts the IF signal to a video baseband signal and an audio baseband signal. The baseband signals are coupled to appropriate video and audio decoders to generate the display video signals (e.g. RGB) or sound. In general, the conventional television receiver includes a tuner for receiving the input RF signal and converting the RF signal to an IF signal by one or more frequency conversions. The frequency conversions are generally implemented as single or dual super-heterodyne conversions. In conventional television receivers, the intermediate frequency is dictated by the geographical area the receivers are to be used. Currently, there are five intermediate frequencies being used in the world. For example, in the United States, the IF is 41 to 47 MHz.

The conventional television receiver also includes a channel filter and a demodulator for converting the IF signal to video and audio baseband signals. The channel filter is typically a discrete filter implemented as a SAW (Surface Acoustic Wave) filter. The shape of the SAW filter is designed specifically for the format (analog or digital TV) and the television standard (NTSC, PAL or SECAM) of the television signals being received. The demodulator is typically a dedicated component and designed specifically for a predetermined television signal format and a predetermined television standard. For analog television signal reception, the demodulator is a VIF/SIF module. The VIF/SIF module provides a video output called CVBS (Composite Video Baseband Signal) and audio outputs, such as MPX or A2. For digital television signal reception, the demodulator is a digital demodulator typically including a down-converter,

2

an analog-to-digital converter and other supporting circuitry to perform the demodulation. The digital demodulator outputs data in a MPEG data stream.

Television receivers for receiving both analog and digital television signals are being developed. These dual-format television receivers are typically implemented by duplicating the hardware required for processing the analog television signals and digital television signals. For instance, it is known to implement a dual-format television receiver by using a bank of channel filters, each of the channel filters designed for a specific format and standard, and a bank of demodulators, each demodulator receiving filtered signals from a corresponding channel filter. A switch can be used to select the desired signal processing path including the desired channel filter and the associated demodulator. An alternate implementation, proposed by U.S. Pat. No. 6,369,857 to Balaban, involves digitizing the intermediate frequency signal and processing the digitized signal using two separate processing circuitry—one for the analog television signal and one for the digital television signal.

A television receiver for providing dual-format reception is desired. It is further desirable that such a dual-format television receiver be cost effective to manufacture and provides high quality video and audio performance.

### SUMMARY OF THE INVENTION

According to one embodiment of the present invention, a television receiver includes a frequency conversion circuit, an analog-to-digital converter, a signal processor, and a signal output circuit. The frequency conversion circuit receives an input RF signal and converts the input RF signal to an intermediate frequency signal having an intermediate frequency (IF). The input RF signal encodes information in one of several television signal formats. The analog-to-digital converter samples the intermediate frequency signal and generates a digital representation thereof. The signal processor processes the digital representation of the intermediate frequency signal in accordance with the television signal format of the input RF signal and generates digital output signals indicative of information encoded in the input RF signal. Finally, the signal output circuit receives the digital output signals from the signal processor and provides one or more output signals corresponding to the digital output signals.

In one embodiment, the television signal formats include an analog television format and a digital television format. The signal output circuit can be configured to provide output signals corresponding to an analog television format or a digital television format or both. In another embodiment, the television receiver is formed as a monolithic integrated circuit.

The present invention is better understood upon consideration of the detailed description below and the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram of a dual-format television receiver according to one embodiment of the present invention.

FIG. 2 is a block diagram illustrating alternate embodiments of the signal output circuit which can be incorporated in the dual-format television receiver of FIG. 1.

FIG. 3A is a block diagram of a dual-format television receiver system employing the television receiver of FIG. 1 according to one embodiment of the present invention.

US 7,265,792 B2

**3**

FIG. 3B is a block diagram of a dual-format television receiver system employing the television receiver of FIG. 1 according to an alternate embodiment of the present invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In accordance with the principles of the present invention, a dual-format television (TV) receiver for receiving analog and digital TV signals uses a single signal processing circuit for processing the received input RF television signal. The dual-format television receiver provides output signals indicative of the analog or digital television format of the received television signal. The output signals can be coupled to demodulators and/or decoders to generate the baseband signals and subsequently the video/audio signals for display or recording. In one embodiment, the dual-format TV receiver includes a frequency conversion circuit (a tuner), a digitizing IF circuit, a digital signal processor (DSP) circuit and a signal output circuit. In one embodiment, the dual-format TV receiver provides a first output signal that is the video baseband signal for television signals transmitted in the analog format, a second output signal that is the audio baseband signal for television signals transmitted in the analog format, and a third output signal that is the digital television (DTV) low-IF signals for television signals transmitted in the digital format.

The dual-format television receiver of the present invention provides many advantages not realized by conventional television receivers. First, by processing all signals in the digital domain, the TV receiver of the present invention eliminates the need for analog components, such as SAW filters. Thus, the TV receiver of the present invention can be readily integrated in one integrated circuit to reduce the size and the manufacturing cost of the receiver. In one embodiment, the dual-format TV receiver is formed as a monolithic integrated circuit. As such, the receiver integrates a large part of the components for a television receiver system into a single integrated circuit. A television receiver system incorporating the dual-format television receiver of the present invention can thus be built with minimal components, reducing the size and the overall manufacturing cost of the television receiver system. Another advantage of the dual-format TV receiver of the present invention is that the digital signal processor circuit of the receiver uses a single signal processing path to process television signals in either the analog format or the digital format. Thus, the need to duplicate components is entirely obviated. Finally, the digital signal processor circuit can be readily reconfigured to support multi-standard reception, thereby enabling the television receiver of the present invention to be used in any geographical area of interest.

FIG. 1 is a schematic diagram of a dual-format television receiver according to one embodiment of the present invention. Referring to FIG. 1, a dual-format television receiver **100** includes a signal input terminal **102** for receiving incoming RF signal, a first output terminal **104** for providing a first output signal for television signals transmitted in the analog format, a second output terminal **105** for providing a second output signal for television signals transmitted in the analog format, and a third output terminal **106** for providing a third output signal for television signals transmitted in the digital format. The signal input terminal and output terminals of receiver **100** can be configured as single-ended or differential terminals, depending on the applications.

**4**

In the present embodiment, signal input terminal **102** is a single-ended input terminal. In an alternate embodiment, a differential input terminal can also be used. When signal input terminal **102** is a differential input terminal, receiver **100** further includes a balun transformer to convert the differential input signals into a single-ended signal, as is well understood by one of ordinary skill in the art.

Furthermore, in the present embodiment, first and second output terminals **104**, **105** are single-ended output terminals while third output terminal **106** is a differential output terminal. Third output terminal **106** therefore includes two signal ports providing differential signals. In the present description, a differential output terminal is sometimes referred to as an "output terminal" but it is understood that the differential output terminal actually includes two signal ports. As will be described in more detail below, each of the output terminals of receiver **100** can be configured as either a differential output terminal or a single-ended output terminal or two single-ended output terminals can be used to provide differential output signals. Moreover, receiver **100** can provide output signals in either analog or digital format on one or more output terminals. Thus, the output signals corresponding to the video and audio signals for analog television signals can be provided in either analog or digital format and using single-ended or differential output terminals. Similarly, the output signals corresponding to the video and audio signals for digital television signals can be provided in either analog or digital format and using single-ended or differential output terminals.

Dual-format TV receiver **100** processes the incoming RF signal and provides output signals depending on the television format of the incoming RF signal. When the incoming RF signal is in the analog television format, receiver **100** provides first and second output signals which can be decoded to generate the video and audio signals for display. When the incoming RF signal is in the digital television format, receiver **100** provides the third output signal which can be demodulated and decoded to generate the video and audio signals for display. In one embodiment, the dual-format TV receiver **100** is formed as a monolithic integrated circuit. Thus, an integrated circuit implementing TV receiver **100** of the present invention can include as few as five pins in the present embodiment, apart from the power supply and ground pins. As will be discussed in more detail below, in other embodiments of the dual-format TV receiver of the present invention, an integrated circuit implementing TV receiver **100** of the present invention can include as few as three pins, apart from the power supply and ground pins.

Referring to FIG. 1, receiver **100** includes a frequency conversion circuit **110** (or tuner circuit **110**), a digitizing IF circuit **120**, a digital signal processor (DSP) circuit **130** and a signal output circuit **140**. Frequency conversion circuit **110** receives input RF signals on signal input terminal **102**. The input RF signals can be received from terrestrial broadcast or cable transmissions. Frequency conversion circuit **110** operates to convert the input RF signal to an intermediate frequency (IF) signal using one or more frequency conversions. In the present illustration shown in FIG. 1, the input RF signal is first coupled to a RF tunable filter **111** which is a bandpass filter. Then, the filtered signal is coupled to a variable gain low noise amplifier **112**. The output signal of amplifier **112** is coupled to a bandstop filter **113** which is also known as a "notch filter." The output signal of bandstop filter **113** is then coupled to a mixer **114**, controlled by a phase-locked loop **115**. Mixer **114** operates to tune the filtered input RF signal to the desired frequency range in one or more frequency conversions and generate the IF signal. Frequency

US 7,265,792 B2

| 5 | 6 |

conversion circuit 110 provides the IF signal on a terminal 116 have a preselected intermediate frequency.

In accordance with the present invention, frequency conversion circuit 110 can be designed to generate IF signals having an intermediate frequency of any values. The IF used by tuner 110 can be the same as or different than the IF specified by the worldwide standards. Furthermore, as receiver 100 uses a single digital signal processor for signal processing, tuner 110 can use the same IF for receiving analog or digital television signals in any standards. The value of the IF in an integrated tuner is a matter of design choice. In one embodiment, the IF is selected to be 20 MHz or higher.

The IF signal generated by frequency conversion circuit 110 having a preselected intermediate frequency is provided to digitizing IF circuit 120 of receiver 100. Digitizing IF circuit 120 includes a bandpass filter 121, a variable gain amplifier 122 and an analog-to-digital converter (ADC) 123. The IF signal is filtered by bandpass filter 121. Then, amplifier 122 operates on the filtered IF signal for the purpose of regulating the dynamic range of ADC 123. ADC 123 operates to digitize the analog IF signal and provide a digital IF signal on a terminal 124. Receiver 100 thereby performs subsequent processing in the digital domain entirely. By applying the appropriate sampling frequency at ADC 123 and the appropriate signal processing functions at DSP circuit 130, receiver 100 can handle television signals in any format (analog or digital) and in any standard (e.g.: NTSC, PAL, SECAM, DVB or ATSC).

In the present embodiment, ADC 123 is a 10-bit converter and has a sampling rate of up to 40 megasamples per second. In other embodiments, ADC 123 can have other resolution and in most applications, a resolution of greater than 9 bits will suffice. The sampling frequency of ADC 123 is selected based on the intermediate frequency of the IF signal and should be at least larger than twice the bandwidth of the intermediate frequency signal. The sampling frequency of ADC 123 can be adjusted by using a voltage controlled oscillator and a phase locked loop (not shown in FIG. 1). In an alternate embodiment, a tuning control circuit (not shown) can be included for adjusting the sampling frequency of ADC 123. The tuning control circuit can receive a control signal external to receiver 100, such as a manual control signal from a user. The tuning control circuit can also perform auto-detection of the intermediate frequency of the IF signals and adjust the operating frequencies of the ADC accordingly.

After the IF signal is filtered and digitized, the digital representation of the signal is processed by a digital signal processor (DSP) 131 in DSP circuit 130. DSP 131 processes the digital IF signal according to the television format and standard to which the input RF signal is encoded. In the present illustration, DSP circuit 130 includes a format/ standard selection circuit 133 for selecting between the several analog television standards and the several digital television standards. DSP 131 applies the appropriate filter function, such as an impulse response, to the digital IF signals received on terminal 124 depending on the state of format/standard selection circuit 133. In one embodiment, the coefficients of the filter functions are stored in a look-up table in a memory 132 in DSP circuit 130. DSP 131 retrieves the coefficients from memory 132 to be applied to the incoming digital signals.

DSP 131 is a programmable and reconfigurable processor. In the present embodiment, DSP 131 implements a finite impulse response (FIR) filter which is reconfigured based on the TV standard selected. Furthermore, in the present embodiment, DSP 131 includes two computing units to speed up the computation time. Specifically, the filtering operations of the real and imaginary parts in the frequency domain are carried out in parallel. In other embodiments, DSP 131 may include only one computing unit.

Format/standard selection circuit 133 can be implemented in one of many ways. The selection of the correct format and television standard can be made manually by the user of the television system, such as by activating a switch, or the selection can be made automatically by providing an auto-detection capability in receiver 100. In the present embodiment, auto-detection is implemented by detecting in the first and second output signals the presence or absence of carrier signals which uniquely identify the television formats and standards. For example, analog television signals can be identified by the analog visual carrier signal while digital television signals can be identified by the pilot carrier. A detection circuit can be included in receiver 100 for generating a signal which is fed back to format/standard selection circuit 133 indicating which television format and standard the input signal is encoded. In other embodiments, other means for selecting between the different formats and standards can be used.

When the input RF signal is an analog television signal, DSP 131 applies a video filter function and a sound filter function to the digitized signals to separate the video signals from the audio signals. The video and sound filters can be implemented as FIR filters. DSP 131 can also implement other filter functions such as ghost cancellation for reducing the interference of the input signal. The filter response is then derived from the measured channel response. In the present embodiments, DSP 131 generates a processed IF signal on terminal 134 as the video baseband signal and a processed IF signal on terminal 135 as the audio baseband (or sound IF) signal.

When the input RF signal is a digital television signal, DSP 131 applies a filter function to the digitized signals. The filter function can be implemented as a FIR filter. An example is the ATSC-VSB standard where the filter response is specified as raised root cosine with 0.1152 roll-off (refer to the ATSC A-53 specification). Furthermore, additional filter functions, such as an equalizer for echo cancellation (multipath), can also be implemented in DSP 131. The filter response is then derived from the measured channel response. In the present embodiment, DSP 131 also performs a down-conversion function for converting the IF signal into a low IF signal.

The processed IF signals on terminals 134 and 135 are coupled to signal output circuit 140 to be converted into the desired output signals. In accordance with the present invention, signal output circuit 140 can assume various configurations to provide output signals in different formats. A configuration for signal output circuit 140 can be selected based on factors such as the desired pin count for receiver 100 and the desired format for the output signals. One useful feature of signal output circuit 140 is that the signal output circuit can be configured to provide output signals for analog TV format and digital TV format simultaneously. That is, a first set of output signals can be provided for the television signals received in the analog television format and a second set of output signals can be provided for the television signals received in the digital television format so that television signals for both analog and digital formats can be displayed at the same time. Simultaneous display of analog and digital television signals is not possible in the conventional television receivers as the conventional television

A000097

US 7,265,792 B2

7

receivers carry out input or output switching operation to select only one of the two television signals to be processed.

FIG. 1 illustrates one embodiment of a signal output circuit which can be incorporated in receiver 100 of the present invention. Other embodiments of the signal output circuit are shown in FIG. 2. Referring first to FIG. 1, signal output circuit 140 includes a digital-to-analog converter (DAC) 141 coupled to a low pass filter 142. The processed digital signals provided by DSP 131 on terminal 134 is coupled to DAC 141 to be converted back to analog format. The analog signal is filtered by low pass filter 142 to smooth out the signal. The filtered analog signal is coupled to a first driver 143 to provide a first output signal for analog television format on output terminal 104 and also to a second driver 144 to provide a third output signal for digital television format on output terminal 106. Meanwhile, DSP 131 also provides the processed digital sound signal on terminal 135 to a DAC 145. The output signal from DAC 145 is coupled to a third driver 146 to provide a second output signal on output terminal 105 for the analog television format. In the present embodiment, driver 143 and driver 146 are single-ended drivers while driver 144 is a differential output driver. In one embodiment, driver 144 is a low voltage differential signaling driver.

As thus configured, signal output circuit 140 provides analog television signals on output terminals 104 and 105 and digital television signals on output terminal 106 which is a differential output terminals (2 signal ports). In the present embodiment, the first output signal is a Composite Video Baseband Signal (CVBS) for analog television signals and the second output signal is the audio baseband signal for analog television signals. The third output signal is a DTV low-IF signal for digital television signals.

Turning now to FIG. 2 where alternate embodiments of the signal output circuit are shown. Referring to FIG. 2, in a first alternate embodiment, a signal output circuit 340 includes a digital-to-analog converter (DAC) 341 receiving the processed digital IF signal. The output terminal of DAC 341 is coupled directly to a first driver 343 providing a first output signal being the video baseband signal (CVBS) for analog television and a second driver 344 providing the DTV low-IF signal for digital television. Signal output circuit 340 eliminates the low pass filter that is used in signal output circuit 140 of FIG. 1. By providing DAC 341 with increased sample frequency, the low pass filter can be eliminated and signal output circuit 340 can be simplified as compared to signal output circuit 140. In signal output circuit 340, a DAC 345 coupled to a third driver 346 provides the audio baseband signal for analog television. Drivers 343 and 346 are single-ended drivers while driver 344 is a differential output driver.

In a second alternate embodiment, a signal output circuit 440 includes a digital-to-analog converter (DAC) 441 receiving the processed digital IF signal. The output terminal of DAC 441 is coupled directly to a first driver 443. DAC 441 and first driver 443 form the output signal path for the video baseband signals (CVBS) for analog television. A DAC 445 and a driver 446 form the output signal path for the audio baseband signals for analog television. For the digital television signals, signal output circuit 440 includes a serializer 442 for converting the processed digital IF signal from the DSP circuit into a serial digital data stream. In this manner, the digital signals for digital television can be provided to a digital demodulator through a serial digital interface. In signal output circuit 440, the serial digital data stream is coupled to a second driver 444 which is a differential output driver. In one embodiment, driver 444 is a low

8

voltage differential signaling (LVDS) driver providing the DTV low-IF signal as low voltage differential signals.

In a third alternate embodiment, a signal output circuit 540 includes a first serializer 541 and a second serializer 542 so that the video signals from the signal output circuit are provided as serial digital interfaces. In this embodiment, first serializer 541 receives the processed digital IF signal and provides a serial digital data stream to a first driver 543. Driver 543 is a differential output driver and drives the serial digital data stream onto an output terminal 504. Serializer 542 and driver 544 form a parallel data path providing a serial digital data stream on an output terminal 506. The serial digital data on output terminal 504 can be coupled to a decoder circuit for decoding into video signals for analog television. An analog-to-digital converter may be included in the decoder circuit to convert the serial digital data into an analog format. The serial digital data on output terminal 506 can be coupled to a digital demodulator and a decoder for demodulating and decoding the digital television signals. A DAC 545 and a driver 546 form the output signal path for the audio baseband signals for analog television.

In the signal output circuits described above, the signal output circuits are configured to provide separate output signals for the analog television signal and the digital television signal. In a fourth alternate embodiment, a signal output circuit 640 includes a single serializer 641 coupled to a driver 642 providing a serial digital data stream on a single output terminal 604. In the present embodiment, driver 642 is a differential output drive and output terminal 604 is a differential output terminal including two signal ports. A DAC 645 and a driver 646 form the output signal path for the audio baseband signals for analog television.

In signal output circuit 640, one output signal in differential format is provided on output terminal 607. The single serial digital data stream can be coupled through a serial digital interface to a demodulator circuit for demodulating the digital television signal or to a decoder circuit for decoding analog television signal. Alternately, the single serial digital data stream from signal output circuit 640 can be coupled to an integrated circuit incorporating both the digital demodulator circuit and the analog decoding circuit. In that case, the single output terminal 607 can be coupled to a single input terminal of the demodulator/decoder integrated circuit where the demodulator/decoder integrated circuit provides an output signal for analog television and an output signal for digital television.

In the embodiments described above with reference to FIG. 2, the serializer can implement any types of serial digital interface. For example, the serial digital interface can be an asynchronous interface or a synchronous interface. The serial digital interface can be a bit serial interface or can be implemented according to any known serial digital interface standards, including but not limited to ANSI/SMPTE 259M, ITU-R (CCIR) 601, 656, DVB-ASI (EN 50083-9).

Finally, in a fifth alternate embodiment, a signal output circuit 740 includes a DAC 741 receiving the processed digital IF signal. DAC 741 is coupled to a low-pass filter 742. The filtered analog output signal is provided to a first driver 743 and a second driver 744. Low-pass filter 742 is optional and is not needed when DAC 741 has a high sampling rate. A DAC 745 and a third driver 746 form the output signal path for the audio baseband signals for analog television. In the present configuration, the first, second and third drivers share a first output terminal 708 and a second output terminal 709. Because of the sharing of the output terminals, drivers 743, 744 and 746 are tristate drivers and can be selectively turned off so that only one driver drives

A000098

US 7,265,792 B2

9

the output terminal at a time. In this manner, the pin count for the dual-format television receiver is reduced while the receiver can still provide video/audio signals for either the analog or the digital television format. Specifically, first driver **743**, being a single-ended driver, drives video baseband signals (CVBS) onto first output terminal **708**. Third driver **746**, being a single-ended driver, drives audio baseband signals for analog television onto second output terminal **709**. When the analog video and audio television signals are to be displayed, driver **744** is turned off. Alternate, second driver **744**, being a differential output driver, drives the differential DTV low-IF signal onto first and second output terminals **708** and **109**. When the digital television signal is to be displayed, drivers **743** and **746** are turned off.

In the above embodiments, the signal output circuit generates the audio output signal for analog television using a DAC and a single-ended driver. This configuration is suitable when the sampling rate of the DAC is high enough so that no filtering of the converted analog signal is needed. In other embodiments, a low-pass filter can be added between the DAC and the single-ended driver. In that case, the sampling rate of the DAC can be reduced.

A salient feature of the dual-format television receiver of the present invention is the use of a single programmable digital signal processing path for processing the received television signal regardless of the television format and standard in which the television signal is transmitted. Furthermore, the receiver provides output signals for the analog or digital television signals simultaneously. The receiver of the present invention thus enables the construction of a dual-format TV receiver system for providing analog and digital television display signals. The receiver can be built as a monolithic integrated circuit providing a single chip solution to the tuner and signal processing function of an analog/digital TV receiver.

FIG. **3**A is a block diagram of a dual-format television receiver system employing dual-format television receiver **100** according to one embodiment of the present invention. Referring to FIG. **3**A, dual-format television receiver system **200** incorporates dual-format television receiver **100** for receiving and processing the incoming RF signal. In the present illustration, receiver **100** incorporates signal output circuit **140** (FIG. 1), **340**, **440** or **540** (FIG. 2). Thus, receiver **100** provides a video baseband signal (CVBS) for analog television, an audio baseband signal (sound IF), and a DTV low-IF signal for digital television. TV receiver system **200** includes the back-end circuits for generating the display signals and the audio playback signals for the television display.

In the present embodiment, the video baseband signal (CVBS) from receiver **100** is coupled to a decoder circuit **202**. Decoder circuit **202** can be implemented as a PAL/ SECAM/NTSC decoder circuit. Decoder circuit **202** provides video output signals on an output terminal **204** which can be coupled to a television for display. The sound IF signal from receiver **100** is coupled to a sound decoder circuit **212** to provide the audio output signals on a terminal **214** which can be coupled to a television for playback. Finally, the DTV low-IF signal is coupled to a demodulator circuit **206** for digital demodulation. Typically, digital television signals are modulated in a VSB, QAM or COFDM scheme. Demodulator circuit **206** operates to demodulate the DTV low-IF signal and generates an MPEG data stream as an output signal. The MPEG data stream generated by demodulator circuit **206** is coupled to a MPEG decoder circuit **208** to be decoded into the video and audio signals on

10

an output terminal **210**. The video and audio signals can then be provided to a television for display and playback.

FIG. **3**A illustrates one embodiment of a dual-format TV receiver system which can incorporate the dual-format television receiver of the present invention. Other embodiments of the TV receiver system are possible. In particular, the configuration of TV receiver system will depend on the configuration of the signal output circuit used by television receiver **100**. FIG. **3**B is a block diagram of a dual-format television receiver system employing television receiver **100** according to an alternate embodiment of the present invention.

Referring to FIG. **3**B, TV receiver system **250** includes receiver **100** which incorporates signal output circuit **740** (FIG. 2). Thus, receiver **100** includes only two output terminals: a first output terminal **708** and a second output terminal **709**. The two output terminals selectively provide the video baseband signals and audio baseband signals for analog television or the differential DTV low-IF signals. First output terminal **708** is coupled to a decoder circuit **252** for decoding analog television signals and to a demodulator circuit **256** for demodulating digital television signals. Demodulator circuit **256** is further coupled to a MPEG decoder circuit **258** to decode the MPEG data stream generated by the demodulator. Second output terminal **709** is coupled to a sound decoder circuit **262** for decoding sound IF signals for analog television. The second output terminal **709** is also coupled to demodulator circuit **256**. When digital television signals are being processed by receiver **100**, first and second output terminals **708**, **709** functions as the differential output terminals providing the differential output signals indicative of the DTV low-IF signal. TV receiver system **250** can be operated to provide either analog television signal display or digital analog television signal display.

The above detailed descriptions are provided to illustrate specific embodiments of the present invention and are not intended to be limiting. Numerous modifications and variations within the scope of the present invention are possible. For instance, FIG. **2** illustrates various embodiments of the signal output circuit of the dual-format television (TV) receiver of the present invention. However, other embodiments of the signal output circuit are possible and FIG. **2** is not intended to limit the configuration of the signal output circuit to those illustrated. As described above, the signal output circuit can provide output signals in either analog or digital format and the output terminals of the signal output circuit can be single-ended or differential output terminals. The present invention is defined by the appended claims.

We claim:

1. A television receiver comprising:
   a frequency conversion circuit for receiving an input RF signal and for converting the input RF signal to an intermediate frequency signal having an intermediate frequency (IF), the input RF signal encoding information in one of a plurality of television signal formats;
   an analog-to-digital converter for sampling the intermediate frequency signal and generating a digital representation thereof;
   a signal processor for processing the digital representation of the intermediate frequency signal in accordance with the television signal format of the input RF signal, the signal processor generating digital output signals indicative of information encoded in the input RF signal, wherein the signal processor applies one of a plurality of finite impulse response filters to the digital representation of the intermediate frequency signal,

US 7,265,792 B2

11

each of the plurality of finite impulse response corresponding to a format of the input RF signal; and

a signal output circuit for receiving the digital output signals from the signal processor and for providing one or more output signals corresponding to the digital output signals.

2. The television receiver of claim 1, wherein the plurality of television signal formats comprises an analog television format and a digital television format.

3. The television receiver of claim 1, wherein the television receiver is formed as a monolithic integrated circuit.

4. The television receiver of claim 1, wherein the signal output circuit provides a first output signal being a video baseband signal corresponding to an analog television format and a second output signal being an audio baseband signal corresponding to the analog television format.

5. The television receiver of claim 4, further comprising:

a first decoder circuit coupled to decode the video baseband signal for providing video display signals corresponding to the analog television format; and

a second decoder circuit coupled to decode the audio baseband signal for providing audio signals corresponding to the analog television format.

6. The television receiver of claim 5, wherein the first decoder circuit comprises a PAL/SECAM/NTSC decoder circuit.

7. The television receiver of claim 1, wherein the signal output circuit provides a first output signal and a second output signal corresponding to the digital output signals, the first output signal and the second output signal being differential output signals corresponding to a digital television format.

8. The television receiver of claim 7, further comprising:

a demodulator circuit for demodulating the first output signal and the second output signal according to the television signal format of the input RF signal, the demodulator circuit generating video and audio baseband signals corresponding to the format of the input RF signal; and

a decoder circuit coupled to decode the video and audio baseband signals for providing video and audio display signals corresponding to the digital television format.

9. The television receiver of claim 8, wherein the video and audio baseband signals comprise a MPEG data stream and the decoder circuit comprises a MPEG decoder circuit.

10. The television receiver of claim 1, further comprising:

a bandpass filter coupled to receive the intermediate frequency signal from the frequency conversion circuit and generate a filtered intermediate frequency signal; and

a variable gain amplifier coupled to receive the filtered intermediate frequency signal and provide the amplified, filtered intermediate frequency signal to the analog-to-digital converter.

11. The television receiver of claim 1, wherein the signal output circuit provides output signals in an analog or a digital signal format.

12. The television receiver of claim 1, wherein the signal output circuit comprises one or more output terminals, each of the one or more output terminals of the signal output circuit comprises a single-ended output terminal or a differential output terminal.

13. The television receiver of claim 1, wherein the signal output circuit comprises:

a first digital-to-analog converter coupled to receive digital output signals from the signal processor and convert the digital output signals to analog output signals;

12

a first driver circuit for driving the analog output signals from the first digital-to-analog converter onto a first output terminal;

a second driver circuit for driving the analog output signals from the first digital-to-analog converter onto a second output terminal;

a second digital-to-analog converter coupled to receive digital output signals from the signal processor encoding audio information and convert the digital output signals to analog output signals; and

a third driver circuit for driving the analog output signals from the second digital-to-analog converter onto a third output terminal,

wherein the first and second output terminals provide signals indicative of video and audio information encoded in the input RF signal and the third output terminal provides signals indicative of audio information encoded in the input RF signal.

14. The television receiver of claim 13, wherein the first driver circuit comprises a single-ended driver circuit for driving analog output signals corresponding to an analog television format, the analog output signals being video baseband signals; and the third driver circuit comprises a single-ended driver circuit for driving analog output signals corresponding to the analog television format, the analog output signals being audio baseband signals.

15. The television receiver of claim 13, wherein the second driver circuit comprises a differential output driver circuit for driving analog output signals corresponding to a digital television format, the analog output signals being DTV low-IF signals, and wherein the second output terminal comprises a first differential output terminal and a second differential output terminal.

16. The television receiver of claim 13, wherein the signal output circuit further comprises:

a low pass filter coupled between the first digital-to-analog converter and the first and second driver circuits, the low pass filter providing low pass filtering function.

17. The television receiver of claim 13, wherein the signal output circuit further comprises:

a low pass filter coupled between the second digital-to-analog converter and the third driver circuit, the low pass filter providing low pass filtering function.

18. The television receiver of claim 1, wherein the signal output circuit comprises:

a first digital-to-analog converter coupled to receive digital output signals from the signal processor and convert the digital output signals to analog output signals;

a first driver circuit for driving the analog output signals from the first digital-to-analog converter onto a first output terminal;

a second driver circuit for driving the analog output signals from the first digital-to-analog converter, the second driver circuit comprising a differential output driver circuit having a first differential output terminal and a second differential output terminal, the first differential output terminal being coupled to the first output terminal and the second differential output terminal being coupled to a second output terminal;

a second digital-to-analog converter coupled to receive digital output signals from the signal processor encoding audio information and convert the digital output signals to analog output signals; and

a third driver circuit for driving the analog output signals from the second digital-to-analog converter onto the second output terminal,

US 7,265,792 B2

13

wherein the first and second output terminals provide differential output signals indicative of video and audio information encoded in the input RF signal when the input RF signal has a digital television signal format; and the first output terminal provides video information encoded in the input RF signal and the second output terminal provides signals indicative of audio information encoded in the input RF signal when the input RF signal has an analog television signal format.

**19**. The television receiver of claim **18**, wherein the signal output circuit further comprises:

a low pass filter coupled between the first digital-to-analog converter and the first and second driver circuits, the low pass filter providing low pass filtering function.

**20**. The television receiver of claim **1**, wherein the signal output circuit comprises:

a first serializer circuit coupled to receive the digital output signals from the signal processor and convert the digital output signals to a serial digital data stream;

a first driver circuit comprising a differential output driver for driving the serial digital data stream from the first serializer onto a first output terminal and a second output terminal;

a first digital-to-analog converter coupled to receive digital output signals from the signal processor encoding audio information and convert the digital output signals to analog output signals; and

a second driver circuit for driving the analog output signals from the first digital-to-analog converter onto a third output terminal,

wherein the first and second output terminals provide differential output signals indicative of video and audio information encoded in the input RF signal when the input RF signal has a digital television signal format and provide differential output signal indicative of video information when the input RF signal has an analog television signal format; and the third output terminal provides signals indicative of audio information encoded in the input RF signal when the input RF signal has an analog television signal format.

**21**. The television receiver of claim **20**, wherein the first, second and third output terminals of the signal output circuit are coupled to a demodulator-decoder circuit, the demodulator-decoder circuit demodulating the serial digital data stream when the data stream corresponds to a digital television format and the demodulator-decoder circuit decoding the serial digital data stream when the data stream corresponds to an analog television format.

**22**. The television receiver of claim **20**, wherein the signal output circuit further comprises:

a second digital-to-analog converter coupled to receive the digital output signals from the signal processor and convert the digital output signals to analog output signal; and

14

a third driver circuit for driving the analog output signals from the second digital-to-analog converter onto a fourth output terminal,

wherein the fourth output terminal provides signals indicative of video information encoded in the input RF signal when the input RF signal has an analog television signal format.

**23**. The television receiver of claim **20**, wherein the signal output circuit further comprises:

a second serializer circuit coupled to receive the digital output signals from the signal processor and convert the digital output signals to a serial digital data stream; and

a third driver circuit comprising a differential output driver for driving the serial digital data stream from the second serializer onto a fourth output terminal and a fifth output terminal,

wherein the first and second driver circuits drive the serial digital data stream corresponding to a digital television format and the fourth and fifth driver circuits drive the serial digital data stream corresponding to an analog television format.

**24**. The television receiver of claim **1**, wherein the plurality of finite impulse response filters are stored in a memory, and the signal processor indexes the memory to retrieve one of the plurality of finite impulse response filters.

**25**. The television receiver of claim **1**, wherein the signal processor comprises a first computing unit and a second computing unit, the first computing unit processing a real part of the finite impulse response filter operation while the second computing unit processing an imaginary part of the finite impulse response filter operation.

**26**. The television receiver of claim **1**, further comprising a format/standard selection circuit coupled to the signal processor, the format/standard selection circuit generating a select signal indicative of a format of the input RF signal and the signal processor selecting a finite impulse response filter in response to the select signal.

**27**. The television receiver of claim **26**, wherein the format/standard selection circuit generates the select signal in response to an input signal from a user.

**28**. The television receiver of claim **26**, wherein the format/standard selection circuit generates the select signal by detecting carrier signals identifying one of the formats of the input RF signals.

**29**. The television receiver of claim **1**, wherein the input RF signal comprises an RF signal received from terrestrial broadcast, an RF signal received from satellite broadcast, and an RF signal received from cable transmission.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 7,265,792 B2

APPLICATION NO.  : 10/884347

DATED          : September 4, 2007

INVENTOR(S)    : Favrat et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 11, line 1 (claim 1 line 18), insert -- filters -- after "response."

Signed and Sealed this
Eleventh Day of March, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)(B)**

The undersigned, Counsel of Record for Appellant ***Cresta Technology***

***Corporation***, hereby certifies that this ***Brief of Appellant A*** Appellant ***Cresta***

***Technology Corporation*** complies with the type-volume limitation provided in

Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  In preparing this

Certificate, I relied on the word-count function of Microsoft Word 2010.  This

Brief contains 13,688 words.

Dated:  March 28, 2016                     Respectfully submitted,

                                        By:  */s/ Craig R. Smith*
                                             Craig R. Smith (*Lead Counsel*)
                                             **LANDO & ANASTASI, LLP**
                                             Riverfront Office Park
                                             One Main Street – 11th Floor
                                             Cambridge, MA 02142
                                             Tel: (617) 395-7000
                                             Fax: (617) 395-7070
                                             Email:  csmith@lalaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2016, I caused the foregoing ***Brief of Appellant, Cresta Technology Corporation*** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following persons:

Peter J. Ayers
**LEE & HAYES, PLLC**
11501 Alterra Parkway, Ste 450
Austin, TX 78758
Tel: 512.505.8162
Fax: 512.605.0269
Email:  peter@leehayes.com

Mark D. Fowler
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303
Tel: 650-833-2000
Fax: 650-833-2001
Email:  mark.fowler@dlapiper.com

Dated:  March 28, 2016

Respectfully submitted,

By:  */s/ Craig R. Smith*
Craig R. Smith (*Lead Counsel*)
**LANDO & ANASTASI, LLP**
Riverfront Office Park
One Main Street – 11th Floor
Cambridge, MA 02142
Tel: (617) 395-7000
Fax: (617) 395-7070
Email:  csmith@lalaw.com